Joseph Page
PO Box 19735
Las Vegas, NV 89132
jpage@josephpage.com
702 849 4805
*Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| JOSEPH PAGE,<br><br>                    Plaintiff,<br><br>v.<br><br>ELLENOFF GROSSMAN & SCHOLE LLP,<br><br>                    Defendant. | Case No.:<br><br>COMPLAINT FOR:<br>1. Negligence;<br>2. Legal Malpractice;<br>3. Breach of Contract; and<br>4. Breach of Fiduciary Duty<br><br>**DEMAND FOR JURY TRIAL** |
| --- | --- |

Plaintiff Joseph Page does hereby allege:

**PARTIES**

1.      Plaintiff Joseph Page, hereinafter PAGE, is resident in Paradise, Nevada since at least 2000.

2.      Defendant Ellenoff Grossman & Schole LLP, herein ELLENOFF, is organized as a limited liability partnership operating as a very sophisticated New York headquartered law

firm providing legal services world-wide including representation of clients from all parts. All attorney partner members of ELLENOFF are natural persons who are citizens of various states.

**JURISDICTION AND VENUE**

3.      This court has jurisdiction pursuant to 28 U.S.C. §1332(a) as claims alleged herein include those having an amount in controversy of not less than $75,000 and Defendant is citizen of New York while Plaintiff is a Nevada citizen.

4.      In addition, Defendant ELLENOFF performed legal services for Plaintiff and these legal services specifically relate to preparation of matter in support of securities transactions including sales of federally regulated securities, SEC reporting among others, and still further patent related questions.

5.      Defendant ELLENOFF is resident within this District and their primary headquarters is within the District.

6.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) a substantial portion of acts and omissions complained of and giving rise to these claims - occurred in New York.

7.      The transaction at bar primarily includes the exchange of shares of RocketFuel Blockchain Company and federally regulated securities of B4MC Gold Mines Inc., the property in question, each of which are Nevada corporate entities.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SUMMARY

8.    On March 5 2018, ELLENOFF was hired by RocketFuel Blockchain Company, herein RBC, **and its associates** including RBC's Officer PAGE, as legal counsel to represent them in an anticipated MERGER transaction, herein 'MERGER'.

9.    On or about April 10, 2018, months prior to said transaction, PAGE cooperated with ELLENOFF by responding to the April 3, 2018, email request of ELLENOFF Partner John Stellabotte, by providing the full patent prosecution histories, 'IFW', as downloaded from the USPTO.

10.    On June 27, 2018, RBC merged with B4MC Gold Mines Inc., B4MC, to form a parent-subsidiary relationship.

11.    Unbeknownst to PAGE and quite remarkably, ELLENOFF failed to convey or otherwise adequately disclose to B4MC materials developed in the due diligence investigation including at least the patent file histories and important information contained therein, among other, the information developed in ELLENOFF's due diligence investigation done prior to the MERGER.

12.    B4MC Director Bennett Yankowitz claims to have first discovered on August 21, 2019, more than 1 year after the MERGER, important details relating to the patent prosecution – details that were fully disclosed in the materials PAGE provided to ELLENOFF.

13.     B4MC, then RocketFuel Blockchain Inc., RBI, by way of name change, claims it was not properly advised of the patent applications' status and with particular regard to their abandonments.

14.     As a direct result of ELLENOFF's misconduct, negligence, and due diligence reporting failures, on October 8, 2020, B4MC/RBI sued PAGE with an amount in controversy ***greater than $50 million*** for *fraud*, *securities violations*, *breach of fiduciary duty*, *unjust enrichment*, among others, alleging 'misrepresentation and omission' on PAGE's part in relation to the patent applications he conveyed by assignment to its subsidiary RBC prior to the Merger.

## INTRODUCTION
### Facts common to all causes of action

15.     In December 2017, Henrik Oerbekker, hereinafter OERBEKKER, Henrik Rouf, ROUF, Gert Funk, FUNK, met with Plaintiff Joseph Page, PAGE, at Gerhardt's Bar in the Fontvieille district of Monaco for an organizational meeting regarding a business proposal including a MERGER of two companies wherein a publicly traded shell company and a newly formed intellectual property holding company would be combined, herein MERGER.

***The Proposal***

16.     The Monaco meeting was memorialized in a *non-binding* written "proposal", herein PROPOSAL, dated January 8, 2018 (Exhibit A) that set forth the deal. Accordingly to the proposal, upon completion of the proposed merger, PAGE and FUNK were to receive 90%

of the holding company in consideration for valuable intellectual property including five blockchain eCommerce patent applications.

17.    Because it is now very well recognized that blockchain technologies will have a remarkable impact on future of finance, these technologies command very high valuations. This is especially true for matters related to eCommerce such as PAGE's inventions. For this reason, PacificWave Partners offered PAGE a compensation in an amount greater than $75,740,000 embodied as 7,650,591 shares of B4MC which traded at $9.90 just prior to the merger.

18.    In furtherance of the PROPOSAL, RBC, was formed and incorporated in Nevada as an intellectual property holding company. Since inception, PAGE was a shareholder and Officer of RBC. Still further, PAGE was a prospective Director and Officer of the soon to be Merged companies.

19.    Previously existing publicly-traded Nevada shell company, B4MC, having Bennett Yankowitz, YANKOWITZ, as President, Sole Director, Secretary and Treasurer was the target for MERGER with the newly formed RBC in accordance with the PROPOSAL authored by ROUF and OERBEKKER's investment entities 'PacificWave Partners'. The shell was primarily, 97%, controlled by ROUF and OERBEKKER via their various PacificWave entities.

**RBC hires ELLENOFF**

20.     Very soon after its formation, RBC, its officers and associates, specifically including PAGE, hired Defendant law firm Ellenoff Grossman & Schole LLP, to represent them in the proposed MERGER transaction including "*all necessary due diligence*" and "*all other work necessary to consummate the Merger*". Engagement Agreement dated March 2, 2018, executed March 5, 2018 (Exhibit B) clearly sets forth the contract for legal services including further details of the legal work to be performed for both RBC and B4MC/RBI.

### *The Merger*

21.     The PROPOSAL contemplated two coupled transactions. In a first transaction that occurred in March 2018, five patent applications owned by PAGE through a company he controlled, Blockchain Inc., were conveyed to RBC by assignment. A few months later on June 27, 2018, in a second, separate but related transaction, the '*MERGER*' defined by a 'Contribution Agreement' (Exhibit C), PAGE exchanged 300 RBC shares for 5,100,394 B4MC shares.

22.     At the time of the MERGER on June 27, 2018, RBC, represented by ELLENOFF, had been the duly recorded owner and assignee of the 5 patent applications for 3 months, or since March 28, 2018.

### *Patent Value*

23.     In March 2018, B4MC shares traded freely on duly regulated open markets and exchanges without manipulation, in which independent persons having free access to information about the company valued B4MC shares at $9.90 per.

24.     At the time of the assignment of the patents, March 2018, PacificWave Partner's expert valuation as a fair market value for the patent portfolio was over $75 million ($9.9 X 7,650,591 shares). PAGE similarly valued the Intellectual Property at $75,000,000 by his own independent appraisals. Thus, PAGE, PacificWave Partners, RBC, B4MC *and* the free trading public each *independently* valued the patent portfolio at more than $75 million on the day the patents were conveyed to RBC.

25.     As part of their careful preliminary work, ELLENOFF determined that proposed patent application assignment documents of March 21, 2018 may have been imperfect, possibly contained errors or other defects, and were perhaps not fully operable. ELLENOFF worked together by telephone to resolve errors and further discuss details regarding the conveyance of the patent applications. Ellenoff thus assisted with preparation and filing of replacement assignments and these replacement assignments effectively operated to transfer ownership of PAGE's valuable intellectual property, the five patent applications, to RBC on March 28, 2018.

26.     In furtherance of the anticipated MERGER and preparation therefor, ELLENOFF continued its due diligence investigation of the patent portfolio. In particular, on April 3, 2018 ELLENOFF Patent Attorney John Stellabotte requested by email the complete patent prosecution history, the 'Image File Wrappers', or IFWs. In direct response to ELLENOFF's request for the IFWs, on or about April 10, 2018, PAGE retrieved the most recent copies directly from the USPTO and transmitted the complete prosecution history for all five patent applications to ELLENOFF.

27.     Thus, since on or about April 10, 2018, more than two months prior to the closing date of the MERGER, ELLENOFF had the *entire* patent prosecution history as provided by PAGE.

28.     PAGE provided the complete patent application prosecution history to his attorneys at ELLENOFF with the belief that ELLENOFF would have a firm understanding regarding which disclosures were necessary to be made, to whom, and how to properly make those disclosures and in what manner, form and forum. PAGE relied upon ELLENOFF to do this properly.

29.     PAGE is not an expert in either securities or company merger laws and thus PAGE relies upon ELLENOFF to handle these task in his name, and it is precisely this very task that ELLENOFF was contracted to do in accordance with their written agreement of March 5, 2018.

30.     PAGE relied upon ELLENOFF as counsel to know exactly how to execute all aspects of the complex MERGER transaction properly – including preparing all the necessary clauses of the 'Contribution Agreement' and making all required disclosures to parties of the transaction.

31.     The patent application prosecution record duly transmitted to ELLENOFF early in April included all information and the entire record without omission regarding the patent

applications and very particularly '*the critical information as to the abandonment of the patent applications*' as explicitly stated by RBC in related pleadings[1] (Exhibit D).

32.     PAGE, as Officer of RBC, and contemplated Director and Chief Technology Officer of B4MC post-MERGER, submitted to all of ELLENOFF's investigatory questions and other inquires with understanding that ELLENOFF would properly represent PAGE in the coming MERGER, and where necessary and proper, make all disclosures and statements required for perfect execution of the MERGER's 'Contribution Agreement', in accordance with the contract for legal services which bound ELLENOFF and PAGE in the attorney-client relationship.

33.     ELLENOFF was, in part, *successful* in their representation of PAGE when preparing certain required disclosures. ELLENOFF *properly* prepared necessary SEC disclosures for PAGE in view of his role as a B4MC/RBI Director and Officer.

34.     In March 2018, B4MC and ELLENOFF caused to be transmitted to PAGE a 'D&O Questionnaire' (Exhibit E) in which they informed PAGE that ELLENOFF was legal counsel for B4MC. The document includes identification of its origin from B4MC, defines the 'Company' to include:

> "All officers, directors, nominees for officers or directors, and affiliated 5% stockholders of B4MC Gold Mines, Inc.,",

---

[1] RBC's SAC in 1:21-cv-01764, Southern District of New York, @ ¶95

and clearly announces ELLENOFF as '*our outside legal counsel*'.

35.     The document fashioned as a 'Directors and Officers Questionnaire…' further includes clear indication of the purpose of the document: that it was in support of the anticipated MERGER – precisely: "in connection with the preparation of the merger transaction". An excerpt in pertinent part is reproduced here for convenience.

**B4MC GOLD MINES, INC.**

**DIRECTORS, OFFICERS AND PRINCIPAL STOCKHOLDERS**
**QUESTIONNAIRE FOR 2017 ANNUAL REPORT AND 2018 PROXY MATERIALS**

**INSTRUCTIONS**

All officers, directors, nominees for officers or directors, and affiliated 5% stockholders of B4MC Gold Mines, Inc., a Nevada corporation (the "**Company**"), are required to complete this request for information (this "**Questionnaire**") in connection with the preparation of the merger transaction documents between the Company and Rocketfuel Blockchain Company as well as any materials to be filed with the Securities and Exchange Commission ("**SEC**") in relation to such transaction. |

Please provide all the information requested, and if any item is inapplicable, please so state. Information should be provided as of the date of your response, unless the question seeks a response as of a specified date. **Please complete and sign one copy of this Questionnaire and return it to Linda Kalayjian at Ellenoff Grossman & Schole LLP, 1345 Avenue of the Americas, 11th Floor, New York, NY 10105, as soon as possible.** If you have any questions regarding how to respond to any portion of this Questionnaire, please contact our outside legal counsel, Linda Kalayjian of Ellenoff Grossman & Schole LLP at (212) 370-1300 (lkalayjian@egsllp.com).

36.     PAGE completed the questionnaire, signed the document, and returned it directly to B4MC's outside legal counsel, ELLENOFF, in accordance with the instructions provided him by B4MC and ELLENOFF in anticipation of the coming MERGER expected in a few months.

37.     Thus, PAGE yielded to and fully submitted to ELLENOFF's authority as competent counsel and understood at all times that ELLENOFF duly represented both RBC and B4MC, and further represented PAGE as Officer and/or Director of both. As such, PAGE relied fully on ELLENOFF to execute the MERGER for which they under contract to perform – including all due diligence necessary.

38.     PAGE made disclosures to ELLENOFF in the due diligence investigation with the understanding ELLENOFF would organize and prepare the materials in accordance with law and submit it to all parties as proper and required – as part of the contracted legal services task explicitly defined in the 'Engagement Agreement' as:

"supervise and manage all necessary due diligence" and

"perform all other work, within our expertise, necessary to consummate the Merger".

39.     PAGE is not an attorney, has no formal education in law, is unable to make determinations as to procedure and disclosure requirements in complex MERGER type transactions involving federal securities, and as such, *relied upon* ELLENOFF to diligently perform the legal services for which they were contracted.

40.     The MERGER occurred on June 27, 2018 several months after the patent applications were acquired by RBC. Under the agreement, intellectual property holding company RBC merged with publicly traded shell company B4MC Gold Mines Inc., to form a parent-subsidiary relationship.

41.     ELLENOFF as RBC's competent legal counsel and *author* of the MERGER's 'Contribution Agreement' was expected by PAGE to understand precisely which statements and disclosures needed to be included in the document and what was not needed. ELLENOFF prepared the 'Contribution Agreement' in accordance with their expertise, and RBC, its Officers

and Directors *relied* upon ELLENOFF to execute the transaction with precision and skill and to use due professional care in perfecting and bringing about the MERGER as they promised.

42.     If the remarkable allegations raised in the first amended complaint of 2:21-cv-00103 (Exhibit F), District of Nevada, and the discovery production thereafter, are true, then ELLENOFF as RBC's counsel, *failed to properly inform B4MC* of the condition of the patent portfolio and somehow did not convey to B4MC Directors a complete due diligence reporting as required and expected.

43.     At all times up until being served the Complaint by B4MC/RBI and RBC in the end of November 2020, PAGE believed that ELLENOFF had in fact provided the entire patent files to B4MC and other parties as a report on ELLENOFF's due diligence findings in preparation for the MERGER.

44.     ELLENOFF had the complete record of the patent prosecution as duly provided by PAGE in April 2018, and further had a duty to disclose and provide same to B4MC and its Directors, but it now appears unfortunately, shockingly, ELLENOFF did not properly make the required disclosures to B4MC.

45.     Because the information was important as to the nature and condition of the patent applications, and was a significant part of or the entirety of the assets of RBC, ELLENOFF was *grossly negligent* in failing to disclose materials developed in their due

diligence investigation including the patent application IFWs for which they had been explicitly contracted to perform in the written contract for legal services.

46.    On May 29, 2019, PAGE lost confidence in his colleagues' ability to administer the company's operations as expected and resigned and left peaceably to pursue other ventures. At this time, PAGE ceased being a client of ELLENOFF.

47.    After PAGE's departure and B4MC/RBI and RBC having ownership of the patent applications for more than 15 months, RBI finally hired patent counsel Mark Kendrick to prosecute the patent applications. Upon examining the file, Kendrick asserts that he first *learned* the applications had been abandoned.

48.    When Kendrick and Yankowitz confronted PAGE regarding the status of the applications, PAGE duly reported to them both in writing and conversation – that they already had the IFWs and all of the information they sought was in those files.

49.    RBI's CFO YANKOWITZ, probably knew and is lying, or should have known but did not know, and wrongly believed PAGE failed to disclose the status of the patent applications prior to the MERGER when in fact PAGE did provide a complete disclosure of the patent prosecution history, the IFWs, to the attorneys at ELLENOFF on or about April 10, 2018, more than two months prior to the MERGER.

50.     On 10/08/2020, B4MC/RBI and RBC hired YANKOWITZ's law firm Shumaker Mallory LLP and *improperly* sued PAGE in Central District of California in matter 2:20-cv-09270 with the substantive allegations being repeated more than 54 times that PAGE "misrepresented or omitted" by failing to disclose the patent prosecution history and state of the patent applications. As a horrific and unending result, PAGE remains mired in continued litigation in Nevada as RocketFuel continues to prosecute false claims against PAGE – all as a result of ELLENOFF's gross incompetence.

51.     In stark contrast to the false allegations egregiously brought against PAGE, the record is now *uncontested* by all parties that PAGE directly provided to ELLENOFF as part of their due diligence investigation conduced under contract in April 2018 the complete prosecution record, without omission, as recorded in the USPTO, the IFWs.

52.     ELLENOFF senior and named partner Barry Grossman finally confirmed to YANKOWITZ and RBI on August 21, 2019 that PAGE did in fact provide the entire prosecution history to them months prior to the MERGER.

53.     As alleged by RocketFuel in their legal malpractice case against Ellenoff in a First Amended Complaint, ECF#7, SDNY 1:21-cv-01764 at ¶86 "EGS admitted facts reflecting some of its knowledge of some of its failures in due diligence which had not been known to RBI/RocketFuel".

54.     It appears from the record, ELLENOFF failed to duly inform B4MC Director YANKOWITZ of matters developed in the due diligence investigation conducted by them prior to the MERGER – specifically the patent prosecution history.

55.     As a result of ELLENOFF's failure to properly disseminate and/or disclose the information obtained in the due diligence to the Board of B4MC prior to the merger, RocketFuel mistakenly believed PAGE had defrauded them by misrepresenting the true status of the patent applications and in particular with regard to needing to be reconstituted via revival or refiling.

56.     The RocketFuel v. PAGE litigation filed in California in which RocketFuel sued PAGE for over $50,000,000 was transferred to District of Nevada as 2:21-cv-00103 in January 2021 and remains pending there this even date.

57.     PAGE had been living the good life in the South of France for the previous 4 years when he received service of B4MC/RBI and RBC's complaint via the Huissier[2] in Valbonne, France at his residence.

58.     Being subject of a lawsuit having an amount in controversy over $50 million is extremely stressful to PAGE and immediately triggered severe anxiety and mental distress accompanied by stress insomnia among other things.

---

[2] 'Huissier' is French for a kind of officer of the court similar to an American bailiff.

59.     In France, it is impossible to hire competent US litigation counsel with capacity to prosecution a Federal Case in Nevada.

60.     It is nearly impossible to conduct an effective defense without the ability to personally meet and confer and study evidence with counsel, conduct in-person mediation, conduct effective depositions and other discovery, conduct over-the-counter business with the Clerk of the Court, as necessary in a lengthy complex case such as that being prosecuted against PAGE.

61.     In further view of <u>severe</u> travel restrictions due to the global pandemic whose peak occurred in October 2020, PAGE was initially forced to defend the matter in *pro per* from Europe – a highly disadvantageous position with severe shortcomings that would effect his ability to bring about an effective defense.

62.     Because of the pandemic and ever-changing complex travel restrictions, PAGE was finally forced to abandon his residency in France at great financial expense and further emotional stress, and to re-establish temporary new residency within the District of Nevada in which the case against him is being heard for the sole purpose of defending the action.

63.     Because of gross negligence in handling of the due diligence for which ELLENOFF was contracted to perform, ELLENOFF failed to report on materials developed

therein including the record on patent prosecution which was in their possession since early in April 2018, as it was properly provided and disclosed to them by PAGE.

64.    But for ELLENOFF's failures to properly prepare required disclosures to B4MC prior to the MERGER as they were under contract to do, PAGE was sued for more than $50 million by B4MC/RBI and continues to suffer severe and extensive difficulties and financial burden this even date. But for ELLENOFF's failures to properly handle the due diligence and related disclosures, PAGE would not have been sued by B4MC/RBI and B4MC/RBI would have no causes of action against PAGE.

65.    Because of the grossly negligent handling and legal malpractice related to the pre-MERGER due diligence that ELLENOFF was contracted to perform, PAGE was improperly sued by B4MC/RBI and RBC causing severe anxiety, severe emotional distress, loss of productivity, and extensive financial losses which continue to mount, among others.

66.    While PAGE believed at all times that ELLENOFF *had* properly produced a full account on their due diligence investigation including full disclosure regarding the patent application prosecution and diligently provided same to B4MC *prior* to the MERGER as required, PAGE first learned with great horror and surprise when examining the record[3], that

---

[3] Second Amended Complaint in 1:21-cv-01764, Southern District of New York, RBI et al v. Ellenoff, at ¶95.

ELLENOFF Senior Partner Barry Grossman only transmitted the materials produced in the due diligence, *for the very first time* on August 21, 2019 – more than one year after the MERGER.

67.     Upon learning this, PAGE immediately thought it was some unusual litigation dirty-trick, typical of people who do dirty-tricks in litigation, PAGE is not a litigator and not apprised of all manner in which these dirty-tricks are brought about – and thought further that it could not possibly be true.

68.     At all times prior to this startling revelation, PAGE believed that ELLENOFF had duly shared the patent prosecution history PAGE provided to B4MC's Yankowitz in April 2018 – with ALL PARTIES entitled to review the due diligence and especially ALL PARTIES to the 'Contribution Agreement' who *necessarily* would consider the due diligence developed in view of the anticipated MERGER.

69.     PAGE relied upon his attorneys at ELLENOFF to present this material in the proper mode and manner commensurate with their legal obligation to do so.

70.     PAGE did at all times believe and understand that ELLENOFF as counsel for RBC would have and did make all proper and necessary disclosures to B4MC before, up to, and after the MERGER of June 27, 2018; but remarkably, somehow, they apparently did not.

71.     After being wrongly sued by B4MC for purportedly not disclosing the patent prosecution histories that were in fact properly disclosed to B4MC's attorneys ELLENOFF,

PAGE contacted Mr. John Stellabotte at his former law firm for assistance in rectifying the matter.

72.     PAGE sought his client files that would assist with his defense in proving that ELLENOFF had those materials since at least April 2018. Rather than assist PAGE, their former client from whom they took money for legal services, they very rudely and abruptly hung up the phone without explanation. In an act that was the absolute height of arrogance and unprofessionalism, John Stellabotte, immediately after learning the identity of the caller, shouted: "I can't talk to you!" and disconnected the call without explanation or any semblance of social manners whatever.

73.     PAGE continued polite efforts to seek his client files from ELLENOFF by requesting them directly from senior partner Barry Grossman and ELLENOFF's attorneys at Ackerman. To no avail. His requests were met with stark silence.

74.     Thus, PAGE is left without other recourse than bringing the present action against ELLENOFF this day.

**FIRST CLAIM FOR RELIEF**
**Negligence**

75.     PAGE repeats and realleges each and every allegation set forth in paragraphs 1 - 74 as if they were fully set forth here.

76.     ELLENOFF as counsel for RBC and *its associates*, by way of contract dated March 2, 2018, had a duty to RBC Officer PAGE to faithfully represent PAGE's interests and obligations in the complex MERGER transaction, including its patent due diligence conducted by ELLENOFF Partner John Stellabotte.

77.     ELLENOFF failed to properly disclose information including, but not limited to, the patent file histories to the parties of the MERGER agreement including failing to provide a due diligence report including the patent prosecution history to B4MC prior to the MERGER.

78.     ELLENOFF as counsel for RBC and *its associates*, had a duty to RBC Officer PAGE to prepare required disclosures to parties of the 'Contribution Agreement', specifically information in their possession related to patent prosecution including materials developed in the due diligence investigation conducted by ELLENOFF as provided by PAGE.

79.     ELLENOFF further had duty to PAGE as an *individual party* to the 'Contribution Agreement' to disclose to all other parties of the agreement materials developed as the due diligence investigation including the patent prosecution history that PAGE provided to ELLENOFF in April 2018.

80.     ELLENOFF breached duties they had to PAGE both in the capacity of RBC Officer and as an individual party to the agreement when ELLENOFF failed to disclose the patent prosecution record to B4MC and all parties of the 'Contribution Agreement'.

81.     PAGE was damaged by ELLENOFF's failures to inform B4MC and other parties to the MERGER when those parties and specifically RBI and RBC *wrongly* sued PAGE for more than $50 million causing severe financial burden and extreme emotional distress, among other damages.

82.     Because RBI and RBC have now consumed their entire financial resources prosecuting an improper lawsuit against PAGE due to ELLENOFF's negligence and other misconduct, rather than spending those resources advancing the technology for PAGE's benefit, PAGE has completely lost his valuable intellectual property as a direct result of ELLENOFF's failures.

83.     But for ELLENOFF's failures to prepare and present disclosures related to the patent applications as necessary, PAGE *would not* have been sued by RBC and RBI.

84.     ELLENOFF's failure to disclose the patent prosecution history to parties of the agreement was sole, direct, and proximate cause of these damages including the lawsuit against PAGE brought by RBI and RBC and the resulting financial, other tangible and intangible damages, but not less than $75,000,000.

85.     Because ELLENOFF's actions were highly reckless, wanton and otherwise shocking, punitive damages are appropriate and sought by PAGE in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Legal Malpractice**

86.     PAGE repeats and realleges each and every allegation set forth in paragraphs 1 -
85 as if they were fully set forth here.


87.     ELLENOFF was duty-bound to PAGE in an *attorney-client* relationship by way
of Engagement Agreement of March 2, 2018 as PAGE was both an associate and Officer of
RBC.


88.     ELLENOFF and at least five of its attorneys did not perform to an accepted
professional standard of due care in performance of legal services executed under the contract
for same when they failed to make necessary and appropriate disclosures to parties of the
MERGER, particularly the patent application prosecution history provided by PAGE in April
2018.


89.     As such, ELLENOFF was *negligent* in their performance of legal work in
connection with the MERGER in that they did not provide the patent due diligence report
including the prosecution history to B4MC and other parties to the MERGER agreement.


90.     ELLENOFF's conduct, omissions, and performance of their duties as alleged
breached applicable standards of care in the exercise of an attorney's professional work.


91.     PAGE suffered, and continues to suffer, great losses and injury, due to and as a
proximate cause of, ELLENOFF's negligent legal malpractice and particularly its failure to

properly disclose and report to B4MC and other parties, the patent prosecution history prior to the MERGER.

92.    Had ELLENOFF simply provided B4MC with proper disclosures necessary to consummate the MERGER, and particularly report on their due diligence investigation by informing B4MC of the IFWs and related information therein, B4MC would not have grounds to sue PAGE and would not have sued PAGE. But for ELLENOFF's failure to make needed disclosures on behalf of their client, PAGE would not have been sued for over $50 million and would have no injuries.

### THIRD CLAIM FOR RELIEF
### Breach of Contract

93.    PAGE repeats and realleges each and every allegation set forth in paragraphs 1 - 92 as if they were fully set forth here.

94.    The 'Engagement Agreement' dated March 2, 2018 is a valid and enforceable contract for legal services duly executed (March 5th) by both parties Ellenoff Grossman & Schole LLP and RocketFuel Blockchain Company.

95.    The contract provides explicitly that ELLENOFF 'act as counsel to Rocketfuel Blockchain Company **and its affiliates**' (emphasis added). PAGE was an Officer of RocketFuel Blockchain Company and as such, was a client of ELLENOFF by way of the contract, whereby ELLENOFF became bound to 'act as counsel' to PAGE.

96.     ELLENOFF was paid in full and on-time, all due amounts, without discount under the terms of the agreement, and thus RBC performed on its part without exception.

97.     ELLENOFF breached express promises made as part of the contract by failing to complete the required due diligence and failing to report properly to parties of the MERGER transaction on the due diligence by failing to inform them of important details of the patent prosecution history that were diligently provided by PAGE, among other things.

98.     The written contract explicitly provides: "supervise and manage all necessary due diligence" and "perform all other work, within our expertise, necessary to consummate the Merger" and was breached when ELLENOFF failed to represent RBC and its affiliates properly as ELLENOFF omitted disclosure of critical information in their possession since April 2018, three months prior to the MERGER.

99.     ELLENOFF's breach was not justified nor excused in any way and thus failure to perform these obligations by ELLENOFF is necessarily a breach of the contract.

100.    ELLENOFF's failure to inform B4MC and other parties to the MERGER of the patent prosecution files is the sole, direct and proximate cause of B4MC's greater than $50,100,000 claims against PAGE which has resulted and continues to result in considerable damages including extensive financial as well as intangible losses, among others.

101.    If ELLENOFF *had* performed as required and disclosed to B4MC the patent prosecution history, then B4MC would not have consummated the transaction[4] and PAGE would still be in possession of his $45,000,000 patent portfolio today.

102.    But for ELLENOFF's failures and breaches under the contract, PAGE would not have suffered loss of his very valuable intellectual properties.

**FOURTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**

103.    PAGE repeats and realleges each and every allegation set forth in paragraphs 1 - 102 as if they were fully set forth here.

104.    In addition to and in conjunction with their attorney-client relationship by contract, ELLENOFF *additionally* had a fiduciary duty to PAGE. ELLENOFF was in a superior position to PAGE and as such was bound to act as fiduciary on behalf of PAGE in organizing the MERGER transaction and its associated necessary elements.

105.    As an associate and Officer of RBC, PAGE had a special relationship to ELLENOFF and accordingly submitted thereto ELLENOFF's knowledge, skill and advice making PAGE vulnerable to them.

---

[4] 1:21-cv-01764; Southern District New York, SAC, Doc. 27, ¶¶58-60

106.    ELLENOFF was empowered and in a superior position to decide the proper way to proceed and PAGE yielded to their well-recognized professional skill and ability to conduct the proposed MERGER transaction properly and further did believe at all times relevant up until October 2020 that ELLENOFF had duly provided the disclosures to B4MC in accordance with law.

107.    ELLENOFF accepted their role as legal counsel and adviser to RBC and its affiliates by contract for legal services, and thus as fiduciary for PAGE.

108.    Upon accepting ELLENOFF's role as counsel and placing his trust therein, PAGE could no longer act to protect himself and was at the mercy and dependence that ELLENOFF would act properly on his behalf.

109.    PAGE relied upon ELLENOFF to make a legal analysis as to the correct mode and manner of making all necessary disclosures to parties of the MERGER.

110.    ELLENOFF breached those fiduciary duties by, among other things, failing to provide parties to the MERGER the due diligence materials including the patent prosecution history PAGE provided to ELLENOFF.

111.    As direct and proximate result of said breaches, PAGE has suffered and continues to suffer injuries and damages including financial damages, intense emotional stress, among others, as alleged throughout herein.

COMPLAINT

112.    PAGE is therefore entitled to recover damages from ELLENOFF in amounts to be determined at trial.

113.    In addition, to the extent that ELLENOFF's conduct was willful and/or reckless and wanton and/or was of such character as would shock the conscience or otherwise warrant an award of exemplary or punitive damages in favor of PAGE and against ELLENOFF, PAGE is entitled to such award, in an amount to be determined at trial.

## **PRAYER**

WHEREFORE, Plaintiff prays judgment against Defendant as follows:

### **On the FIRST CLAIM FOR RELIEF – Negligence**

1.    For general and specific damages in an amounts alleged herein to be further proven at trial;

2.    For prejudgment interest at the maximum legal rate;

3.    For reasonable attorneys' fees and costs of the suit where permitted; and

4.    For such other relief as the Court deems just, proper or necessary.

//

### **On the SECOND CLAIM FOR RELIEF – Legal Malpractice**

5.    For general and specific damages in an amounts alleged herein to be further proven at trial;

6.    For reasonable attorneys' fees and costs of the suit where permitted; and

7.    For such other relief as the Court deems just, proper or necessary.

//

### On the THIRD CLAIM FOR RELIEF – Breach of Contract

8.      For compensatory and consequential damages in an amount to be proven at trial;

9.      For prejudgment interest at the maximum legal rate;

10.     For reasonable attorneys' fees and costs of the suit incurred herein; and

11.     For such other and further relief as the Court deems just and proper.

### On the FOURTH CLAIM FOR RELIEF – Breach of Fiduciary Duty

12.     For general and special damages in an amount to be proven at trial;

13.     For exemplary and punitive damages in an amount to be proven at trial;

14.     For award of prejudgment interest, costs of the suit, and reasonable attorneys' fees to the extent permitted by law; and

15.     For such other relief as this Court deems just, proper or necessary under the circumstances.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of F.R.Civ.P., PAGE requests a trial by jury on all issues so triable.

//

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

May 27, 2022

*/jp/ Joseph Page*
JOSEPH PAGE

COMPLAINT

Exhibit A – PWP Proposal

# EXHIBIT A



PacificWave Partners Limited
468 N. Camden Drive – Suite 350
Beverly Hills, CA 90210
U.S.A.
Tel:  +1 310 666 0750
www.pacificwavepartners.com

January 8, 2018

### PROPOSAL REGARDING ROCKETFUEL

*This Proposal is intended solely as a basis for further discussion and is not intended to be a legally binding agreement and does not give rise to any legally binding obligations. No legally binding obligations will be created, implied, or inferred until definitive agreements reflecting the terms and conditions agreed to by the parties are duly executed and delivered.*

*This Proposal shall expire at 5:00 P.M., Pacific time, on Friday, January 12, 2018.*

| | |
|---|---|
| **Transaction Structure:** | Reverse acquisition ("*RTO*") of a to-be formed Nevada corporation to be named Rocketfuel Blockchain Company ("*Rocketfuel*"). |
| **Formation and Capitalization of Rocketfuel:** | Prior to the RTO, Rocketfuel will be formed as a Nevada corporation. The initial capitalization will be as follows: |

| Shareholder | Percentage Ownership | Initial Capital Contribution |
|---|---|---|
| Gert Funk, Joe Page and associates (the "*Founders*") | 90% | Transfer of patents, intellectual property and other assets of Blockchain, Inc., a Nevada corporation |
| New Investor(s) | 10% | $250,000 |

The Founders and PacificWave Partners Limited will use their best efforts to raise the $250,000 investment. If the total is not raised by January 31, 2018, the Founders and PacificWave Partners Limited will find a solution to the capital raise until completed.

The $250,000 shall be subject to a subscription agreement between each investor and Rocketfuel. BFMC will agree to hold the subscription proceeds in escrow in its bank account at City National Bank. The proceeds shall be used solely for the payment of the expenses referred to below.

| | |
|---|---|
| **Acquisition Company:** | B4MC Gold Mines, Inc., a Nevada corporation ("*BFMC*"), which has the following characteristics: |

- Current trading market: OTC Pink Sheets

- Total shares of common stock outstanding currently and immediately prior to closing of the RTO: 5,667,485.

- No preferred stock, convertible securities, warrants or options outstanding.

- Public float: 167,485 shares (included in the total shares outstanding); approximately 950 shareholders

- Shares controlled by PacificWave Partners Limited ("*PWP*") and affiliates, investors, etc.: 97.0%

- Current management: Bennett Yankowitz is President and sole director. If the shareholders of Rocketfuel desire, Mr. Yankowitz is available to continue as a director post-closing.

**Reverse Acquisition:**    BFMC will issue 17,002,455 shares of its common stock to the shareholders of Rocketfuel, in exchange for 100% of the outstanding shares of Rocketfuel's capital stock, including all options and convertible securities.  Immediately after the closing of the RTO, total shares outstanding will be 22,669,940 shares, and the shareholders of Rocketfuel would own 75% of the outstanding common stock of BFMC. The RTO would be structured as a reverse subsidiary merger or other tax-free structure as mutually agreed.

**Post-Closing Objectives:**    PWP is targeting a valuation in two years such that BFMC should be eligible for listing on the NYSE-MKT or Nasdaq.

**Expenses:**    The amounts held in escrow by BFMC shall be disbursed solely to pay the following expenses to complete the transaction and to satisfy BFMC's  trade accounts payable, not to exceed $40,000: (i) the fees of the auditors and consultants to be engaged in connection with the preparation, review and audit of BFMC's quarterly and annual financial statements and filing of Forms 10-Q and 10-K; (ii) all of BFMC's transactional costs, including accounts payable, arising prior to closing; (iii) the fees of Rocketfuel's independent accountants and consultants engaged in connection with preparation and audit of Rocketfuel's financial statements and any pro forma or combined financial statements required for the RTO; (iv) preparation of the "Super 8-K" to be filed at closing; (v) EDGAR service provider's fees for both BFMC and Rocketfuel; (vi) organization and filing fees in connection with the incorporation of Rocketfuel and (vii) Rocketfuel's legal and other expenses.

**Outside Consultants:**    Accounting consultant:              David Volpe

Auditors:                                    Paritz & Company

Counsel to Founders:              Ellenoff Grossman & Schole

**Post-Closing**         Joe Page                    Chairman
**Management:**
                         Gert Funk                   CEO and Director

                         Bennett Yankowitz           CFO and Director

                         BFMC will change its name post-closing to Rocketfuel Blockchain,
                         Inc.

**B4MC GOLD MINES, INC.**

By: _____                    _____
       Bennett J. Yankowitz, President                        Joe Page


                                                   _____
                                                              Gert Funk

3

Exhibit B – Engagement Agreement

# EXHIBIT B

Ellenoff Grossman & Schole LLP

1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 370-1300
Facsimile: (212) 370-7889
www.egsllp.com

March 2, 2018

<u>Via E-Mail</u>
Mr. Gert Funk, President
Rocketfuel Blockchain Company
651 Lindell Road - Suite D565
Las Vegas, NV 89103

      Re: <u>Engagement Agreement</u>

Dear Gert:

      This letter contains the terms and conditions of Ellenoff Grossman & Schole LLP's (the "Firm") agreement to act as counsel to Rocketfuel Blockchain Company and its affiliates (collectively the "Company") with respect to (i) the reverse merger/capital contribution of the Company into B4MC Gold Mines, Inc. (the "Merger), and (ii) ongoing corporate and securities matters for the Company following the Merger (hereinafter referred to as "Monthly Retainer Matters").

      To assist you in the Merger we will: (a) prepare, review and revise all documents necessary to consummate the Merger including the term sheet, the contribution agreement/merger agreement, and the Super 8-K associated with the Merger; (b) supervise and manage all necessary due diligence, (c) attend (via telephone or, at your request, in person) all Shareholder or Board of Directors meetings, (d) correspond and/or meet with the Securities Exchange Commission ("SEC"), (e) prepare all necessary corporate governance documents applicable to the board of directors for a public company, and (f) perform all other work, within our expertise, necessary to consummate the Merger.

      We propose a flat fee for the Merger equal to Sixty Thousand Dollars ($60,000). The flat fee shall be paid as follows: (a) Twenty Thousand Dollars ($20,000) upon the execution of this retainer agreement; (b) Twenty Thousand Dollars ($20,000) upon the execution of the merger/contribution agreement (or similar agreement); and (c) the remainder of the outstanding amount upon the Super 8-K being cleared by the SEC (plus any out of pocket expenses not previously paid).

      As part of the Monthly Retainer Matters we will perform securities compliance work requested by the Company except those identified as Excluded Services herein. These legal services will include, but not be limited to, all securities law compliance work which you may request, including without limitation, preparation and filing of Forms 10-K and 10-Q, annual proxy statement and annual report to stockholders, we will review Forms 3, 4 and 5 and Schedules 13D and 13G, in each case as appropriate and press releases. We will also attend (via telephone or, at your request, in person) all Shareholder or Board of Directors meetings and prepare the appropriate agenda, resolutions or minutes for such meetings. We will also review, maintain and update your corporate governance documents, such as the Company's code of ethics, audit committee charter, whistle blower policy and web site to insure that they comply with Sarbanes-Oxley and all other applicable rules. As counsel we will also answer "on the fly" any questions within our area of expertise that may arise.

      For the Monthly Retainer Matters you agree to pay us, on the first of each month, a fixed monthly retainer of Five Thousand Dollars ($5,000) (the "Monthly Retainer"). The Monthly Retainer does not include legal representation relating to matters that are not within our area of expertise and extraordinary activities such as, but not limited to, work relating to your intellectual property, the preparation of a Registration Statement

{00575184.DOC.1}

Ellenoff Grossman & Schole LLP

(including post-effective amendments thereto), private placements, bank financings, mergers, dispositions, acquisitions, shareholder complaints, SEC enforcement actions or inquiries and litigation ("Excluded Services"), which we will bill, with your prior approval, at either our regular hourly rates or at a negotiated flat fee. Our regular hourly rates are currently between Four Hundred Ninety-Five Dollars ($495) and Six Hundred Ninety-Five Dollars ($695) per partner and between Three Hundred Ninety-Five Dollars ($395) and Six Hundred Ninety-Five Dollars ($695), for associate and of-counsel time. Please note, these rates are scheduled to be adjusted as of January 1, 2019. The Monthly Retainer will begin upon the closing of the Merger.

In addition to the fees described above, the Firm will bill you for all costs, disbursements and out-of-pocket expenses incurred specifically on your behalf. These expenses may include, without limitation, overnight mail/couriers, messengers, secretarial overtime, if required due to time scheduling, and filing fees. We seek only to reimburse our expenses related to these items, and do not "mark up" these items in any respect. No secretarial overtime shall be utilized without your prior consent. Our goal is to minimize these out-of-pocket expenses subject to your needs.

In the event of a fee dispute between you, as client, and my firm, you may seek to resolve the dispute by arbitration under Part 137 of the Rules of the Chief Administrator of the New York State Courts. I will be happy to provide you with a copy of those rules at your request. You agree that you indemnify us and hold us harmless from all of our reasonable costs and disbursements with respect to collection, including without limitation, reasonable attorney's fees and expenses and fees to collection agencies.

The Company acknowledges and agrees that the Firm may reference the Company and/or the matters undertaken by the Firm on behalf of the Company (without revealing any privileged or confidential information) on the Firm's website, social media and in other advertising or marketing materials, and may use the Company's logos in connection therewith

If you are in agreement with the foregoing, please sign below where indicated and return an executed version of this Agreement along with the initial Twenty Thousand Dollar ($20,000) retainer.

This letter agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same document.

If you have any questions or comments on the above, please feel free to call me. My partners and I look forward to the opportunity to be of service to you.

Very truly yours,

Ellenoff Grossman & Schole LLP

ACCEPTED AND AGREED TO AS OF
THIS 5TH DAY OF MARCH 2018

ROCKETFUEL BLOCKCHAIN COMPANY

By: _____
      Name: Gert Funk
      Title: President

{00575184.DOC.1}

Exhibit C – Contribution Agreement

# EXHIBIT C

**Execution Version**

**CONTRIBUTION AGREEMENT**

by and among

**B4MC Gold Mines, Inc.**
as the Purchaser,

**Rocketfuel Blockchain Company**
as the Company,

and

**Gert Funk, Joseph Page, PacificWave Partners Limited, PacificWave Partners UK Ltd. and Saxton Capital Ltd.**

as the Sellers

**Dated as of June 27, 2018**

## CONTRIBUTION AGREEMENT

This Contribution Agreement (this "***Agreement***") is made and entered into as of June 27, 2018 by and among (i) B4MC Gold Mines, Inc., a Nevada corporation (the "***Purchaser***"), (ii) Rocketfuel Blockchain Company, a Nevada corporation (the "***Company***"), and Gert Funk ("***Funk***"), Joseph Page ("***Page***"), PacificWave Partners Limited ("***PWP***"), PacificWave Partners UK Ltd. ("***PWPUK***") and Saxton Capital Ltd ("***Saxton***"). Funk, Page, PWP, PWPUK and Saxton are collectively referred to herein as the "***Sellers***", individually each a "***Seller***"). The Purchaser, Company and the Sellers are sometimes referred to herein individually as a "***Party***" and, collectively, as the "***Parties***".

### RECITALS:

A.      The Sellers are the owners of all of the issued and outstanding shares of common stock of the Company (the "***Company Interests***") and desire to transfer one hundred percent (100%) of such shares of common stock of the Company ("***Contributed Securities***") for shares of Purchaser Common Stock as described herein.

B.      The Purchaser is authorized to issue seven hundred fifty million (750,000,000) shares of its Common Stock, and as of the date hereof, 5,667,104 shares of that Purchaser Common Stock are issued and outstanding. The Purchaser desires to exchange at the Closing, seventeen million one thousand three hundred twelve (17,001,312) Purchaser Common Stock (the "***Contribution Consideration***") representing seventy-five percent (75%) of the total outstanding Purchaser Common Stock, on a fully diluted basis, after the issuance of the Contribution Consideration, for the Contributed Securities.

C.      The Parties intend that the Contribution will qualify as a tax-free "reorganization" within the meaning of Section 351 of the Code (as defined herein).

D.      Certain capitalized terms used herein are defined in <u>Article XII</u> hereof.

**NOW, THEREFORE**, in consideration of the premises set forth above, which are incorporated in this Agreement as if fully set forth below, and the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, the Parties hereto agree as follows:

### ARTICLE I
### <u>CONTRIBUTION</u>

1.1      <u>Contribution</u>. Effective as of the Closing Date, (i) the Sellers each hereby contribute, transfer, assign and convey to the Purchaser all right, title and interest in and to all of the Contributed Securities, together with any and all rights, privileges, benefits, obligations and liabilities appertaining thereto, reserving unto such Seller no rights or interests therein whatsoever, and (ii) the Purchaser hereby accepts the contribution of the Contributed Securities, and in consideration for such contribution the Sellers collectively shall be entitled to receive from the Purchaser the Contribution Consideration with each Seller receiving for their respective percentage of Contributed Securities that same percentage of the Contribution Consideration (the "***Contribution***").

1.2      <u>Tax Treatment</u>. For federal income tax purposes, the Contribution is intended to constitute a tax-free reorganization within the meaning of Section 351, as mutually agreed to by the Parties.

**ARTICLE II**
**CLOSING**

2.1     Closing**.** Subject to and conditional upon the satisfaction or waiver of the Closing Conditions the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place at the offices of Ellenoff Grossman & Schole, LLP ("***EGS***"), 1345 Avenue of the Americas, New York, NY 10105, on the second (2nd) Business Day after all the Closing conditions to this Agreement have been satisfied or waived at 10:00 a.m. local time, or at such other date, time or place as the Purchaser and the Company may agree (the date and time at which the Closing is actually held being the "***Closing Date***"). The parties need not be physically present at the Closing and may participate telephonically.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

Except as set forth in the disclosure schedules delivered by the Purchaser to the Company on the date hereof (the "***Purchaser Disclosure Schedules***"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer the Purchaser represents and warrants to the Company, as of the date hereof and as of the Closing, as follows:

3.1     Organization and Standing**.** The Purchaser is a corporation duly incorporated, validly existing and in good standing under the state of Nevada. The Purchaser has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Purchaser is duly qualified or licensed and in good standing to do business in each jurisdiction in which the character of the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary.  The Purchaser has heretofore made available to the Company accurate and complete copies of the Organizational Documents of the Purchaser, as currently in effect.  The Purchaser is not in violation of any provision of its Organizational Documents.

3.2     Authorization; Binding Agreement.  The Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Document to which it is a party, to perform the Purchaser's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each Ancillary Document to which it is a party and the consummation of the transactions contemplated hereby and thereby (a) have been duly and validly authorized by the board of directors of the Purchaser, and (b) no other corporate proceedings, other than as set forth elsewhere in the Agreement, on the part of the Purchaser are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which the Purchaser is a party shall be when delivered, duly and validly executed and delivered by the Purchaser and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting the enforcement of creditors' rights generally or by any applicable statute of limitation or by any valid defense of set-off or counterclaim, and the fact that equitable remedies or relief (including the remedy of specific performance) are subject to the discretion of the court from which such relief may be sought (collectively, the "***Enforceability Exceptions***").

3.3    <u>Governmental Approvals</u>**.** No Consent of or with any Governmental Authority, on the part of the Purchaser is required to be obtained or made in connection with the execution, delivery or performance by the Purchaser of this Agreement and each Ancillary Document to which it is a party or the consummation by the Purchaser of the transactions contemplated hereby and thereby, other than (a) such filings as contemplated by this Agreement, (b) any filings required with FINRA or the SEC with respect to the transactions contemplated by this Agreement, (c) applicable requirements, if any, of the Securities Act, the Exchange Act, and/ or any state "blue sky" securities Laws, and the rules and regulations thereunder, and (d) where the failure to obtain or make such Consents or to make such filings or notifications, would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.4    <u>Non-Contravention</u>**.** The execution and delivery by the Purchaser of this Agreement and each Ancillary Document to which it is a party, the consummation by the Purchaser of the transactions contemplated hereby and thereby, and compliance by the Purchaser with any of the provisions hereof and thereof, will not (a) conflict with or violate any provision of the Purchaser's Organizational Documents, (b) subject to obtaining the Consents from Governmental Authorities referred to in <u>Section 3.3</u> hereof, and the waiting periods referred to therein having expired, and any condition precedent to such Consent or waiver having been satisfied, conflict with or violate any Law, Order or Consent applicable to the Purchaser or any of its properties or assets, or (c) (i) violate, conflict with or result in a breach of, (ii) constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, (iii) result in the termination, withdrawal, suspension, cancellation or modification of, (iv) accelerate the performance required by the Purchaser under, (v) result in a right of termination or acceleration under, (vi) give rise to any obligation to make payments or provide compensation under, (vii) result in the creation of any Lien upon any of the properties or assets of the Purchaser under, (viii) give rise to any obligation to obtain any third party Consent or provide any notice to any Person or (ix) give any Person the right to declare a default, exercise any remedy, claim a rebate, chargeback, penalty or change in delivery schedule, accelerate the maturity or performance, cancel, terminate or modify any right, benefit, obligation or other term under, any of the terms, conditions or provisions of, any Purchaser Material Contract, except for any deviations from any of the foregoing clauses (a), (b) or (c) that would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.5    <u>Capitalization</u>

(a)    The Purchaser is authorized to issue 750,000,000 shares of Purchaser Common Stock.  The issued and outstanding shares of Purchaser Common Stock as of the date of this Agreement are set forth on <u>Schedule 3.5(a)</u>.  All outstanding Purchaser Common Stock are duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, right of first refusal, preemptive right, subscription right or any similar right under any provision under Chapter 78 of the Nevada Revised Statutes, as then applicable, the Purchaser Charter or any Contract to which the Purchaser is a party.  None of the outstanding Purchaser Common Stock has been issued in violation of any applicable securities Laws.

(b)    There are no (i) outstanding options, warrants, puts, calls, convertible securities, preemptive or similar rights, (ii) bonds, debentures, notes or other Indebtedness having general voting rights or that are convertible or exchangeable into securities having such rights or (iii) subscriptions or other rights, agreements, arrangements, Contracts or commitments of any character (other than this Agreement and the Ancillary Documents), (A) relating to the issued or unissued shares of the Purchaser or (B) obligating the Purchaser to issue, transfer, deliver or sell or cause to be issued, transferred, delivered, sold or repurchased any options or shares or securities convertible into or exchangeable for such shares, or (C) obligating the Purchaser to grant, extend or enter into any such option, warrant, call, subscription or other right, agreement, arrangement or commitment for such capital shares.  There are no outstanding obligations of the Purchaser to repurchase, redeem or otherwise acquire any shares of the

Purchaser or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any Person. There are no shareholders agreements, voting trusts or other agreements or understandings to which the Purchaser is a party with respect to the voting of any shares of the Purchaser.

3.6    <u>Indebtedness</u>. Except as otherwise set forth in the balance sheet of the Purchaser, dated March 31, 2018 (the "***Closing Date Balance Sheet***"), immediately prior to the Closing, the Purchaser will not have any Indebtedness except for certain accounts payable and accrued expenses not to exceed $10,000 in the aggregate.

3.7    <u>SEC Filings and Purchaser Financials</u>

(a)    The Purchaser, since May 12, 2015, has filed all forms, reports, schedules, statements, registration statements, prospectuses and other documents required to be filed or furnished by the Purchaser with the SEC under the Securities Act and/or the Exchange Act, together with any amendments, restatements or supplements thereto, and will file all such forms, reports, schedules, statements and other documents required to be filed subsequent to the date of this Agreement (the "***SEC Reports***"). The SEC Reports (x) were prepared in all material respects in accordance with the requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations thereunder and (y) did not, as of their respective effective dates (in the case of SEC Reports that are registration statements filed pursuant to the requirements of the Securities Act) and at the time they were filed with the SEC (in the case of all other SEC Reports) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)    The financial statements and notes contained or incorporated by reference in the SEC Reports (the "***Purchaser Financials***"), fairly present in all material respects the financial position and the results of operations, changes in shareholders' equity, and cash flows of the Purchaser at the respective dates of and for the periods referred to in such financial statements, all in accordance with (i) GAAP methodologies applied on a consistent basis throughout the periods involved and (ii) Regulation S-X or Regulation S-K, as applicable (except as may be indicated in the notes thereto and for the omission of notes and audit adjustments in the case of unaudited quarterly financial statements to the extent permitted by Regulation S-X or Regulation S-K, as applicable).

(c)    Except as and to the extent reflected or reserved against in the Purchaser Financials, the Purchaser has not incurred any Liabilities or obligations of the type required to be reflected on a balance sheet in accordance with GAAP that is not adequately reflected or reserved on or provided for in the Purchaser Financials, other than Liabilities of the type required to be reflected on a balance sheet in accordance with GAAP that have been incurred since the Purchaser's formation in the ordinary course of business.

3.8    <u>Shell Company</u>. The Purchaser is a shell company and except as otherwise shown on the Closing Date Balance Sheet, has (a) no assets or liabilities as of the Closing Date, (b) other than as described on Schedule 3.8, since May 12, 2015, conducted no business other than the public offering of its securities (and the related private offerings), public reporting and related activities.

3.9    <u>Compliance with Laws</u>. The Purchaser is, and has since May 12, 2015, been, in compliance with all Laws applicable to it and the conduct of its business except for such noncompliance which would not reasonably be expected to have a Material Adverse Effect on the Purchaser, and the Purchaser has not received since May 12, 2015, written notice alleging any violation of applicable Law in any material respect by the Purchaser.

3.10    Actions; Orders; Permits. There is no pending or, to the Knowledge of the Purchaser, threatened material Action to which the Purchaser is subject which would reasonably be expected to have a Material Adverse Effect on the Purchaser.  There is no material Action that the Purchaser has pending against any other Person.  The Purchaser is not subject to any material Orders of any Governmental Authority, nor are any such Orders pending.  The Purchaser holds all material Permits necessary to lawfully conduct its business as presently conducted, and to own, lease and operate its assets and properties, all of which are in full force and effect, except where the failure to hold such Consent or for such Consent to be in full force and effect would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.11    Taxes and Returns.

(a)    The Purchaser has or will have timely filed, or caused to be timely filed, all material Tax Returns required to be filed by it for the tax years 2015 and later, which Tax Returns are true, accurate, correct and complete in all material respects, and has paid, collected or withheld, or caused to be paid, collected or withheld, all material Taxes required to be paid, collected or withheld, other than such Taxes for which adequate reserves in the Purchaser Financials have been established in accordance with GAAP.  There are no audits, examinations, investigations or other proceedings pending against the Purchaser in respect of any Tax, and the Purchaser has not been notified in writing of any proposed Tax claims or assessments against the Purchaser (other than, in each case, claims or assessments for which adequate reserves in the Purchaser Financials have been established in accordance with GAAP or are immaterial in amount).  There are no Liens with respect to any Taxes upon any of the Purchaser's assets, other than Permitted Liens.  The Purchaser has no outstanding waivers or extensions of any applicable statute of limitations to assess any material amount of Taxes.  There are no outstanding requests by the Purchaser for any extension of time within which to file any Tax Return or within which to pay any Taxes shown to be due on any Tax Return.

(b)    Since May 12, 2015, the Purchaser has not (i) changed any Tax accounting methods, policies or procedures except as required by a change in Law, (ii) made, revoked, or amended any material Tax election, (iii) filed any amended Tax Returns or claim for refund or (iv) entered into any closing agreement affecting or otherwise settled or compromised any material Tax Liability or refund.

3.12    Employees and Employee Benefit Plans.  The Purchaser does not (a) have any paid employees or (b) maintain, sponsor, contribute to or otherwise have any Liability under, any Benefit Plans.

3.13    Properties. The Purchaser does not own, license or otherwise have any right, title or interest in any material Intellectual Property.  The Purchaser does not own or lease any material real property or Personal Property.

3.14    Material Contracts. Except as set forth on Schedule 3.14, other than this Agreement and the Ancillary Documents, there are no Contracts to which the Purchaser is a party or by which any of its properties or assets may be bound, subject or affected, which (i) creates or imposes a Liability greater than $1,000, (ii) may not be cancelled by the Purchaser on less than sixty (60) days' prior notice without payment of a material penalty or termination fee or (iii) prohibits, prevents, restricts or impairs in any material respect any business practice of the Purchaser as its business is currently conducted, any acquisition of material property by the Purchaser, or restricts in any material respect the ability of the Purchaser from engaging in business as currently conducted by it or from competing with any other Person (each, a "***Purchaser Material Contract***").  All Purchaser Material Contracts have been filed as exhibits to the SEC Reports.

3.15    <u>Transactions with Affiliates</u>.  Except as set forth on Schedule 3.15, there are no contracts or arrangements that are in existence as of the date of this Agreement under which there are any existing or future Liabilities or obligations between the Purchaser and any (a) present or former director, officer or employee or Affiliate of the Purchaser, or any immediate family member of any of the foregoing, or (b) record or beneficial owner of more than five percent (5%) of the Purchaser's outstanding capital stock as of the date hereof.

3.16    <u>Finders and Brokers</u>.  Except as set forth on Schedule 3.16, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Purchaser, the Company or any of their respective Affiliates in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Purchaser.

3.17    <u>Ownership of Contribution Consideration</u>.  All shares of Purchaser Common Stock to be issued and delivered to the Sellers as Contribution Consideration in accordance with <u>Article I</u> shall be, upon issuance and delivery of such Purchaser Common Stock, fully paid and non-assessable, free and clear of all Liens, other than restrictions arising from applicable securities Laws and any Liens incurred by the Company or any Seller, and the issuance and sale of such Purchaser Common Stock pursuant hereto will not be subject to or give rise to any preemptive rights or rights of first refusal.

3.18    <u>Independent Investigation</u>.  The Purchaser has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Company for such purpose.  The Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied solely upon its own investigation and the express representations and warranties of the Company set forth in <u>Article IV</u> (including the related portions of the Company Disclosure Schedules); and (b) none of the Company nor its respective Representatives have made any representation or warranty as to the Company, or this Agreement, except as expressly set forth in <u>Article IV</u> (including the related portions of the Company Disclosure Schedules).

**ARTICLE IV**
**<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>**

Except as set forth in the disclosure schedules delivered by the Company to the Purchaser on the date hereof (the "***Company Disclosure Schedules***"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer, the Company hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing, as follows:

4.1    <u>Organization and Standing</u>. The Company is a Nevada corporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  The Company has heretofore made available to the Purchaser accurate and complete copies of the Organizational Documents of the Company, as currently in effect.  The Company is not in violation of any provision of its Organizational Documents.

4.2    <u>Authorization; Binding Agreement</u>. The Company has all requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Document to which it is or is required to be a party, to perform the Company's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which the Company is a party shall be when delivered, duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement and such

Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of the Company, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by the Enforceability Exceptions.

        4.3    <u>Subsidiaries</u>. The Company does not own, of record or beneficially, or control any direct or indirect equity or other interest, or any right (contingent or otherwise) to acquire the same, in any corporation, partnership, limited liability company, joint venture, association or other entity.

        4.4    <u>Governmental Approvals</u>. No Consent of or with any Governmental Authority on the part of the Company is required to be obtained or made in connection with the execution, delivery or performance by the Company of this Agreement or any Ancillary Documents or the consummation by the Company of the transactions contemplated hereby or thereby other than such filings as are expressly contemplated by this Agreement and (b) pursuant to Antitrust Laws.

        4.5    <u>Non-Contravention</u>. The execution and delivery by the Company of this Agreement and each Ancillary Document to which the Company is a party or otherwise bound, and the consummation by the Company of the transactions contemplated hereby and thereby and compliance by the Company with any of the provisions hereof and thereof, will not (a) conflict with or violate any provision of the Company's Organizational Documents, (b) subject to obtaining the Consents from Governmental Authorities referred to in <u>Section 4.4</u> hereof, the waiting periods referred to therein having expired, and any condition precedent to such Consent or waiver having been satisfied, conflict with or violate any Law, Order or Consent applicable to the Company or any of its properties or assets, or (c) (i) violate, conflict with or result in a breach of, (ii) constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, (iii) result in the termination, withdrawal, suspension, cancellation or modification of, (iv) accelerate the performance required by the Company under, (v) result in a right of termination or acceleration under, (vi) give rise to any obligation to make payments or provide compensation under, (vii) result in the creation of any Lien upon any of the properties or assets of the Company under, (viii) give rise to any obligation to obtain any third party Consent or provide any notice to any Person or (ix) give any Person the right to declare a default, exercise any remedy, claim a rebate, chargeback, penalty or change in delivery schedule, accelerate the maturity or performance, cancel, terminate or modify any right, benefit, obligation or other term under, any of the terms, conditions or provisions of any material contract of the Company.

        4.6    <u>Financial Statements</u>. As used herein, the term "***Company Financials***" means the (i) audited financial statements of the Company (including, in each case, any related notes thereto), consisting of the audited balance sheets of the Company as of March 31, 2018, and the related audited income statements, changes in stockholder equity and statements of cash flows for the period from inception to March 31, 2018, each audited in accordance with GAAP standards by a PCAOB qualified auditor (the "***Audited Company Financials***"), (ii) pro forma financial information for the Company after the Contribution, (iii) if the Closing occurs prior to August 14, 2018 but the Super 8-K (as defined in <u>Section 6.6(b)</u> herein) is filed after August 14, 2018, the unaudited financial statements, consisting of the balance sheet of the Company as of June 30, 2018, and (iv) if the Closing occurs after August 14, 2018, the unaudited financial statements, consisting of the balance sheet of the Company for the applicable fiscal quarters as may be required for the SEC filing. True and correct copies of the Company Financials have been provided to the Purchaser.  The Company Financials (i) accurately reflect the books and records of the Company as of the times and for the periods referred to therein, (ii) were prepared in accordance with GAAP, consistently applied throughout and among the periods involved (except that the unaudited statements exclude the footnote disclosures and other presentation items required for GAAP and exclude year-end adjustments which will not be material in amount), and (iii) fairly present in all material respects the financial position of the Company as of the respective dates thereof and the results

of the operations and cash flows of the Company for the periods indicated. The Company has never been subject to the reporting requirements of Sections 13(a) and 15(d) of the Exchange Act.

4.7     Absence of Certain Changes. Since January 12, 2018 (date of inception), the Company has (a) conducted its business only in the ordinary course of business consistent with past practice, (b) not been subject to a Material Adverse Effect and (c) has not taken any action or committed or agreed to take any action that would be prohibited by Section 6.2(b) if such action were taken on or after the date hereof without the consent of the Purchaser.

4.8     Compliance with Laws. The Company has not nor has been in material conflict or material non-compliance with, or in material default or violation of, nor has the Company received, since January 12, 2018 (date of inception), any written or, to the Knowledge of the Company, oral notice of any material conflict or non-compliance with, or material default or violation of, any applicable Laws by which it or any of its properties, assets, employees, business or operations are or were bound or affected.

4.9     Litigation. There is no (a) Action of any nature pending or, to the Company's Knowledge, threatened, nor is there any reasonable basis for any Action to be made (and no such Action has been brought or, to the Company's Knowledge, threatened); or (b) Order pending now or rendered by a Governmental Authority, in either case of (a) or (b) by or against the Company, its members, its business, equity securities or assets.

4.10     Material Contracts. The Company has not received notice of breach on any material contract.

4.11     Taxes and Returns. The Company has or will have timely filed, or caused to be timely filed, all federal, state and local Tax Returns required to be filed by it (taking into account all available extensions), which Tax Returns are true, accurate, correct and complete in all material respects. The Company has complied with all applicable Laws relating to Tax.

4.12     Title to and Sufficiency of Assets. The Company has good and marketable title to, or a valid leasehold interest in or right to use, all of its assets, free and clear of all Liens other than (a) Permitted Liens, (b) the rights of lessors under leasehold interests, and (c) Liens specifically identified on the Interim Balance Sheet. The assets (including contractual rights) of the Company constitute all of the assets, rights and properties that are used in the operation of the businesses of the Company as it is now conducted and presently proposed to be conducted or that are used or held by the Company for use in the operation of the businesses of the Company, and taken together, are adequate and sufficient for the operation of the businesses of the Company as currently conducted and as presently proposed to be conducted.

4.13     No Brokers. The Company has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or charges or any similar charges in connection with this Agreement or any transactions contemplated hereby.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth in the disclosure schedules delivered by the Sellers to the Purchaser on the date hereof (the "Seller Disclosure Schedules"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer, each of the Sellers, severally, hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing, as follows:

5.1    <u>Authority, Etc</u>. Each of the Sellers has the requisite power and authority to enter into this Agreement and to carry out such Seller's obligations hereunder. The execution and delivery of this Agreement and each Ancillary Document to which it is a party and the consummation of the transactions contemplated hereby and thereby (a) have been duly and validly authorized by each Seller, and (b) no other joint venture proceedings, other than as set forth elsewhere in the Agreement, on the part of such Seller are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which such Seller is a party shall be when delivered, duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of such Seller, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by the Enforceability Exceptions.

5.2    <u>Title to Properties, Liens and Encumbrances</u>. Each of the Sellers have good title to each of their Contributed Securities of the Company, free and clear free of all claims, liens, security interests and other rights and encumbrances, and as a group the Sellers are owners of all the Company Interests.

5.3    <u>Reliance</u>.  This Agreement is made with the Sellers in reliance upon each Seller's representation to the Purchaser, which by such Seller's execution of this Agreement, such Seller hereby confirms, that the shares of the Purchaser's Common stock constituting the Contribution Consideration to be acquired by such Seller (the "***Securities***") will be acquired for investment for such Seller's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Seller has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, each Seller further represents that such Seller does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Securities.  The Purchaser has not been formed for the specific purpose of acquiring the Securities.

5.4    <u>Investment Representations</u>. Each Seller understands that the shares of Purchaser Common Stock have not been registered under the Securities Act, or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under applicable securities laws of certain states or unless an exemption from such registration is available. Each Seller understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  Each Seller acknowledges that the Purchaser has no obligation to register or qualify the Securities for resale.  Each Seller further acknowledges that (a) there is no assurance that any exemption from registration or qualification will be available, and (b) if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Purchaser which are outside of such Seller's control (including without limitation any current public information requirements of Rule 144 promulgated under the Securities Act or any similar or successor rule or regulation), and which the Purchaser is under no obligation and may not be able to satisfy, and therefore that there is no assurance that any such exemption will allow such Seller to dispose of, or otherwise transfer, all or any portion of the Securities.

5.5    <u>Legends</u>.  Each Seller understands that the Securities and any securities issued in respect of or exchange for the Securities, may bear one or all of the following legends:

(a)    "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SALE, TRANSFER, ASSIGNMENT, PLEDGE OR HYPOTHOCATION OF SUCH SECURITIES MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT, PLEDGE OR HYPOTHOCATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

(b)    Any legend required by the securities laws of any state to the extent such laws are applicable to the Securities represented by the certificate so legended.

5.6    <u>Accredited Investor</u>.  Each Seller is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

5.7    <u>Risks</u>.  Each Seller is aware that the Securities are highly speculative and that there can be no assurance as to what return, if any, there may be.  Each Seller is aware that the Purchaser may issue additional securities in the future which could result in the dilution of such Seller's ownership interest in the Purchaser.

## ARTICLE VI
## COVENANTS

6.1    <u>Access and Information</u>  The Purchaser shall give, and shall direct its Representatives to give, the Company and its Representatives, at reasonable times during normal business hours and upon reasonable intervals and notice, access to all offices and other facilities and to all employees, properties, Contracts, agreements, commitments, books and records, financial and operating data and other information (including Tax Returns, internal working papers, client files, client Contracts and director service agreements), of or pertaining to the Purchaser or its Subsidiaries, as the Company or its Representatives may reasonably request regarding the Purchaser, its Subsidiaries and their respective businesses, assets, Liabilities, financial condition, prospects, operations, management, employees and other aspects (including unaudited quarterly financial statements, including a consolidated quarterly balance sheet and income statement, a copy of each material report, schedule and other document filed with or received by a Governmental Authority pursuant to the requirements of applicable securities Laws, and independent public accountants' work papers (subject to the consent or any other conditions required by such accountants, if any)) and to reasonably cooperate with the Company and its Representatives in their investigation; provided, however, that the Company and its Representatives shall conduct any such activities in such a manner as not to unreasonably interfere with the business or operations of the Purchaser or any of its Subsidiaries.

6.2    <u>No Solicitation</u>.

(a)    For purposes of this Agreement, (i) an "**Acquisition Proposal**" means any inquiry, proposal or offer, or any indication of interest in making an offer or proposal, from any Person or group at any time relating to an Alternative Transaction, and (ii) an "**Alternative Transaction**" means (A) with respect to the Company and its Affiliates, a transaction (other than the transactions contemplated by this Agreement) concerning the sale of (x) all or any material part of the business or assets of the Company (other than in the ordinary course of business consistent with past practice) or (y) any of the shares or other equity interests or profits of the Company, in any case, whether such transaction takes the

form of a sale of shares or other equity, assets, merger, consolidation, issuance of debt securities, management Contract, joint venture or partnership, or otherwise and (B) with respect to the Purchaser and its Affiliates, a transaction (other than the transactions contemplated by this Agreement) concerning a Business Combination.

(b)     In order to induce the other Parties to continue to commit to expend management time and financial resources in furtherance of the transactions contemplated hereby, each Party shall not, and shall cause its Representatives to not, without the prior written consent of the Company and the Purchaser, directly or indirectly, (i) solicit, assist, initiate or facilitate the making, submission or announcement of, or intentionally encourage, any Acquisition Proposal, (ii) furnish any non-public information regarding such Party or its Affiliates or their respective businesses, operations, assets, Liabilities, financial condition, prospects or employees to any Person or group (other than a Party to this Agreement or their respective Representatives) in connection with or in response to an Acquisition Proposal, (iii) engage or participate in discussions or negotiations with any Person or group with respect to, or that could be expected to lead to, an Acquisition Proposal, (iv) approve, endorse or recommend, or publicly propose to approve, endorse or recommend, any Acquisition Proposal, (v) negotiate or enter into any letter of intent, agreement in principle, acquisition agreement or other similar agreement related to any Acquisition Proposal, or (vi) release any third Person from, or waive any provision of, any confidentiality agreement to which such Party is a party.

(c)     Each Party shall notify the others as promptly as practicable (and in any event within 48 hours) orally and in writing of the receipt by such Party or any of its Representatives of (i) any bona fide inquiries, proposals or offers, requests for information or requests for discussions or negotiations regarding or constituting any Acquisition Proposal or any bona fide inquiries, proposals or offers, requests for information or requests for discussions or negotiations that could be expected to result in an Acquisition Proposal, and (ii) any request for non-public information relating to such Party or its Affiliates, specifying in each case, the material terms and conditions thereof (including a copy thereof if in writing or a written summary thereof if oral) and the identity of the party making such inquiry, proposal, offer or request for information. Each Party shall keep the others promptly informed of the status of any such inquiries, proposals, offers or requests for information. Each Party shall, and shall cause its Representatives to, immediately cease and cause to be terminated any solicitations, discussions or negotiations with any Person with respect to any Acquisition Proposal and shall, and shall direct its Representatives to, cease and terminate any such solicitations, discussions or negotiations.

6.3     <u>Notification of Certain Matters</u>. Each of the Parties shall give prompt notice to the other Parties if such Party or its Affiliates:  (a) fails to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it or its Affiliates hereunder in any material respect; (b) receives any notice or other communication in writing from any third party (including any Governmental Authority) alleging (i) that the Consent of such third party is or may be required in connection with the transactions contemplated by this Agreement or (ii) any non-compliance with any Law by such Party or its Affiliates; (c) receives any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; (d) discovers any fact or circumstance that, or becomes aware of the occurrence or non-occurrence of any event the occurrence or non-occurrence of which, would reasonably be expected to cause or result in any of the conditions to set forth in <u>Article VIII</u> not being satisfied or the satisfaction of those conditions being materially delayed; or (e) becomes aware of the commencement or threat, in writing, of any Action against such Party or any of its Affiliates, or any of their respective properties or assets, or, to the Knowledge of such Party, any officer, director, partner, member or manager, in his, her or its capacity as such, of such Party or of its Affiliates with respect to the consummation of the transactions contemplated by this Agreement. No such notice shall constitute an acknowledgement or admission by the Party providing the notice regarding

whether or not any of the conditions to the Closing have been satisfied or in determining whether or not any of the representations, warranties or covenants contained in this Agreement have been breached.

6.4     Tax Matters. For federal income tax purposes, the Contribution is intended to constitute a "reorganization" within the meaning of Section 351 of the Code, as mutually agreed to by the Parties. None of the Parties shall (and each of the Parties shall cause their respective Subsidiaries not to) take any action, or fail to take any action, that could reasonably be expected to cause the Contribution to fail to qualify as a "reorganization" within the meaning of Section 351 of the Code. The Parties intend to report and, except to the extent otherwise required by Law, shall report, for federal income tax purposes, the Contribution as a "reorganization" within the meaning of Section 351 of the Code.

6.5     Further Assurances.  The Parties hereto shall further cooperate with each other and use their respective commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on their part under this Agreement and applicable Laws to consummate the transactions contemplated by this Agreement as soon as reasonably practicable, including preparing and filing as soon as practicable all documentation to effect all necessary notices, reports and other filings.

6.6     Public Announcements and Filings.

(a)     The Parties shall mutually agree upon and, as promptly as practicable after the execution of this Agreement (but in any event within four (4) Business Days thereafter), issue a press release announcing the execution of this Agreement (the "*Signing Press Release*").

(b)     Promptly after the issuance of the Signing Press Release, the Purchaser shall file a current report on Form 8-K (the "*Super 8-K*") with the Signing Press Release and a description of this Agreement as required by Federal Securities Laws, which the Company shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing (with the Company reviewing, commenting upon and approving such Super 8-K in any event no later than the third (3rd) Business Day after the execution of this Agreement).

(c)     The Parties shall mutually agree upon and, as promptly as practicable after the Closing (but in any event within four (4) Business Days thereafter), issue a press release announcing the consummation of the transactions contemplated by this Agreement (the "*Closing Press Release*"). Promptly after the issuance of the Closing Press Release, the Purchaser shall file a current report on Form 8-K (the "*Closing Filing*") with the Closing Press Release and a description of the Closing as required by Federal Securities Laws which the Company shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing.

(d)     The Parties shall mutually agree upon and, as promptly as practicable after the execution of this Agreement (but in any event within ten (10) days thereafter), file a current report on Form 8-K reporting a change in control of the Company and a Rule 14f-1 Information Statement (the "*14f Filing*"). In addition, those directors and officers or other insiders or Affiliates who will no longer have such status as a result of this Agreement and the contemplated transactions, shall file final Form 4's with the SEC within two (2) days following the effective date of the 14f Filing as to all current directors.

(e)     The Parties shall mutually agree upon and, as promptly as practicable after the Closing Date, file an information statement on a Schedule 14C with the SEC reporting a name change and mail such Schedule 14C to the shareholders of the Purchaser (the "*Schedule 14C*").

(f)      In connection with the preparation of the Signing Press Release, the Super 8-K, the Closing Filing, the Closing Press Release, the 14f Filing, the Schedule 14C or any other report, statement, filing notice or application made by or on behalf of a Party to any Governmental Authority or other third party in connection with the transactions contemplated hereby, each Party shall, upon request by any other Party, furnish the Parties with all information concerning themselves, their respective managers, members, directors, officers and equity holders, and such other matters as may be reasonably necessary or advisable in connection with the transactions contemplated hereby, or any other report, statement, filing, notice or application made by or on behalf of a Party to any third party and/ or any Governmental Authority in connection with the transactions contemplated hereby.

(g)      Purchaser shall be solely responsible for the costs and expenses relating to the Signing Press Release, the Super 8-K, the Closing Press Release, the Closing Filing, the 14f Filing, the Schedule 14C and related documents, instruments or filings. Purchaser shall be responsible for any Form 10-K filing, and any related documents, instruments or filings due to be filed with the SEC on or before the Closing Date.

6.7    <u>Confidential Information</u>. The Parties hereby agree that in the event this Agreement is terminated in accordance with Section 9.1, for a period of two (2) years after such termination, they shall, and shall cause their Representatives to: (i) treat and hold in strict confidence any Confidential Information, and will not use for any purpose (except in connection with the consummation of the transactions contemplated by this Agreement or the Ancillary Documents, performing their obligations hereunder or thereunder, enforcing their rights hereunder or thereunder), nor directly or indirectly disclose, distribute, publish, disseminate or otherwise make available to any third party any of the Confidential Information without the other Party's prior written consent; and (ii) in the event that either Party or its Affiliates or Representatives, in the event this Agreement is terminated in accordance with Section 9.1, for a period of two (2) years after such termination, becomes legally compelled to disclose any Confidential Information, (A) provide the other Party with prompt written notice of such requirement so that that Party or an Affiliate thereof may seek a protective Order or other remedy or waive compliance with this <u>Section 6.7</u>, and (B) in the event that such protective Order or other remedy is not obtained, or the relevant Party waives compliance with this <u>Section 6.7</u>, furnish only that portion of such Confidential Information which is legally required to be provided as advised in writing by outside counsel and to exercise its commercially reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information.  In the event that this Agreement is terminated and the transactions contemplated hereby are not consummated, the Parties shall, and shall cause their Affiliates and Representatives to, promptly deliver to the other Party any and all copies (in whatever form or medium) of Confidential Information and destroy all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon.

## ARTICLE VII
## SURVIVAL AND INDEMNIFICATION

7.1    <u>Survival</u>.

(a)      All representations and warranties of the Purchaser contained in this Agreement (including all schedules and exhibits hereto and all certificates, documents, instruments and undertakings furnished pursuant to this Agreement) shall survive the Closing through and until and including June 27, 2020.  All covenants, obligations and agreements of the Purchaser contained in this Agreement (including all schedules and exhibits hereto and all certificates, documents, instruments and undertakings furnished by the Purchaser pursuant to this Agreement), including any indemnification obligations, shall survive the Closing and continue until fully performed in accordance with their terms.

(b)    The representations and warranties of the Company contained in this Agreement or in any certificate or instrument delivered by or on behalf of Company pursuant to this Agreement shall not survive the Closing, and from and after the Closing, the Company shall not have any further obligations, nor shall any claim be asserted or action be brought against the Purchaser. The covenants and agreements made by the Company in this Agreement or in any certificate or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such covenants or agreements, shall not survive the Closing, except for those covenants and agreements contained herein and therein that by their terms apply or are to be performed in whole or in part after the Closing (which such covenants shall survive the Closing and continue until fully performed in accordance with their terms).

## ARTICLE VIII
## CLOSING CONDITIONS

8.1    <u>Conditions to Obligations of the Company</u>.    The obligations of the Company to consummate the Contribution and the other transactions contemplated by this Agreement are subject to the satisfaction or written waiver (by the Company) of the following conditions:

(a)    *Representations and Warranties*.  All of the representations and warranties of the Purchaser set forth in this Agreement and in any certificate delivered by the Purchaser pursuant hereto shall be true and correct on and as of the date of this Agreement and on and as of the Closing Date as if made on the Closing Date, except for (i) those representations and warranties that address matters only as of a particular date (which representations and warranties shall have been accurate as of such date), and (ii) any failures to be true and correct that (without giving effect to any qualifications or limitations as to materiality or Material Adverse Effect), individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on, or with respect to, the Purchaser.

(b)    *Agreements and Covenants*.  The Purchaser shall have performed in all material respects all of the Purchaser's obligations and complied in all material respects with all of the Purchaser's agreements and covenants under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)    *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred with respect to the Purchaser since the date of this Agreement which is continuing and uncured.

(d)    *Closing Deliveries.*

(i)    OFFICER CERTIFICATE.  The Purchaser shall have delivered to the Company a certificate, dated the Closing Date, signed by an executive officer of the Purchaser in such capacity, certifying as to the satisfaction of the conditions specified in <u>Sections 8.1(a)</u>, <u>8.1(b)</u> and <u>8.1(c)</u>.

(ii)    SECRETARY CERTIFICATE.  The Purchaser shall have delivered to the Company a certificate from its secretary or other executive officer certifying as to, and attaching, (A) copies of the Purchaser's Organizational Documents as in effect as of the Closing Date (immediately prior to giving effect to the Conversion), (B) the resolutions of the Purchaser's board of directors authorizing the execution, delivery and performance of this Agreement and each of the Ancillary Documents to which it is a party or by which it is bound, and the consummation of the transactions contemplated hereby and thereby, and (C) the incumbency of officers authorized to execute this Agreement or any Ancillary Document to which the Purchaser is or is required to be a party or otherwise bound.

(iii)   GOOD STANDING.  The Purchaser shall have delivered to the Company a good standing certificate (or similar documents applicable for such jurisdictions) for the Purchaser certified as of a date no later than thirty (30) days prior to the Closing Date from the proper Governmental Authority of the Purchaser's jurisdiction of organization and from each other jurisdiction in which the Purchaser is qualified to do business as a foreign entity as of the Closing, in each case to the extent that good standing certificates or similar documents are generally available in such jurisdictions.

(iv)   RESIGNATIONS AND ELECTIONS. The Purchaser shall have obtained and deliver to the Company at or prior to the Closing the resignation of each officer of the Purchaser and the board resolutions of the Purchaser appointing, effective at Closing, Joe Page as Chief Technical Officer and Chairman, Gert Funk as Chief Executive Officer and Bennett Yankowitz as Chief Financial Officer, and the elections (subject to requirements of Rule 14f-1 of the Exchange Act) of Joe Page and Gert Funk as additional directors of the Purchaser .

8.2   Conditions to Obligations of the Purchaser.   The obligations of the Purchaser to consummate the Contribution and the other transactions contemplated by this Agreement are subject to the satisfaction or written waiver (by the Purchaser) of the following conditions:

(a)   *Representations and Warranties*.  All of the representations and warranties of the Company set forth in this Agreement and in any certificate delivered by the Company, shall be true and correct on and as of the date of this Agreement and on and as of the Closing Date as if made on the Closing Date, except for (i) those representations and warranties that address matters only as of a particular date (which representations and warranties shall have been accurate as of such date), and (ii) any failures to be true and correct that (without giving effect to any qualifications or limitations as to materiality or Material Adverse Effect), individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on, or with respect to, the Company.

(b)   *Agreements and Covenants*.  The Company shall have performed in all material respects all of its obligations and complied in all material respects with all of its agreements and covenants under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)   *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred with respect to the Company since the date of this Agreement which is continuing and uncured.

(d)   Closing Deliveries.

(i)   OFFICER CERTIFICATE.  The Purchaser shall have received a certificate from the Company, dated as the Closing Date, signed by an executive officer of the Company in such capacity, certifying as to the satisfaction of the conditions specified in Sections 8.2(a), 1.1(b) and 1.1(c).

(ii)   SECRETARY CERTIFICATE.  The Company shall have delivered to the Purchaser a certificate executed by the Company's secretary certifying as to the validity and effectiveness of, and attaching, (A) copies of the Company's Organizational Documents as in effect as of the Closing Date (immediately prior to the Closing), and (B) the incumbency of officers of the Company authorized to execute this Agreement or any Ancillary Document to which the Company is or is required to be a party or otherwise bound.

8.3   Frustration of Conditions. Notwithstanding anything contained herein to the contrary, no Party may rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure was caused by the failure of such Party or its Affiliates (or with respect to the Company, the Company or Seller) failure to comply with or perform any of its covenants or obligations set forth in this Agreement.

**ARTICLE IX**
**TERMINATION AND EXPENSES**

9.1     <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as follows:

(a)     by mutual written consent of the Purchaser and the Company;

(b)     by written notice by the Purchaser or the Company if any of the conditions to the Closing set forth in Article VIIII have not been satisfied or waived by August 1, 2018 (the "*Outside Date*"); provided, however, the right to terminate this Agreement under this <u>Section 9.1(b)</u> shall not be available to a Party if the breach or violation by such Party or its Affiliates of any representation, warranty, covenant or obligation under this Agreement was the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

(c)     by written notice by either the Purchaser or the Company if a Governmental Authority of competent jurisdiction shall have issued an Order or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such Order or other action has become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> shall not be available to a Party if the failure by such Party or its Affiliates to comply with any provision of this Agreement has been a substantial cause of, or substantially resulted in, such action by such Governmental Authority;

(d)     by written notice by the Company, if (i) there has been a material breach by the Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, or if any representation or warranty of the Purchaser shall have become materially untrue or materially inaccurate, in any case, which would result in a failure of a condition set forth in <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u> to be satisfied (treating the Closing Date for such purposes as the date of this Agreement or, if later, the date of such breach), and (ii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of (A) twenty (20) days after written notice of such breach or inaccuracy is provided by the Company or (B) the Outside Date;

(e)     by written notice by the Purchaser, if (i) there has been a breach by the Company of any of its representations, warranties, covenants or agreements contained in this Agreement, or if any representation or warranty of such Parties shall have become untrue or inaccurate, in any case, which would result in a failure of a condition set forth in Section 8.2<u>(a)</u> to be satisfied (treating the Closing Date for such purposes as the date of this Agreement or, if later, the date of such breach), and (ii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of (A) twenty (20) days after written notice of such breach or inaccuracy is provided by the Purchaser or (B) the Outside Date;

(f)     by written notice by the Purchaser, if there shall have been a Material Adverse Effect on the Company or its Subsidiaries following the date of this Agreement which is uncured and continuing; or

(g)     by written notice by the Purchaser to the Company if (i) the Company shall not have delivered to the Purchaser on or prior to August 14, 2018 the PCAOB Audited Financials, or (ii) if the PCAOB Audited Financials are substantially different from the Audited Company Financials in an adverse manner, including any of the consolidated revenues, net income or assets being at least five percent (5%) less than the amounts set forth in the Audited Company Financials or the

consolidated liabilities being at least five percent (5%) greater than the amounts set forth in the Audited Company Financials.

9.2    <u>Effect of Termination</u>. This Agreement may only be terminated in the circumstances described in <u>Section 9.1</u> and pursuant to a written notice delivered by the applicable Party to the other applicable Parties, which sets forth the basis for such termination, including the provision of <u>Section 9.1</u> under which such termination is made.  In the event of the valid termination of this Agreement pursuant to <u>Section 9.1</u>, (i) this Agreement shall forthwith become void, , and (ii) there shall be no Liability on the part of any Party or any of their respective Representatives, and all rights and obligations of each Party shall cease, except: (x) <u>Section 9.3</u>, <u>Article X</u>, <u>Article XI</u> and this <u>Section 9.2</u> shall survive the termination of this Agreement, and (y) nothing herein shall relieve any Party from Liability for any willful breach of any representation, warranty, covenant or obligation under this Agreement or any Fraud Claim against such Party, in either case, prior to termination of this Agreement.

9.3    <u>Fees and Expenses</u>.  Except as provided otherwise in this Agreement, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.  As used in this Agreement, "*Expenses*" shall include all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, financial advisors, financing sources, experts and consultants to a Party hereto or any of its Affiliates) incurred by a Party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution or performance of this Agreement or any Ancillary Document related hereto and all other matters related to the consummation of this Agreement.

**<u>ARTICLE X</u>**
**<u>OTHER AGREEMENT OF THE PARTIES</u>**

10.1 <u>Piggy-Back Registration Rights.</u>

(a)    If the Company proposes to register any of the Purchaser Common Stock after the first anniversary of the Closing Date, but prior to the third anniversary of the Closing Date, it will give prompt written notice to PacificWave Partners and Bennett Yankowitz of its intention to effect such registration (the "*Incidental Registration*"). Within five (5) Business Days of receiving such written notice of an Incidental Registration, Sellers, PacificWave Partners or its Affiliates, or Bennett Yankowitz (the "*Piggy-Back Parties*") may each make a written request (the "*Piggy-Back Request*") that the Company include in the proposed Incidental Registration all, or a portion, of the Registrable Shares owned by such Piggy-Back Party (which Piggy-Back Request shall set forth the number of Registrable Shares intended to be disposed of by the Piggy-Back Party and the intended method of disposition thereof). For the purposes of <u>Section 10.1</u> "*Registrable Shares*" shall mean the Purchaser Common Stock held by any of the Piggy-Back Parties at Closing; provided that any particular securities of such Registrable Shares shall cease to be Registrable Shares when (i) any registration statement of the Company that covers the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such registration statement, (ii) such securities shall have become eligible to be sold to the public by the Purchaser pursuant to Rule 144 under the Securities Act, or (iii) subsequent disposition of such securities shall not require registration or qualification of them under the Securities Act or of any similar state law then in force.

(b)    The Company will use its commercially reasonable efforts to include in any Incidental Registration all Registrable Shares which the Company has been requested to register pursuant to any timely Piggy-Back Request, to the extent required to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Shares so to be registered. If the Registrable Shares are not included in an Incidental Registration by the 90th calendar day after the Closing Date, then

the Company shall immediately prepare and file a registration statement on such form as may be required covering the Registrable Shares.

        (c)      Notwithstanding the preceding Sections 10.1(a) and 10.1(b): (i) the Company shall not be obligated pursuant to this Section 10.1 to effect a registration of Registrable Shares requested pursuant to a timely Piggy-Back Request if the Company discontinues the related Incidental Registration at any time prior to the effective date of any registration statement filed in connection therewith; (ii) if a registration pursuant to this Section 10.1 involves an underwritten offering, and the managing underwriter (or, in the case of an offering that is not underwritten, an investment banker) shall advise the Company that, in its opinion, the number of securities requested and otherwise proposed to be included in such registration exceeds the number which can be sold in such offering without adversely affecting the marketability of the offering, the Company will include in such registration the number which the Company is so advised can be sold in such offering in the following order: first, the securities the Company proposes to sell for its own account in such registration, second, the Registrable Shares of the Piggy-Back Party requesting to be included in such Registration, through a timely Piggy-Back Request, and, third, all other securities requested to be included in such registration on a pro rata basis; and (iii) if the Company is engaged in, or has definitive plans to engage in, any activity or negotiations that, in the good faith determination of the managers of the Company, would be adversely affected by disclosure that would be required in connection with a registration to the material detriment of the Company, then the Company may delay such registration for a period of 20 days from the date of termination or disclosure of such activity or negotiations.

## ARTICLE XI
## MISCELLANEOUS

11.1 Notices.  All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered (i) in person, (ii) by facsimile or other electronic means, with affirmative confirmation of receipt, (iii) one Business Day after being sent, if sent by reputable, nationally recognized overnight courier service or (iv) three (3) Business Days after being mailed, if sent by registered or certified mail, pre-paid and return receipt requested, in each case to the applicable Party at the following addresses (or at such other address for a Party as shall be specified by like notice):

| | |
|---|---|
| *If to the Purchaser, to* | B4MC Gold Mines, Inc.<br>c/o Bennett J. Yankowitz<br>3651 Lindell Road, Suite D565<br>Las Vegas, NV 89103<br>bjy@yankowitzlaw.com |
| *If to the Company, to:* | Henrik Rouf<br>c/o PacificWave Partners<br>468 N. Camden Dr., Suite 350<br>Beverly Hills, CA 90210<br>hrouf@pacificwavepartners.com |

11.2 Binding Effect; Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. This Agreement shall not be assigned by operation of Law or otherwise without the prior written

consent of the Purchaser and the Company and any assignment without such consent shall be null and void; provided that no such assignment shall relieve the assigning Party of its obligations hereunder.

11.3 Third Parties. Nothing contained in this Agreement or in any instrument or document executed by any party in connection with the transactions contemplated hereby shall create any rights in, or be deemed to have been executed for the benefit of, any Person that is not a Party hereto or thereto or a successor or permitted assign of such a Party.

11.4 Governing Law; Jurisdiction. This Agreement shall be governed by, construed and enforced in accordance with the Laws of the State of Nevada without regard to the conflict of laws principles thereof. All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any state or federal court located in Las Vegas, Nevada (or in any appellate court thereof) (the "*Specified Courts*"). Each Party hereto hereby (a) submits to the exclusive jurisdiction of any Specified Court for the purpose of any Action arising out of or relating to this Agreement brought by any Party hereto and (b) irrevocably waives, and agrees not to assert by way of motion, defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any Specified Court. Each Party agrees that a final judgment in any Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably consents to the service of the summons and complaint and any other process in any other Action relating to the transactions contemplated by this Agreement, on behalf of itself, or its property, by personal delivery of copies of such process to such Party at the applicable address set forth in Section 11.1. Nothing in this Section 11.4 shall affect the right of any Party to serve legal process in any other manner permitted by Law.

11.5 WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.5.

11.6 Specific Performance. Each Party acknowledges that the rights of each Party to consummate the transactions contemplated hereby are unique, recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Parties may have not adequate remedy at law, and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by an applicable Party in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such Party may be entitled under this Agreement, at law or in equity.

11.7 Severability. In case any provision in this Agreement shall be held invalid, illegal or unenforceable in a jurisdiction, such provision shall be modified or deleted, as to the jurisdiction involved, only to the extent necessary to render the same valid, legal and enforceable, and the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby nor shall the validity, legality or enforceability of such provision be affected thereby in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will substitute for any invalid, illegal or unenforceable provision a suitable and equitable provision that carries out, so far as may be valid, legal and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

11.8 Amendment. This Agreement may be amended, supplemented or modified only by execution of a written instrument signed by the Purchaser and the Company.

11.9 Waiver. The Purchaser on behalf of itself and its Affiliates, the Company on behalf of itself and its Affiliates, may in its sole discretion (i) extend the time for the performance of any obligation or other act of any other non-Affiliated Party hereto, (ii) waive any inaccuracy in the representations and warranties by such other non-Affiliated Party contained herein or in any document delivered pursuant hereto and (iii) waive compliance by such other non-Affiliated Party with any covenant or condition contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party or Parties to be bound thereby. Notwithstanding the foregoing, no failure or delay by a Party in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

11.10 Entire Agreement. This Agreement and the documents or instruments referred to herein, including any exhibits and schedules attached hereto, which exhibits and schedules are incorporated herein by reference, together with the Ancillary Documents, embody the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or the documents or instruments referred to herein, which collectively supersede all prior agreements and the understandings among the Parties with respect to the subject matter contained herein.

11.11 Counterparts. This Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

11.12 Power of Attorney. The Sellers, each and individually, irrevocably and severally appoint Henrik Rouf to be their attorney in fact and to take any action which the Sellers are obliged to take under this Agreement. The Sellers hereby ratify and confirm whatever their attorney in fact does or purports to do pursuant to its appointment under this Section 11.12.

## ARTICLE XII
## DEFINITIONS

12.1 Certain Definitions. For purpose of this Agreement, the following capitalized terms have the following meanings:

"*Accounting Principles*" means in accordance with GAAP as in effect at the date of the financial statement to which it refers or if there is no such financial statement, then as of the Closing Date,

using and applying the same accounting principles, practices, procedures, policies and methods (with consistent classifications, judgments, elections, inclusions, exclusions and valuation and estimation methodologies) used and applied by the Company in the preparation of the latest audited Financial Statements.  In any event, the Accounting Principles (i) shall not include any purchase accounting or other adjustment arising out of the consummation of the transactions contemplated by this Agreement, (ii) shall be based on facts and circumstances as they exist at or prior to the Closing and shall exclude the effect of any act, decision or event occurring after the Closing and (iii) shall follow the defined terms contained in this Agreement.

"*Action*" means any notice of noncompliance or violation, or any claim, demand, charge, action, suit, litigation, audit, settlement, complaint, stipulation, assessment or arbitration, or any request (including any request for information), inquiry, hearing, proceeding or investigation, by or before any Governmental Authority.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"*Ancillary Documents*" means each agreement, instrument or document attached hereto as an Exhibit, and the other agreements, certificates and instruments to be executed or delivered by any of the Parties hereto in connection with or pursuant to this Agreement.

"*Assignment and Assumption Agreement*" means the (i) Assignment and Assumption Agreement relating to the Company between Purchaser and the Sellers substantially in the form of Exhibit A".

"*Benefit Plans*" of any Person means any and all deferred compensation, executive compensation, incentive compensation, equity purchase or other equity-based compensation plan, employment or consulting, severance or termination pay, holiday, vacation or other bonus plan or practice, hospitalization or other medical, life or other insurance, supplemental unemployment benefits, profit sharing, pension, or retirement plan, program, agreement, commitment or arrangement, and each other employee benefit plan, program, agreement or arrangement, including each "employee benefit plan" as such term is defined under Section 3(3) of ERISA, maintained or contributed to or required to be contributed to by a Person for the benefit of any employee or terminated employee of such Person, or with respect to which such Person has any Liability, whether direct or indirect, actual or contingent, whether formal or informal, and whether legally binding or not.

"*Business Day*" means any day other than a Saturday, Sunday or a legal holiday on which commercial banking institutions in New York, New York are authorized to close for business.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto, as amended.  Reference to a specific section of the Code shall include such section and any valid treasury regulation promulgated thereunder.

"*Company Charter*" means the Operating Agreement of the Company, as amended.

"*Confidential Information*" means all confidential or proprietary documents and information concerning the either Party or any of its Representatives; provided, however, that the Confidential Information shall not include any information which, (i) at the time of disclosure by the Company or its respective Representatives, is generally available publicly and was not disclosed in breach of this Agreement or (ii) at the time of the disclosure by the Purchaser or its Representatives to the Company or its Representatives, was previously known by such receiving party without violation of Law

or any confidentiality obligation by the Person receiving such Purchaser Confidential Information. For the avoidance of doubt, from and after the Closing, Purchaser Confidential Information will include the confidential or

"*Consent*" means any consent, approval, waiver, authorization or Permit of, or notice to or declaration or filing with any Governmental Authority or any other Person.

"*Contracts*" means all contracts, agreements, binding arrangements, bonds, notes, indentures, mortgages, debt instruments, purchase order, licenses (and all other contracts, agreements or binding arrangements concerning Intellectual Property), franchises, leases and other instruments or obligations of any kind, written or oral (including any amendments and other modifications thereto).

"*Control*" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise. "Controlled", "Controlling" and "under common Control with" have correlative meanings. Without limiting the foregoing a Person (the "*Controlled Person*") shall be deemed Controlled by (a) any other Person (the "*10% Owner*") (i) owning beneficially, as meant in Rule 13d-3 under the Exchange Act, securities entitling such Person to cast ten percent (10%) or more of the votes for election of directors or equivalent governing authority of the Controlled Person or (ii) entitled to be allocated or receive ten percent (10%) or more of the profits, losses, or distributions of the Controlled Person; (b) an officer, director, general partner, partner (other than a limited partner), manager, or member (other than a member having no management authority that is not a 10% Owner) of the Controlled Person; or (c) a spouse, parent, lineal descendant, sibling, aunt, uncle, niece, nephew, mother-in-law, father-in-law, sister-in-law, or brother-in-law of an Affiliate of the Controlled Person or a trust for the benefit of an Affiliate of the Controlled Person or of which an Affiliate of the Controlled Person is a trustee.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*FINRA*" means the Financial Industry Regulatory Authority, Inc.

"*Fraud Claim*" means any claim based in whole or in part upon fraud, willful misconduct or intentional misrepresentation.

"*GAAP*" means generally accepted accounting principles as in effect in the United States of America.

"*Governmental Authority*" means any federal, state, local, foreign or other governmental, quasi-governmental or administrative body, instrumentality, department or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"*Indebtedness*" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money (including the outstanding principal and accrued but unpaid interest), (b) obligations for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business), (c) any other indebtedness of such Person that is evidenced by a note, bond, debenture, credit agreement or similar instrument, (d) all obligations of such Person under leases that should be classified as capital leases in accordance with GAAP, (e) all obligations of such Person for the reimbursement of any obligor on any line or letter of credit, banker's acceptance, guarantee or similar

credit transaction, in each case, that has been drawn or claimed against, (f) all obligations of such Person in respect of acceptances issued or created, (g) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (h) all obligations secured by an Lien on any property of such Person, (i) any premiums, prepayment fees or other penalties, fees, costs or expenses associated with payment of any Indebtedness of such Person and (j) all obligation described in clauses (a) through (i) above of any other Person which is directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss.

"*Intellectual Property*" means all of the following as they exist in any jurisdiction throughout the world:  patents, trademarks, copyrights, trade secrets, internet assets, software and other intellectual property, and all licenses, sublicenses and other agreements or permissions related to the preceding property.

"*IRS*" means the U.S. Internal Revenue Service (or any successor Governmental Authority).

"*Knowledge*" means, with respect to (i) the Company, the actual knowledge of the executive officers or directors of the Company, after due inquiry or (ii) any other Party, the actual knowledge of its directors and executive officers, after due inquiry.

"*Law*" means any federal, state, local, municipal, foreign or other law, statute, legislation, principle of common law, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, directive, requirement, writ, injunction, settlement, Order or Consent that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"*Liabilities*" means any and all liabilities, Indebtedness, Actions or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, whether direct or indirect, whether matured or unmatured and whether due or to become due), including Tax liabilities due or to become due.

"*Lien*" means any mortgage, pledge, security interest, attachment, right of first refusal, option, proxy, voting trust, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), restriction (whether on voting, sale, transfer, disposition or otherwise), any subordination arrangement in favor of another Person, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar Law.

"*Material Adverse Effect*" means, with respect to any specified Person, any fact, event, occurrence, change or effect that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect upon (a) the business, assets, Liabilities, results of operations, prospects or condition (financial or otherwise) of such Person and its Subsidiaries, taken as a whole, or (b) the ability of such Person or any of its Subsidiaries on a timely  basis to consummate the transactions contemplated by this Agreement or the Ancillary Documents to which it is a party or bound or to perform its obligations hereunder or thereunder; provided, however, that for purposes of clause (a) above, any changes or effects directly or indirectly attributable to, resulting from, relating to or arising out of the following (by themselves or when aggregated with any other, changes or effects) shall not be deemed to be, constitute, or be taken into account when determining whether there has or may, would or could have occurred a Material Adverse Effect:  (i) general changes in the financial or securities markets or general

24

economic or political conditions in the country or region in which such Person or any of its Subsidiaries do business; (ii) changes, conditions or effects that generally affect the industries in which such Person or any of its Subsidiaries principally operate; (iii) changes in GAAP or other applicable accounting principles or mandatory changes in the regulatory accounting requirements applicable to any industry in which such Person or its Subsidiaries principally operate; (iv) conditions caused by acts of God, terrorism, war (whether or not declared) or natural disaster; (v) any failure in and of itself by such Person and its Subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (provided that the underlying cause of any such failure may be considered in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent not excluded by another exception herein) and (vi), with respect to the Purchaser, the consummation and effects of the Redemption; underlined provided further, underlined however, that any event, occurrence, fact, condition, or change referred to in clauses (i) - (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition, or change has a disproportionate effect on such Person or any of its Subsidiaries compared to other participants in the industries in which such Person or any of its Subsidiaries primarily conducts its businesses.

"*Order*" means any order, decree, ruling, judgment, injunction, writ, determination, binding decision, verdict, judicial award or other action that is or has been made, entered, rendered, or otherwise put into effect by or under the authority of any Governmental Authority.

"*Organizational Documents*" means, with respect to any Person that is an entity, its certificate of incorporation or formation, bylaws, operating agreement or similar organizational documents, in each case, as amended.

"*PCAOB*" means the U.S. Public Company Accounting Oversight Board (or any successor thereto).

"*Permits*" means all federal, state, local or foreign or other third-party permits, grants, easements, consents, approvals, authorizations, exemptions, licenses, franchises, concessions, ratifications, permissions, clearances, confirmations, endorsements, waivers, certifications, designations, ratings, registrations, qualifications or orders of any Governmental Authority or any other Person.

"*Permitted Liens*" means (a) Liens for Taxes or assessments and similar governmental charges or levies, which either are (i) not delinquent or (ii) being contested in good faith and by appropriate proceedings, and adequate reserves have been established with respect thereto, (b) other Liens imposed by operation of Law arising in the ordinary course of business for amounts which are not due and payable and as would not in the aggregate materially adversely affect the value of, or materially adversely interfere with the use of, the property subject thereto, (c) Liens incurred or deposits made in the ordinary course of business in connection with social security, (d) Liens on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the ordinary course of business, or (v) Liens arising under this Agreement or any Ancillary Document.

"*Person*" means an individual, corporation, partnership (including a general partnership, limited partnership or limited liability partnership), limited liability company, association, trust or other entity or organization, including a government, domestic or foreign, or political subdivision thereof, or an agency or instrumentality thereof.

"*Personal Property*" means any machinery, equipment, tools, vehicles, furniture, leasehold improvements, office equipment, plant, parts and other tangible personal property.

"***Purchaser Charter***" means the certificate of incorporation of the Purchaser, as amended and effective under Chapter 78 of the Nevada Revised Statutes

"***Purchaser Common Stock***" means the shares of common stock, par value $0.001 per share, of the Purchaser.

"***Representatives***" means, as to any Person, such Person's Affiliates and the respective managers, directors, officers, employees, independent contractors, consultants, advisors (including financial advisors, counsel and accountants), agents and other legal representatives of such Person or its Affiliates.

"***SEC***" means the Securities and Exchange Commission (or any successor Governmental Authority).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons will be allocated a majority of partnership, association or other business entity gains or losses or will be or control the managing director, managing member, general partner or other managing Person of such partnership, association or other business entity. A Subsidiary of a Person will also include any variable interest entity which is consolidated with such Person under applicable accounting rules.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Taxes or the administration of any Laws or administrative requirements relating to any Taxes.

"***Taxes***" means (a) all direct or indirect federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value-added, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, social security and related contributions due in relation to the payment of compensation to employees, excise, severance, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (b) any Liability for payment of amounts described in clause (a) whether as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law and (c) any Liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax group, tax indemnity or tax allocation agreement with, or any other express or implied agreement to indemnify, any other Person.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]***

**Execution Version**

       IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

     Bennett J. Yankowitz, President and Sole
     Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By:

     Name: Gert Funk
     Title: President

*The Sellers*:

Gert Funk

Joseph Page

**PacificWave Partners Limited**

By: _____

     Name: Henrik Rouf
     Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____
   Name: Henrik Oerbekker
   Title:  Managing Director

**Saxton Capital Ltd.**

By: _____
   Name: John Moerk
   Title: Director

Exhibit D – RocketFuel V. Ellenoff

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROCKETFUEL BLOCKCHAIN COMPANY
and ROCKETFUEL BLOCKCHAIN, INC.,

                                    Plaintiffs,

                -against-

ELLENOFF GROSSMAN & SCHOLE LLP,

                                    Defendant.

21 Civ. 1764 (VEC)

SECOND AMENDED COMPLAINT

PLAINTIFFS DEMAND
TRIAL BY JURY

Plaintiffs RocketFuel Blockchain Company and RocketFuel Blockchain, Inc., for

their Second Amended Complaint against defendant Ellenoff Grossman & Schole LLP, by their

attorneys Scarola Zubatov Schaffzin PLLC, allege:

*The Parties*

1.      Plaintiff RocketFuel Blockchain Company is a corporation organized

and existing under the laws of the State of Nevada with its principal place of business in the State

of Nevada.

2.      Plaintiff RocketFuel Blockchain, Inc., is a corporation organized and

existing under the laws of the State of Nevada with its principal place of business in the State of

Nevada.

3.      Defendant Ellenoff Grossman & Schole LLP is a law firm limited

liability partnership organized and existing under the laws of the State of New York with its

principal place of business in the State of New York, and with all of its members being natural

persons who are citizens and residents of states other than the State of Nevada.

*Jurisdiction and Venue*

4.      This Court has personal jurisdiction over the defendant as it is a citizen of the State of New York.  Jurisdiction in this court is proper under 28 U.S.C. §1332(a) because the plaintiffs are citizens of the State of Nevada and defendant is a citizen of the State of New York (with no member of defendant being a citizen of the State of Nevada), and the amount in controversy in this case (the amount the plaintiffs seek to recover) exceeds $75,000 exclusive of interest and costs.

5.      Venue in this Court is proper under 28 U.S.C. §1391(b)(l) & (2) because the defendant resides in the State of New York and a substantial part of the events and omissions giving rise to this case occurred in the State of New York.

*Facts Pertinent to More than One Claim for Relief*

6.      This case arises from legal malpractice, gross negligence and wanton and reckless conduct, breach of fiduciary duty and breach of contract by defendant by Ellenoff Grossman & Schole LLP ("EGS") in connection with defendant's representation of RocketFuel Blockchain Company ("RocketFuel") relating to a venture that included a reverse acquisition transaction that was to take place in which RocketFuel would be acquired by B4MC Gold Mines, Inc. ("B4MC") in exchange for shares of B4MC common stock representing a controlling interest (and the work done for the benefit of B4MC to which EGS is also liable under what is sometimes called the "privity" or "approaching-privity" standard).  (In September 2018, after the acquisition had closed, B4MC changed its name to RocketFuel Blockchain, Inc. ("RBI").)

A.  *The Origin of the Venture and Transactions in Late 2017 and 2018 — An Overview*

7.     Commencing in late 2017, discussions were conducted among a number of persons toward the possibility of developing and bringing to market a highly efficient, automated and secure check-out system for e-commerce merchants based upon blockchain technology through a company the stock of which would be publicly traded (to be accomplished by way of what is sometimes called a "reverse acquisition transaction").  One of these persons was Gert Funk, who had career experience in other forms of payment systems for e-commerce businesses.  These discussions also involved Joseph Page, who claimed to the others involved to have developed technology to support the business, which was subject to five patent applications then pending before the United States Patent and Trademark Office (the "PTO").  The venture as discussed and undertaken also included Henrik Rouf (and entities in which he was involved) and later, Carsten Jensen (and entities in which he was involved) and attorney Bennett J. Yankowitz.

8.     The venture contemplated operating in connection with a publicly traded company through a reverse acquisition transaction with what is sometimes known as a publicly traded "shell company" into which another, operating, company would be subsumed in a transaction in which shares of the operating company would be exchanged for shares of the public company.  Mr. Rouf, together with Mr. Yankowitz, had the ability to bring B4MC into the venture and contemplated transaction as the publicly traded entity.  As Mr. Page has stated it, Mr. Page would participate in the venture by bringing his patent applications to the transactions; others involved would be bringing other skills, assets or capacities.[1]

---

[1] As plaintiffs allege and explain separately herein, they are involved in litigation with Mr. Page over issues related to those presented here.  Plaintiffs make clear that to the extent they refer to Mr. Page or any allegations or statements that he might have made, plaintiffs do not rely upon those statements as necessary to their claims herein (except to the extent of his false statements as alleged herein), independently verify or endorse anything Mr. Page says or has said and disagree with and contest many allegations he has made in other contexts.  Plaintiffs offer those statements for what context they add to their other allegations which, plaintiffs maintain, are in themselves sufficient to state valid claims for relief in this case.

9. The others involved in the venture later learned, as alleged more fully herein, that Mr. Page did not in fact have the five patent applications he claimed to have — they had been abandoned before the PTO long before — and he therefore brought nothing of value to the transaction and was not essential to it. He never was.

10. As is alleged herein, EGS had the role of doing due diligence as counsel in the transactions to discover facts precisely of that sort — that the Page patent applications were not in fact valid or viable.

11. In substance, Mr. Page had no valid patent applications to bring to the transaction.

12. As is also alleged herein, EGS either failed, as a matter of negligence, in discovering that the Page patent applications were not in fact valid or viable or, as Mr. Page has alleged elsewhere, actually knew that the patent applications were not valid or viable, and thereby acted grossly negligently and in a wanton and reckless manner in carrying out its work for and duties to plaintiffs, and breached other duties, including fiduciary duties, to the plaintiffs, by not telling them.

B. *The EGS Retention and Retainer Agreement*

13. RocketFuel entered into an Engagement Agreement with EGS in March 2018 pertaining to the contemplated transactions. (A copy of the Engagement Agreement is Exhibit A.)

14. EGS provided legal services to RocketFuel (and also for the benefit of B4MC as alleged more fully below) commencing in early March 2018, including as alleged herein and including as affirmatively stated by EGS.

15. The EGS retainer agreement specifically stated that under the EGS

engagement EGS would "supervise and manage all necessary due diligence." Those legal services with respect to performance of "necessary due diligence" of necessity included due diligence as to the Page patent applications to ensure that they were in proper order and that such patent applications were part of the assets of the venture because, as alleged more fully below, EGS itself understood that those were the only assets of the venture (apart from its concept and what the other people involved would bring to it) as to which there could be due diligence.

16.     As is also alleged more fully below, EGS in fact did undertake such due diligence to ensure that the patent applications were in proper order, but simply failed in doing so (or else learned the truth, but did not perform its duty to inform its clients of that truth).

C.  *Summary Description of the Central Claims and Allegations*

17.     The contemplated transaction to establish the venture as part of a publicly traded company closed on June 27, 2018.

18.     Subsequent to that closing, EGS continued to represent RocketFuel (which became a 100% subsidiary of B4MC) and also B4MC (now known as RBI).  The Engagement Agreement with EGS (Exhibit A) also provided that EGS would represent B4MC in "ongoing corporate and securities matters for the Company following the merger."

19.     As alleged above, EGS's services prior to the reverse acquisition in June 2018 included in fact conducting due diligence, as alleged more fully below, into the Page patent application's status and viability, as well as preparation of the contribution agreement related to the transaction and related closing documents for the reverse acquisition transaction, preparation of the "Super 8-K" disclosure filed with the Securities and Exchange Commission in connection with the reverse acquisition transaction, and also included, including after the closing, preparation of associated SEC filings such as preparation of B4MC's/RBI's quarterly and annual

reports to the SEC (Forms 10-K and 10-Q).

20.     As alleged above, RocketFuel's only assets at the time of the transaction were, to the extent there were any in fact, the five patent applications assigned by Mr. Page who became one of its shareholders in contemplation of and in connection with the reverse acquisition transaction as the consideration from him as part of the transaction.

21.     In consideration of the assignments, Page initially received 300 shares of RocketFuel common stock, which he subsequently exchanged for 5,100,394 shares of B4MC (now known as RBI) common stock at the closing of the reverse acquisition transaction.

22.     Based upon the value of and the transactions in the publicly traded shares of RBI, Page received value in excess of $45,000,000 at the time of the closing of the reverse acquisition transaction. The RBI shares he received were valued at $9.00 per share as the closing market price of those shares quoted at that time on the OTC Pink sheets (and no less than, $11,000,000 based upon pricing at the time of the filing of this action).

23.     In May 2019 Joseph Page resigned as an officer and Director of RBI.

24.     Subsequently, commencing at around that time, RocketFuel and RBI, through patent counsel, discovered that three of those patent applications assigned by Page had been previously abandoned and were otherwise not as expected prior to Page's assignment to RocketFuel, and prior to the reverse acquisition transaction, and that all five had substantial deficiencies.

25.     Page's filings with the PTO had been on a private and confidential basis, and there had been no way for RocketFuel (or B4MC or any other person or party) to learn of these deficiencies from a public record without assistance of EGS or other similar assistance of the type EGS was providing.

26.     The result of these deficiencies was that the assignments were of little or no value and might not be salvageable at all despite best efforts that RocketFuel might make.  In fact, in October 2014 Page had petitioned the PTO to withdraw its holding that one of the patents was abandoned, which petition the PTO denied in 2015, three years prior to the subject transactions.

27.     A substantial part of EGS's engagement, and its actual work in fact, per its retainer agreement and prior to the consummation of the reverse acquisition transaction, was to conduct due diligence with regard to the existence, proper form and good order, and assignment of the five patent applications, including confirmation that there were no such deficiencies as were later discovered (including such that were not readily apparent from the public record).

28.     As alleged more fully below, plaintiffs learned in the middle of 2019 that the Page patent applications had been abandoned long before the venture at issue commenced in late 2017.

29.     As alleged above, EGS either failed, as a matter of negligence, to discover that the Page patent applications were not in fact valid or viable or, as Mr. Page has alleged elsewhere, actually knew that the patent applications were not valid or viable, and acted grossly negligently, recklessly and wantonly, and breached other duties, including fiduciary duties, to the plaintiffs by not telling them the truth EGS had learned.

30.     RocketFuel and RBI have sued Page relating to these transactions and that lawsuit is pending in United States District Court in Las Vegas, Nevada.

D.  *The Details of the Joseph Page Fraud (the Abandonment of His Patent Applications)
that EGS's Due Diligence Did Not Discover or that EGS Did Not Disclose to Plaintiffs if
EGS Did Discover It.*

31.     As alleged above, Joseph Page told the other parties involved with

RocketFuel and B4MC/RBI that Mr. Page had five pending patent applications in the process of being examined by the PTO that covered the blockchain payment technology the venture intended to and would develop and which would be his contribution to the venture to develop a blockchain based e-commerce payment technology platform.

32.     As alleged above, Mr. Page lied about this to the others involved in the venture through the time of the reverse acquisition transaction and for a long time after it closed in June 2018 and no one among the others involved learned the truth — from Mr. Page, EGS or anyone else — until approximately a year later in 2019.  EGS knew at all times before the transaction and until the truth emerged in 2019 that no one among the others involved was aware that the Page patent applications had been abandoned well before 2018.

33.     In fact, while Mr. Page had filed five such patent applications, through a company he owned (Blockchain, Inc.), in earlier years, each of those five patent applications had been abandoned (and suffered other, additional defects, as well) well before Mr. Page first discussed the venture in 2017 with those who would participate in it through RocketFuel and B4MC/RBI such that Mr. Page in fact had no pending applications for technology relevant to the venture.

34.     Mr. Page did not disclose the fact that his five patent applications had been abandoned and were otherwise defective to any of those involved in the venture until a long time after the reverse acquisition transaction closed in June 2018, including not to any of Gert Funk, Henrik Rouf, Carsten Jensen or Bennett Yankowitz, anyone associated with them or the entities with which they were affiliated and which were involved in the transactions or to any other person or entity involved in the venture and transactions.

35.     Mr. Page acted alone and in secret in this regard (except to the extent

EGS may have learned the truth, but not disclosed it).

36.     In fact, Mr. Page persisted in the deception actively for more than a year after the reverse acquisition transaction closed.  For example, within a matter of days after the reverse acquisition transaction closed, upon which closing Mr. Page became a Director of B4MC, B4MC filed (as prepared by EGS) its so-called Super 8-K with the Securities and Exchange Commission through which the following disclosure was made:

> "Our technology is covered by five applications for U.S. patents.  Each application was submitted by our Chief Technical Officer ('CTO') and director, Joe Page, who assigned then to RocketFuel in exchange for his RocketFuel shares."

37.     Despite the significance of this disclosure, or Mr. Page's knowledge that it was false, Mr. Page, even though then a B4MC Director, took no steps to correct it or advise any of the others involved in the venture of the truth.

38.     In the summer of 2018, after the reverse acquisition transaction closed, Mr. Page participated in the promotion of the business through a brochure describing the business in which — immediately following a page where his personal short biography and photo appeared as one of three members of the "Core Team" — Mr. Page's five abandoned patent applications were described as if they had not in fact been abandoned.

39.     The document stated:

> "Several patent applications have already been filed and more in the pipeline ensuring concepts and technologies behind the RocketFuel including the checkout solutions and supporting administrative systems."

40.     The document then listed as those patent applications the five ostensible Page patent applications, including separately for each of the five (i) the patent application number, (ii) the date of filing and (iii) the title.  This document which Mr. Page among others used with the world-at-large represented the abandoned applications as being active and viable

when they were not.

41.     Mr. Page not only did nothing to correct this, but participated in that document's use.

42.     In October 16, 2018, in e-mail correspondence with others working toward the venture's end, Mr. Page responded to an inquiry about possibly adding additional patents that might be available to the ostensibly existing portfolio, giving no indication that he had conveyed only abandoned patent applications and stating: "We ultimately have very good value in the portfolio we already have." Again, Mr. Page did not disclose that his applications had been abandoned but represented them still in October 2018 as active and viable.

43.     In or about May 2019, Mr. Page made demands to RBI that were rejected, resigned as a Director and was asked to resign his positions as an officer in both RocketFuel and RBI. In the discussions as to Mr. Page's separation from the business that followed, on or about June 3, 2019, during a conversation with Mr. Yankowitz, Mr. Page admitted — and disclosed to someone (anyone) associated with RocketFuel, RBI of their owners — for the first time that the patent applications had been abandoned.

44.     Even then, he did not state the dates on which the applications had been abandoned. Mr. Yankowitz then wrote to Mr. Page on June 3, 2019, requesting that Mr. Page provide the exact date each patent application had been abandoned, the files for each patent application, the Image File Wrappers (IFW)[2] and all of Mr. Page's communications with the PTO.

45.     Still, even then in June 2019, Mr. Page refused to cooperate by simply

---

[2] According to the uspto.gov, the IFW system "uses technology to replace the paper processing of patent applications in the Office. Paper components of these application files (including the specification, oath or declaration, drawings, information disclosure statements, amendments, Office actions, and file jacket notations) have been scanned to create electronic image files."

providing the requested information and files.

          46.     RBI then retained patent attorney Mark Kendrick ("Kendrick") as patent counsel to replace Mr. Page who had served the functions of patent counsel as a registered patent agent.

          47.     Mr. Kendrick became patent attorney of record of the Patent Applications in the PTO, replacing Mr. Page as patent agent.

          48.     Mr. Kendrick reviewed and investigated the abandoned patent applications and uncovered the following information:

          a.     Three of the five Patent Applications had been abandoned because of Mr. Page's failure to respond to a PTO action long before Mr. Page joined the venture in late 2017/early 2018:

          i.     One abandoned 8/7/2014 because Mr. Page failed to pay an extra filing fee for additional claims.

          ii.     One abandoned 5/11/2017 because Mr. Page failed to respond to a restriction requirement.

          iii.     One abandoned 9/8/2016 because Mr. Page failed to pay the filing fee and describe the drawings properly in the specification.

          b.     The assignments by Mr Page for the other two patent applications turned out to have other issues and as a result, Mr. Kendrick was unable to use a power of attorney to review them.  Mr. Kendrick eventually learned that those two patent applications had also been abandoned by Mr. Page long before being assigned to RocketFuel.

          c.     Mr. Kendrick also learned that in or around October 2014, Mr. Page had attempted unsuccessfully to revive one of the patent applications by filing a petition with the

PTO, but that on June 30, 2015, the PTO dismissed his petition. Because the petition had been dismissed, it would be extremely difficult to revive that patent application.

        d.     Mr. Kendrick also determined that because RocketFuel did not own any of the patent applications at the time they were abandoned and because of the extended length of time that had passed since abandonment, it was unlikely that they could revive the patent applications from abandoned status. Mr. Kendrick determined that the only way RocketFuel could protect itself would be to file new patent applications covering the same underlying inventions. However, the new filings would not relate back to the fiing dates of the original applicatiions, putting RocketFuel at risk;

        e.     Because Mr. Page's practice was to file all of his patent applications with a non-publication request, these patent applications are not published and are not searchable on the U.S. Patent and Trademark Office website; thus, there had been no way for those associated with RocketFuel and RBI to know whether there have been intervening filings by Mr. Page assigned to others;

        f.     Relatedly, because of the manner in which Mr. Page made these filings, and because Mr. Page had until that time been the registered patent agent for his abandoned applications, there was no way for those associated with RocketFuel and RBI to know that they had been abandoned except through the due diligence of patent counsel working with Mr. Page as defendant EGS was to have done; and

        g.     Above all, Mr. Kendrick ascertained that Mr. Page had not conveyed the patent applications he said he had pending before the PTO — all referenced in the EGS securities filings and other documents — and essentially conveyed ownership of nothing of value at all to the venture.

49.     At no time before this information was learned in 2019 did Mr. Page disclose it to any of Gert Funk, Henrik Rouf, Carsten Jensen or Bennett Yankowitz, anyone associated with them or the entities with which they were affiliated which were involved in the transactions or to any other person or entity involved in the venture and transactions.

50.     As alleged above, Mr. Page at all relevant times — from before the venture began in late 2017 and until 2109 — acted alone and in secret in regard to hiding the true status of his five patent applications as being abandoned before the venture began in late 2017 (except to the extent EGS may have learned the truth, but did not disclose it).

51.     The conduct of Mr. Page in relation to these matters was entirely adverse to the interests of all of the other parties to the venture and to the interests of any investor in RocketFuel and/or B4MC or RBI.

52.     The conduct of Mr. Page in relation to these matters was entirely adverse to the interests of RocketFuel.

53.     The conduct of Mr. Page in relation to these matters was entirely adverse to the interests of B4MC/RBI.

54.     Mr. Page himself has stated in pleadings in the Nevada litigation that in connection with his dealings with EGS in relation to the due diligence as to his patent applications, he "was necessarily on the opposing side of the transaction in question" from the plaintiffs here.

55.     In the conduct of Mr. Page in relation to these matters, he had totally abandoned the interests of RocketFuel and B4MC and of the others involved in the venture and was acting entirely for his own purposes.

56.     Mr. Page's fraud and concealment as to the true status of his five patent

applications as having been abandoned did not benefit any of those persons and entities, and to the contrary, (i) exposed each of the other parties to the venture, the investors in RocketFuel and B4MC (later RBI) and RocketFuel and B4MC (later RBI) themselves to damages and losses related to the fact that they had been misled to believe that Mr. Page had contributed actual, viable patent applications to the venture which were then disclosed and discussed as alleged above, (ii) exposed them to additional costs and (iii) damaged those parties to the extent Mr. Page acquired an interest in the companies on false pretenses and in exchange for what turned out not to have value.

57.     No part of Mr. Page's fraud benefited the other parties to the venture, the investors in RocketFuel and B4MC (later RBI) or RocketFuel and B4MC (later RBI) themselves.

58.     Had the other officers and Directors of RocketFuel and B4MC known of Mr. Page's fraud, they could and would have stopped him from proceeding with it, and stopped him from acquiring shares in RocketFuel and shares in B4MC.

59.     Additionally, had the other officers and Directors of RocketFuel and B4MC known of Mr. Page's fraud before the reverse acquisition transaction, they could and would have taken steps immediately at the time to ensure that Mr. Page could not continue to participate as an owner of RocketFuel or in the venture the parties had conceived.

60.     Additionally, had the other officers and Directors of RocketFuel and B4MC known of Mr. Page's fraud before the reverse acquisition transaction, they would have taken steps immediately at the time to ensure that Mr. Page could not use his shares of RocketFuel to exchange them for shares in B4MC.

61.     By reason of EGS's failure to discover the fact that the Page patent

applications had been abandoned, Mr. Page walked away with the ownership interest he did, at the expense of all others involved, as the direct and proximate cause of EGS's failure.

E. *EGS's Due Diligence Duty and Its Own Failure or Fraud*

62.     EGS commenced the due diligence effort with regard to the Page patents essentially immediately after being engaged.  EGS knew at all times before the reverse merger transaction and until the truth emerged in 2019 that no one among the others involved was aware that the Page patent applications had been abandoned well before 2018.

63.     For example, on March 26, 2018, Henrik Rouf provided copies to EGS of purported assignments of the patent applications to RocketFuel.

64.     It became apparent that the assignments were defective.

65.     EGS took steps toward addressing this as a part of its due diligence work with regard to the patent applications.

66.     This was remedied in part, but not in full, under EGS's supervision.

67.     EGS and Page were put in direct contact with each other.  At that point, at least five EGS attorneys — senior partner Barry Grossman, patent attorney John Stellabotte, Sarah E Williams, Jessica Yuan and Linda Kalayjian — were involved in the work, with the latter four being part of the dialogue about the Page patent applications.

68.     Mr. Rouf continued in communication with Mr. Stellabotte about the patent applications in the months that followed.

69.     According to allegations made by Mr. Page elsewhere, in the Nevada litigation, he was in fact subjected to a "detailed examination" by EGS about the "patent portfolio" at the instruction of B4MC (through Mr. Yankowitz, who was at the time the sole Director and President of B4MC):

"Mr. YANKOWITZ instructed ELLENOFF to perform due diligence analysis for the benefit of PLAINTIFFS.  In response to YANKOWITZ's instructions, ELLENOFF conducted detailed examination of PAGE and particularly the patent portfolio for the benefit of PLAINTIFFS.  ELLENOFF reported to PLAINTIFFS and YANKOWITZ on their findings and PLAINTIFFS paid ELLENOFF for this work."[3]

70.    Mr. Page has stated similarly that Mr. Yankowitz "himself explicitly instructed [Mr. Page] to cooperate with IP specialist attorney Steven Keefe of EGS — Plaintiffs' counsel in the due diligence investigation."

71.    In the same filing, Mr. Page stated in a Declaration that an EGS attorney "represented" to him "that he was performing a [sic] intellectual property review on behalf of" both of B4MC and RocketFuel, and that the inquiries made were "rigorous examination," "including both telephonic personal interviews and extensive written questionnaire type surveys … ."  Mr. Page did in fact provide copies of examples of such written inquiries from EGS.

72.    EGS did in fact have the duty to perform the necessary due diligence as to the Page patent portfolio for the benefit of RocketFuel and, as alleged more fully below, also for the benefit of B4MC.

73.    Mr. Page has filed a pleading in the Nevada case (a copy of Page's brief dated February 8, 2021, supporting that motion is Exhibit B) in which he states in substance that he had disclosed the deficiencies in the patent applications to EGS, including during EGS's due diligence work.

74.    For example, at p. 10, Page states:

"ELLENOFF IP specialist attorney Steven Keefe reviewed directly with PAGE in telephonic interview, among other things, the specific question of abandonment of the applications and the viability of reviving the applications to normal examination process.  PAGE fully submitted to Attorney Keefe's examination without reservation whatever and fully disclosed all issues relating

---

[3] For the avoidance of doubt, plaintiffs allege specifically that they did not receive such report from EGS that the patent applications in question had been abandoned.

to the patent applications.  At that time, PAGE transmitted to RocketFuel and their attorney Keefe the *entire* patent record (IFW) of all transactions in the USPTO for all five applications."

(Emphasis in original.)

75. On p. 19, Page alleges:

"Further for precision, ELLENOFF *specifically* assigned their intellectual property specialist attorney Stephen L. Keefe to carefully review the matter on behalf of [RocketFuel and B4MC] and directly interview PAGE with *specific regard* to patent application abandonment, revival, and assignment.

"As part of Keefe's investigation, PAGE transmitted directly to him, the full Image File Wrappers for all five patent applications.  Attorney Keefe did diligently perform this review, and the review included follow-up conversations with PAGE.

"These conversations were specific and detailed, and they were primarily directed to the topics of abandonment of the applications and the intention of the Company to revive them as provided by the normal examination rules of the Patent Office.  These conversations between PAGE and Plaintiffs' attorney Keefe additionally included specific discussion about the viability of assignments done for abandoned applications."

(Emphases in original.)

76. In his related Declaration also filed on February 8, 2021 (a copy is part of

Exhibit B), at pp. 24-25, Page states:

"5)  I, Joseph Page, as owner of certain intellectual property, conveyed by assignment five patent applications to RocketFuel Blockchain Company in anticipation of the transaction.

"6)  In cooperation with Ellenoff Grossman & Shole specialist intellectual property attorney Stephen L. Keefe, I submitted to his review and examination and provided to him all things asked of me.

"7)  Interviews with Attorney Keefe included detailed personal telephonic interviews, and additionally written matter related to prosecution of said patent applications.

"8)  Specifically, I downloaded from the USPTO a current copy just prior to transmission of same to Mr. Keefe.  I transmitted by electronic mail a full, complete and unedited copy of the Image File Wrapper document from the

United States Patent and Trademark Office for each patent application subject of the agreement.

"9) Further, I was examined via telephonic interview by Attorney Keefe with specific regard to patent application abandonment, viability of the applications through 'revival', and further assignment of applications is [sic] such condition."

77.     Page has made similar statements in other correspondence and pleadings.

78.     The crux of Page's defense in that case is that he had revealed his fraudulent assignment of the abandoned patent applications — the basis for his receipt from RocketFuel of ownership in it and his later trade of his ownership in RocketFuel for an ownership interest in B4MC/RBI as part of the venture that the principals discussed commencing in late 2017 and consummated as the first step in the formation of the business with the reverse acquisition transaction in June 2018 — to EGS.

79.     RocketFuel (and B4MC/RBI or any other person or party associated with them) were not apprised of those facts by Page or by EGS.

80.     RocketFuel (and B4MC/RBI) relied upon EGS to ascertain any facts of that sort in its due diligence work.

81.     If EGS knew — whether from Page or its other due diligence work — and intentionally did not disclose these facts to RocketFuel (and B4MC/RBI or any other person or party associated with them), it was complicit in fraudulent activity by Page to the direct detriment and direct harm of RocketFuel (and also to B4MC/RBI) and others.

82.     From Page's allegations, if true, EGS knew about the deficiencies in the patent applications prior to the closing of the reverse acquisition transaction in June 2018, and yet made no attempt to disclose the deficiencies or Page's admission, including of fraud, to RocketFuel (and B4MC/RBI or any other person who would face harm from those deficiencies).

83.     If EGS did not actually know about the deficiencies in the patent

applications, it was negligent, and had violated its duty of care in performing due diligence, and not actually ascertaining the truth as to the condition of the patent applications and/or not taking action upon that knowledge by disclosure to RocketFuel (and B4MC/RBI or any other person who or which would face harm from those deficiencies as otherwise alleged herein) — all in a manner inconsistent with the standard of care for attorneys performing similar work in similar circumstances and in the same relevant jurisdiction and locations.

84.    RocketFuel was damaged by EGS's intentional failure to disclose, or else by its negligent failure to discover or negligent failure to disclose, as alleged above.

85.    For example, EGS made no attempt to advise RocketFuel of the true status of the patent applications as abandoned and deficient so as to permit and enable RocketFuel to void and/or avoid delivery of valuable shares in RocketFuel to Page.

86.    EGS also did not disclose the true status of the patent applications as abandoned and deficient in the contribution agreement for the reverse acquisition transaction, even though EGS drafted the contribution agreement for the parties to consummate the reverse acquisition transaction in June 2018, and the contribution agreement EGS drafted is replete with provisions predicated upon the assumption that Mr. Page's five patent applications had been valid and viable (for example, §§ 4.12, 5.1 and 6.5), and the general premise that the patent applications were not abandoned but in fact being advanced by Mr. Page, as registered patent agent.

87.    As of June 27, 2018, RocketFuel became a subsidiary of B4MC (now, RBI), and EGS provided legal services to B4MC/RBI to draft B4MC/RBI's SEC filings, as contemplated by the Engagement Agreement.

88.    The Super 8-K, prepared by EGS and filed on June 29, 2018, and the

19

subsequent 10-Ks and 10-Qs that were drafted by EGS, did not contain any disclosure of the patent applications as abandoned and deficient.

89.  To the contrary, the Super 8-K drafted by EGS for B4MC identified the five abandoned patent applications as if they had not been abandoned:

> "Our technology is covered by five applications for U.S. patents.  Each application was submitted by our Chief Technical Officer ('CTO') and director, Joe Page, who assigned then to RocketFuel in exchange for his RocketFuel shares."

90.  EGS never informed RocketFuel (or B4MC (now, RBI) or any other person who would face harm from those deficiencies) of any deficiencies in the patents.

91.  As a direct and proximate and "but for" cause of EGS's errors and omissions alleged herein, RocketFuel suffered damage in innumerable ways, beginning with value it conveyed to Page that it would not have had it been properly informed and in all of the ways it has had to take extensive and costly remedial steps after learning of the true condition of the patent applications; and B4MC/RBI has similarly suffered such damages as a "but/for" direct and proximate cause of EGS's errors and omissions alleged herein.

92.  And above all, as a direct and proximate cause of EGS's intentional and/or negligent misconduct, Page has been able to walk away with value of his shares.  Those shares were priced at the time of the closing of the reverse acquisition transaction at $9.00 per share — the closing market price of those shares quoted at that time on the OTC Pink sheets — with a total value in excess of $45,000,000 at that time, and in an amount in excess of $11,000,000 as of the filing of this case, all in exchange for conveyance of nothing and (certainly without conveyance of what was understood by all involved to have been the subject of his conveyance and the basis for his receiving value).

93.  Plaintiffs cannot know whether EGS is liable for merely misfeasance in

not discovering the truth or malfeasance in knowing the truth and not, for whatever reason, informing plaintiffs of it.

94.     Notably, however, EGS attorney Mr. Stellabotte, with a copy to Mr. Rouf, wrote to Mr. Page by email on April 2, 2018, pointing out that the patent application files are not publicly available on the PTO website and requested the full file histories as part of EGS's due diligence effort.  More than a year later, on August 21, 2019, Mr. Stellabotte, through his partner Mr. Grossman, transmitted such files as he then claimed were obtained by EGS in its due diligence, yet stating that the complete files needed had not been obtained from Mr. Page:

> "The documents we received are attached.  We never received complete files from Joe Page as we requested.  Just these documents."

95.     The files transmitted in August 2019 by Mr. Stellabotte — transmitted then for the first time to anyone associated with plaintiffs (other than Mr. Page) — were the full IFWs, including the critical information as to the abandonment of the patents applications.

96.     By reason of the foregoing, EGS is liable to plaintiffs for negligence and legal malpractice, gross negligence and wanton and reckless conduct, breach of contract and breach of fiduciary duty (including being liable to RBI for its damages for the following reasons alleged).

F.  *Facts as to the Liability of EGS to B4MC/RBI*

97.     RBI makes the following allegations as to the liability of EGS to RBI in connections with the matters at issue.

98.     EGS represented B4MC/RBI in connection with the matters at issue based upon terms of the retainer agreement (Exhibit A), with an expectation it would also represent B4MC/RBI after consummation of the reverse acquisition transaction and after B4MC/RBI became an affiliate of RocketFuel.

21

99. EGS has liability to RBI for negligence and legal malpractice and the other claims alleged herein under what is sometimes called the "privity" or "approaching-privity" standard, because (i) EGS was aware that its work, including its due diligence work as alleged herein, was to be used by B4MC (and those associated with it) for the particular purpose of evaluating transactions with Joseph Page relating to the patent applications at issue; (ii) EGS knew that there would be and that there was in fact reliance by B4MC (and those associated with it) on EGS's work in that regard and its communications of its findings and of the results of that work, with B4MC being a party known to be among those receiving such information and relying upon it in evaluating the results of the due diligence work for which EGS had been retained by RocketFuel as pertinent to evaluating the reverse acquisition transaction; and (iii) EGS, through its conduct and communications with RocketFuel (and B4MC and those associated with it) demonstrated its understanding and knowledge and connection to B4MC insofar as B4MC would be a party relying upon such information (including through those associated with it) and EGS's work and conduct demonstrated its understanding of that reliance.

100. Additionally, as alleged above, according to allegations made by Mr. Page elsewhere, in the Nevada litigation, he was in fact subjected to a "detailed examination" by EGS about the "patent portfolio" at the instruction of B4MC (through Mr. Yankowitz, who was at the time the sole Director and President of B4MC):

> "Mr. YANKOWITZ instructed ELLENOFF to perform due diligence analysis for the benefit of PLAINTIFFS. In response to YANKOWITZ's instructions, ELLENOFF conducted detailed examination of PAGE and particularly the patent portfolio for the benefit of PLAINTIFFS. ELLENOFF reported to PLAINTIFFS and YANKOWITZ on their findings and PLAINTIFFS paid ELLENOFF for this work."[4]

---

[4] For the avoidance of doubt, plaintiffs allege specifically that they did not receive such report from EGS that the patent applications in question had been abandoned.

101.    Mr. Page has stated similarly that Mr. Yankowitz "himself explicitly instructed [Mr. Page] to cooperate with IP specialist attorney Steven Keefe of EGS — Plaintiffs' counsel in the due diligence investigation."

102.    In the same filing, Mr. Page stated in a Declaration that an EGS attorney "represented" to him "that he was performing a [sic] intellectual property review on behalf of" both of B4MC and RocketFuel.

103.    EGS did in fact have the duty to perform the necessary due diligence as to the Page patent portfolio for the benefit of both B4MC and RocketFuel.

## FIRST CLAIM FOR RELIEF
### (Negligence and Legal Malpractice)

104.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

105.    EGS's conduct as alleged herein breached the applicable standard of care in the exercise of an attorney's professional duties as EGS owed it to RocketFuel and to B4MC/RBI so as to constitute negligence by an attorney and legal malpractice and was in fact gross negligence and wanton and reckless conduct.

106.    Those breaches were the direct and proximate and "but for" cause of damages to RocketFuel and to B4MC/RBI, including the actual and financial damages alleged herein.

107.    By reason of and as a result of the negligence by an attorney and legal malpractice committed by EGS, and its gross negligence and wanton and reckless conduct, RocketFuel and B4MC/RBI have sustained and will continue to sustain financial losses and actual damage in its business.

108.    RocketFuel and B4MC/RBI are therefore entitled to recover damages

from EGS in amounts to be determined at trial as well disgorgement of the fees paid to EGS.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract for Fees)

109.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

110.    RocketFuel and, later, B4MC/RBI, on the one hand, and EGS, on the other hand, had a valid and enforceable contract for EGS's provision of legal services.

111.    EGS's conduct herein, including in its conduct in the Claims for Relief and in the paragraphs that follow (incorporated here by reference), breached its contract and RocketFuel and B4MC/RBI are each entitled, among and in addition to other relief alleged and sought herein, to recover fees paid to EGS.

112.    RocketFuel and B4MC/RBI are therefore entitled to recover damages from EGS in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

113.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

114.    By reason of their attorney-client relationships and other relationships as alleged herein, EGS owed RocketFuel, and also B4MC/RBI, the duties of a fiduciary.

115.    EGS breached those fiduciary duties by, among other things, failing to apprise RocketFuel (and B4MC/RBI and those associated with it) of the facts as to the status of the patent applications alleged herein.

116.    EGS also breached those fiduciary duties by, among other things, failing to apprise RocketFuel (and B4MC/RBI and those associated with it) of the facts as to the status

24

of the patent applications alleged herein, and also in its conduct in the Claims for Relief and in the paragraphs that follow (incorporated here by reference).

117.    By reason of and as a result of those breaches, RocketFuel and B4MC/RBI suffered damages, including the actual and financial damages alleged herein.

118.    RocketFuel and B4MC/RBI are therefore entitled to recover damages from EGS in amounts to be determined at trial.

119.    In addition, to the extent that EGS's conduct was willful and/or reckless and wanton and/or was of such character as would shock the conscience or otherwise warrant an award of exemplary or punitive damages in favor of RocketFuel and B4MC/RBI and against EGS, they are entitled to such award, in an amount to be determined at trial.

FOURTH CLAIM FOR RELIEF
(Declaratory Judgment — 28 U.S.C. § 2201)

120.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

121.    In the summer of 2019, RBI, through its CFO, Bennett J. Yankowitz, requested that EGS, through its partner Jessica Yuan, provide a copy of the files of its work done on the engagement to help with its looking into issues with the Page patent applications.

122.    At around the same time, Mr. Yankowitz also let EGS know that RBI's auditors were requesting that EGS provide what is commonly known as an attorney auditor's letter (such as is discussed in the *American Bar Association Statement of Policy Regarding Lawyers' Responses to Auditors' requests for Information* (adopted in 1975)).

123.    Mr. Yankowitz was informed by EGS partner Barry I. Grossman that EGS would not provide the files or the auditor's letter unless RBI satisfied various conditions including, among others described herein, payment of all outstanding bills in the amount of

approximately $31,000.

124. Mr. Grossman and EGS agreed with RBI that RBI would bring the open billings current, with part to be paid immediately and part to be paid in approximately six weeks.

125. RBI (and RocketFuel) had not asserted any claim against EGS — for any reason at all or in the nature of legal malpractice in particular.

126. In all of these discussions, or before them, EGS had not disclosed to RBI, RocketFuel or anyone connected to them that any person had any reason to assert a claim against EGS in connection with its representation or that there were any facts that would give rise to a claim against EGS in favor of RBI, RocketFuel or anyone connected to them — for any reason at all or in the nature of legal malpractice in particular.

127. The amount RBI would pay EGS was not discounted from the amount claimed and billed by EGS.

128. But EGS then sent to RBI a set of papers titled "Settlement Agreement and General Releases."

129. These documents included a confession of judgment for the amount (net of what RBI was to pay contemporaneous with signing the Settlement Agreement and General Releases) EGS wanted to be paid before release of a copy any RBI/RocketFuel files or release of the required auditor's letter.

130. These documents also included a general release by RBI of all possible claims it had against EGS through that time, though neither EGS nor the documents made any mention to RBI, RocketFuel or anyone connected to them that there were any facts that would give rise to a claim against EGS in favor of RBI, RocketFuel or anyone connected to them — for any reason at all or in the nature of legal malpractice in particular.

131.    These documents' general release language purported to have RBI release all claims against EGS not only of RBI itself but also of a long list of unnamed categories of persons and entities, including shareholders, affiliates and subsidiaries.

132.    EGS had a duty to provide the requested files without demanding and without it being conditioned upon a release from RBI or anyone else.

133.    EGS had a duty to provide the auditor's letter without demanding and without it being conditioned upon a release from RBI or anyone else.

134.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not inform RBI, RocketFuel or anyone associated with them that there was a basis or possible basis for any claim by them against EGS — for any reason at all or in the nature of legal malpractice in particular.

135.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not mention to, specify to in any way or otherwise inform RBI, RocketFuel or anyone associated with them that the Settlement Agreement and General Releases it drafted and provided and demanded from RBI would release any claim in the nature of legal malpractice in particular.

136.    That Settlement Agreement and General Releases itself made no reference to any claim in the nature of legal malpractice in particular.

137.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not provide full knowledge of the material circumstances known to it.

138.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not notify, promptly or at all, RBI, RocketFuel or

anyone associated with them of EGS's failure or even possible failures in performance that could give rise to claims or possible claims against EGS.

139.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not notify, promptly or at all, RBI, RocketFuel or anyone associated with them, or provide any information so as to give them a full understanding of the nature of and effect as to the malpractice as alleged herein of any possible purported release.

140.    EGS, in demanding the release as a condition of releasing copies of any files and of providing the auditor's letter, did not advise RBI, RocketFuel or anyone associated with them, in writing or at all, of the desirability for them of seeking the advice of independent legal counsel in connection with the Settlement Agreement and General Releases and/or issues giving rise to potential malpractice claims against EGS and did not give them a reasonable opportunity to seek such advice, at all, much less based upon the pertinent facts as to possible claims against EGS as alleged herein.

141.    At all times leading to and at the time of the execution of the Settlement Agreement and General Releases, EGS was a fiduciary to RBI and to Rocket Fuel.

142.    Throughout all times relevant, RBI and RocketFuel had not even ceased to be a client of EGS, as confirmed by the EGS's eventual transmittal of the required auditor's letter.

143.    Under the circumstances and duress described herein — including the facts that without the auditor's letter from EGS, RBI's auditors could not release RBI's annual financial statement, RBI could not file its annual report (10-K) with the SEC and EGS's refusal to provide the auditor's letter was already making RBI late in filing the 10-K — RBI signed the

28

Settlement Agreement and General Releases and related papers on or about August 20, 2019, as did EGS through its partner, Barry I. Grossman.

144.     In fact, the Settlement Agreement and General Releases itself states at its ¶2 that (i) EGS would only release the auditor's letter upon receipt of the Settlement Agreement and General Releases and the first payment to EGS provided for therein and (ii) EGS would only release any client files upon the receipt of the second payment provided for therein even though it was also subject to a confession of judgment.

145.     EGS's conduct, and in particular the releases it obtained in the Settlement Agreement and General Releases it extracted, violated numerous rules governing attorney conduct, including without limitation The New York Rules of Professional Conduct for attorneys at 22 NYCRR Part 1200, including without limitation Rules 1.4, 1.8 and 3.4, and the extensive decisional law and relevant ethics opinions as to attorney conduct in this regard, as well as its obligations as a fiduciary, and as a consequence, the releases obtained in the Settlement Agreement and General Releases are void and EGS may not assert or rely upon them.

146.     Ironically, after RBI's execution of the Settlement Agreement and General Releases and transmittal of the first contemplated payment, EGS admitted facts reflecting some of its knowledge of some of its failures in due diligence which had not been known to RBI/RocketFuel or anyone associated with them or theretofore disclosed to them by EGS, in an email from one of its partners John Stellabotte, transmitted to and through its partner Barry Grossman.

147.     By reason of the foregoing, and the claims asserted herein, a case of actual controversy exists within this Court's jurisdiction as to whether EGS may rely upon the release in the Settlement Agreement and General Releases and this Court should declare that such

release is void and that EGS may not rely on it in defense of any claim asserted herein, with the full force and effect of a final judgment or decree in favor of plaintiffs.

## FIFTH CLAIM FOR RELIEF
(Declaratory Judgment — 28 U.S.C. § 2201)

148.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

149.    By reason of the foregoing, EGS extracted the release in the Settlement Agreement and General Releases, and the Settlement Agreement and General Releases itself, by unlawful and improper duress, including EGS's improper and unlawful conduct in that EGS had no right to make the demands that it did before releasing client files to RBI or issuing the auditor's letter, and RBI faced serious and irreparable harm if it did not obtain its files to assess the patent issues and the auditor's letter to meet its audit requirements because it could not obtain what it needed except through EGS (or otherwise make itself whole by means available to it).

150.    By reason of the foregoing, and the claims asserted herein, a case of actual controversy exists within this Court's jurisdiction as to whether EGS may rely upon the release in the Settlement Agreement and General Releases and this Court should declare that such release is void and that EGS may not rely on it in defense of any claim asserted herein, with the full force and effect of a final judgment or decree in favor of plaintiffs.

## SIXTH CLAIM FOR RELIEF
(Declaratory Judgment — 28 U.S.C. § 2201)

151.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth here.

152.    By reason of the foregoing circumstances, the Settlement Agreement and General Releases was obtained by EGS without consideration.

153.    By reason of the foregoing circumstances, the release in the Settlement Agreement and General Releases was obtained by EGS without consideration.

154.    By reason of the foregoing, and the claims asserted herein, a case of actual controversy exists within this Court's jurisdiction as to whether EGS may rely upon the release in the Settlement Agreement and General Releases and this Court should declare that such release is void and that EGS may not rely on it in defense of any claim asserted herein, with the full force and effect of a final judgment or decree in favor of plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against defendant EGS as follows:

a.    on the First Claim for Relief, for negligence by an attorney and legal malpractice in an amount to be determined by the Court not less than $75,000 and as alleged herein and to be proven at trial;

b.    on the Second Claim for Relief, for breach of contract for fees in an amount to be determined by the Court and as alleged herein and to be proven at trial; and

c.    on the Third Claim for Relief, for breach of fiduciary duty, in an amount to be determined by the Court and as alleged herein and to be proven at trial, including exemplary or punitive damages as allowed by law;

d.    on the Fourth Claim for Relief, for a declaration by this Court that the release in the Settlement Agreement and General Releases is void and that EGS may not rely on it in defense of any claim asserted herein;

e.    on the Fifth Claim for Relief, for a declaration by this Court that the release in the Settlement Agreement and General Releases is void and that EGS may not rely on it in defense of any claim asserted herein; and

f.    on the Sixth Claim for Relief, for a declaration by this Court that the release in the Settlement Agreement and General Releases is void and that EGS may not rely on it in defense of any claim asserted herein;

together with costs, attorneys' fees and interest all in the fullest amount allowed at law on each such claim and together with such other and further relief for plaintiffs and against defendant

Ellenoff Grossman & Schole LLP as the Court may deem just and proper.

Dated:  June 18, 2021

SCAROLA ZUBATOV SCHAFFZIN PLLC

By _____
        Richard J.J. Scarola
*Attorneys for Plaintiffs*
1700 Broadway — 41st Floor
New York, NY  10019
Tel.:  (212) 757-0007

Exhibit E – D&O Questionnaire

# EXHIBIT E

**B4MC GOLD MINES, INC.**

**DIRECTORS, OFFICERS AND PRINCIPAL STOCKHOLDERS**
**QUESTIONNAIRE FOR 2017 ANNUAL REPORT AND 2018 PROXY MATERIALS**

<u>**INSTRUCTIONS**</u>

All officers, directors, nominees for officers or directors, and affiliated 5% stockholders of B4MC Gold Mines, Inc., a Nevada corporation (the "**Company**"), are required to complete this request for information (this "**Questionnaire**") in connection with the preparation of the merger transaction documents between the Company and Rocketfuel Blockchain Company as well as any materials to be filed with the Securities and Exchange Commission ("**SEC**") in relation to such transaction.

Please provide all the information requested, and if any item is inapplicable, please so state. Information should be provided as of the date of your response, unless the question seeks a response as of a specified date. **Please complete and sign one copy of this Questionnaire and return it to Linda Kalayjian at Ellenoff Grossman & Schole LLP, 1345 Avenue of the Americas, 11th Floor, New York, NY 10105, as soon as possible.** If you have any questions regarding how to respond to any portion of this Questionnaire, please contact our outside legal counsel, Linda Kalayjian of Ellenoff Grossman & Schole LLP at (212) 370-1300 (lkalayjian@egsllp.com).

**PLEASE COMPLETE EACH QUESTION TO THE FULLEST EXTENT POSSIBLE.   IF NECESSARY, CONTINUE YOUR ANSWER ON A SEPARATE SHEET AND ATTACH IT TO THIS QUESTIONNAIRE.  IF AN ANSWER TO ANY QUESTION IS "NO," "NONE," OR "NOT APPLICABLE," PLEASE INDICATE ACCORDINGLY**.

<u>**DEFINITIONS**</u>

Before you complete this Questionnaire, please give consideration to the following definitions of various capitalized terms used in this Questionnaire:

1.      **Company.**  This term shall mean B4MC Gold Mines, Inc., a Nevada corporation, and shall include all of its consolidated subsidiaries (unless the context otherwise indicates).

2.      **Affiliate.**  An Affiliate of a person is one that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

3.      **Associate.**  This term is defined to mean, when used to indicate a relationship with any person:

(a)      any corporation or organization (other than the Company or a majority-owned subsidiary of the Company) of which you are an officer or partner or of which you are, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities;

(b)      any trust or other estate in which you have a substantial beneficial interest or as to which you serve as trustee or in a similar capacity;

(c)      any relative or spouse of yours or any relative of your spouse who has the same home as

you or who is a director or officer of the Company or any of its parents or subsidiaries;

(d) any entity for which your direct or indirect investment in its equity securities would be required to be accounted for by the equity method by investing entity[1]; and

(e) any of your Family Members who might control or influence you, or who be me controlled or influenced by you, because of the family relationship.

4. **Beneficial Ownership**. A "beneficial owner" of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, has or shares with others (1) <u>voting power</u>, which includes the power to vote, or to direct the voting of, such security; or (2) <u>investment power</u>, which includes the power to dispose, or to direct the disposition, of such security. In addition, a person is deemed to be the beneficial owner of a security if such person, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership.

The term "beneficial ownership" may include shares held by you for the benefit of someone else. Thus, for example, shares held by you as trustee of a trust (whether or not you have any vested beneficial interest therein), executor, administrator, custodian, pledgee, or agent or in any similar capacity, may be considered as beneficially owned by you if you have or share voting power or investment power over such shares. Where by virtue of a special relationship, whether of a family or business nature, you have substantial influence over the decisions of another person in exercising investment power or voting power with respect to his securities, any securities owned by that person also should be considered beneficially owned by you. Thus, for example, securities owned by any person related to you by blood, marriage or adoption who shares your home should be considered beneficially owned by you. If you and such other person both exercise the investment power and/or voting power with respect to such securities, you would be considered to share beneficial ownership with such other person as to such securities.

You are also deemed the "beneficial owner" of shares which you have the right to acquire within sixty (60) days, including, without limitation, any right to acquire such shares: (i) through the exercise of any option, warrant or right; (ii) through the conversion of a security; (iii) pursuant to the power to revoke a trust, discretionary account or similar arrangement; or (iv) pursuant to the automatic termination of a trust, discretionary account or similar arrangement.

5. **Cash Compensation**. The term "cash compensation" shall mean cash and cash-equivalent forms of compensation distributed or accrued during the applicable fiscal year and cash and cash-equivalent forms of compensation in connection with transactions between the Company and a third party, the primary purpose of which is to furnish compensation to an officer or director of the Company. Cash and cash-equivalent compensation include, but are not limited to, the following: salaries, fees, directors' fees, commissions, bonuses paid or allocated to be paid, bonuses paid for services rendered in a previous fiscal year and compensation earned but deferred at your election (whether pursuant to a plan established under Section 401(k) of the Internal Revenue Code or otherwise).

---

[1] The equity method is an accounting technique used by companies to assess the profits earned by their investments in other companies. The company reports the income earned on the investment on its income statement, and the reported value is based on the company's share of the company assets. The reported profit is proportional to the size of the equity investment. Whether the equity method is required is determined under FASB Accounting Standards Codification 323-10. Generally, the equity method is applied if an investor has the ability to exercise significant influence over the operating and financial policies of an investee.

6.     **Compensation for Services**.  The term "compensation for services" includes, among other things, all directors' fees, salaries, commissions, perquisites, bonuses or payments made under any bonus or profit-sharing plan.

7.     **Control**.  The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a "person," whether through the ownership of voting shares, by contract, or otherwise.

8.     **Executive Officers.**  This term, when used with reference to the Company, is defined to mean its president, any vice-president in charge of a principal business unit, division or function (such as sales, administration or finance), other officer who performs policy making functions, any other person who performs a similar policy making functions for the Company or any other individual whose compensation for the past fiscal year would place that individual among the top three compensated persons at the Company, regardless of whether the person is currently affiliated with the Company. Executive officers of the Company's subsidiaries may be deemed executive officers of the Company if they perform such policy making functions for the Company.

9.     **Family Member.**  The term "Family Member" means your spouse, parents, children and siblings, whether by blood, marriage or adoption, or anyone residing in your residence, except where the context of the question indicates a family member of another individual, in which case Family Member shall mean the spouse, parents, children and siblings, whether by blood, marriage or adoption, or anyone residing in the residence of such other person.

10.     **LTIP**.  The term "LTIP" or "long term incentive plan" means any plan providing compensation intended to serve as incentive for performance to occur over a period longer than one fiscal year, whether such performance is measured by reference to financial performance of the Company or an Affiliate, the Company's stock price, or any other measure, but excluding restricted stock, stock option and SAR plans.

11.     **Material**.  The term "material", when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to purchase the security registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or Section 15 of such Exchange Act. If you have any doubts as to whether any information is material or not, we suggest that you report it in this Questionnaire.

12.     **Person.**  The term "person", when used in this Questionnaire, should be understood to include an individual, a corporation, a limited liability company, a partnership, a limited liability partnership, an association, a joint-stock company, a trust, an unincorporated organization or a government or a political subdivision thereof.

13.     **Plan**.  The term "plan" includes, but is not limited to the following: plan, contract, authorization or arrangement, whether or not set forth in any formal documents, pursuant to which cash, stock, restricted stock, restricted stock units, phantom stock, stock options, SARs, stock options in tandem with SARs, warrants, convertible securities, performance units, performance shares and similar instruments may be received.  A plan may be applicable to only one person. Information need not be given with respect to any group life, health, hospitalization, medical reimbursement or relocation plans that do not discriminate in scope, terms, or operation, in favor of executive officers or directors and that are generally available to salaried employees. Compensation pursuant to plans includes, but is not limited to, the following: contributions to pension or retirement plans, annuities, employment contracts, deferred compensation plans, incentive and compensation plans and arrangements, stock purchase plans, or profit

sharing or thrift plans.  With respect to stock options and any other incentive or compensation plans or arrangements pursuant to which the measure of benefit is based on objective standards or on the value of the securities of the Company or other "person" granted, awarded or entered into in connection with services to the Company, include as compensation any amount expended by the Company for financial reporting purposes for the fiscal year ended December 31, 2017 as compensation attributable to an interest in any such plan or arrangement.

14.     **SARs.**  The term "SARs" or "stock appreciation rights" refer to SARs payable in cash or stock, including SARs payable in cash or stock at the election of the Company or the holder thereof.

15.     **Shares**.  Shares of common stock of the Company.

16.     **Transaction**.  Includes, but is not limited to, the receipt of any compensation, loans or other things of value, directly or indirectly, from the Company.  However, information on current compensation for services as an officer or director need not be considered in this context.

## QUESTIONS

**(1)    Personal Information:**

   (a)       Full Name: Joseph Page

   (b)       Date of Birth: 1/14/1964

   (c)       Social Security Number: 567 27 4774

   (d)       Country of citizenship: United States

   (e)       Complete Business Address 280 rte de Biot #21, Valbonne France 06560

   _____

   _____

   (f)       Present Home Address: 280 rte de Biot #21, Valbonne France 06560 _____

   _____

   _____

   (g)       Home Telephone Number: +33 696 99 2056

   (h)       Educational Background:

| Name of College or University | Major | Degree Received | Year Degree Received |
|---|---|---|---|
| San Diego State | Physics | BS | 1988 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**(2)    Principal Occupation.  (confirm biography below):**

   (a)       Briefly describe any non-Company employment you have at the present time.

   _____

   _____

   _____

   _____

   (b)       Were you selected to serve in your capacity with the Company pursuant to any arrangement, understanding or agreement between yourself and any other person?

   **Answer:**    ☐    Yes    ✓    No

If YES, please name such person(s) and describe the arrangement and its material terms.

_____

_____

_____

_____

(c)    Are you a party to any employment, change of control, severance or termination contract or any other compensatory contract, plan or arrangement with the Company?

**Answer:**    ☐    Yes    ✔    No

If YES, please describe the agreement by date, title or other appropriate reference.

_____

_____

_____

(d)    **Biography.**  Please review and update your personal biography set forth in <u>Exhibit A</u>.   If you are an executive officer of the Company and have been employed by the Company for less than five years, your biography should include a brief description of the nature of your responsibilities in prior positions covering the past five years.  If you are a director of the Company, please make sure your biography lists all other directorships of publicly held corporations or investment companies registered under the Investment Company Act of 1940 that you presently hold or held within the past five years.  Please indicate whether you have made any changes to your biography.

<u>Exhibit A</u> is correct  ✔  .

Changes made on <u>Exhibit A</u> _____.

**(3)**    <u>**Directorships and Executive Positions**</u> **(Only directors and executive officers need respond to this Question 3):**

(a)    State the nature of any "family relationship" between you and any director, "executive officer" or person nominated or chose to become a director or executive officer of the Company or any of its subsidiaries or Affiliates.

_____No Family Relationship_____

_____

_____

(b)    *If you are a candidate for election at the Company's next annual meeting of stockholders,* have you received any cash or non-cash payments (including healthcare coverage or indemnification) made by third parties in connection with your candidacy for, and/or your service on, the Company's board of directors?

**Answer:**    ☐    Yes    ✔    No

If YES, please name such person(s) and describe the arrangement.
_____Blockchain Inc.  -  Private _____

_____ Big Money Inc.  -  Private _____

_____

(c)    <u>Other Directorships</u> -- If you are currently, have been at any time during the last five years, or will be a director of any other private or public company, please provide the name of such company and indicate whether they are public or private.

_____

_____

_____

(d)    <u>Other Executive Positions</u> -- If you are currently, have been at any time during the Company's last fiscal year, or will be an executive officer of any entity (other than for the Company), including companies, public or private, organized within or outside the United States, then state the name of such company, the location of its principal office and the date on which you commenced or will commence serving as an executive officer.

_____

_____

_____

(e)    Were you, or any of your Associates or Affiliates or any Family Member, indebted to the Company or any of its pension, retirement savings or similar plans at any time since the beginning of the Company's last fiscal year?

**Answer:**    ☐    **Yes**    ✓    **No**

If YES, please state:

(i)    the largest aggregate amount of indebtedness outstanding at any time since the beginning of the Company's last fiscal year: $_____.

(ii)    the amount of indebtedness outstanding at the date of your answer to this Questionnaire: $_____

(iii)    the rate of interest paid to or charged by the Company (if more than one transaction, state amounts and rates separately): \_\_\_\_\_%

(iv)    the nature of indebtedness and transaction in which it was incurred:

_____

_____

_____

_____

_____

(f)    Were the terms of any debt that you, your Associates or your Affiliates or any Family

Member owe the Company modified or was such debt renewed at any time in the last fiscal year?  If so, describe the circumstances.

_____
_____
_____
_____
_____
_____
_____

(g)    Has the Company or any of its affiliates extended or maintained credit or arranged for the extension or renewal of credit in the form of a personal loan for your benefit?

**Answer:**    ☐    **Yes**    ✓    **No**

If YES, please describe circumstances and details below:

_____
_____
_____
_____
_____

(h)    Is any indebtedness described in this Question 3 arose under short swing profit liability (Section 16(b) of the Exchange Act)?

**Answer:**    ☐    **Yes**    ✓    **No**

If YES, please describe circumstances and details below:

_____
_____
_____
_____
_____

**(4)    Independence (Based on NASDAQ and/or NYSE criteria): Please answer Question 4 if you are a director.**

(a)    Have you during the past three years been an executive officer of the Company or any parent or subsidiary of the Company or employed by the Company or any parent or subsidiary of the Company (other than employment as an interim executive officer which did not last more than one year)?

**Answer:**    ☐    **Yes**    ✓    **No**

(b)    Have you or a Family Member accepted any compensation from the Company or any parent or subsidiary of the Company (including fees paid directly or indirectly for services as a consultant or advisor) in excess of $120,000 during any period of twelve consecutive months within the three years preceding the date hereof (other than

compensation for board or board committee service; compensation paid to a Family Member who is an employee (other than an executive officer) of the Company or any parent or subsidiary of the Company; compensation received for former service as an interim executive officer if such interim employment did not last longer than one year; or benefits under a tax-qualified retirement plan or non-discretionary compensation)?

**Answer:**    ☐    Yes    ✓    No

(c)    Do you have a Family Member who is, or at any time during the past three years was, employed by the Company or any parent or subsidiary of the Company as an executive officer?

**Answer:**    ☐    Yes    ✓    No

(d)    Are you, or do you have a Family Member who is, a partner in, or a controlling stockholder or executive officer of, any organization to which the Company or any parent or subsidiary of the Company made, or from which the Company or any parent or subsidiary of the Company received, payments for property or services in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenues for that year or $200,000, whichever is greater (including an investment bank, accounting, legal, consulting or advisory firm, but excluding payments arising solely from investments in the Company's securities, or payments under non-discretionary charitable contribution matching programs)?

**Answer:**    ☐    Yes    ✓    No

If YES, please provide details, including names of entities, your relationship to them and fees paid, payable, owing or proposed to be paid.

_____

_____

_____

(e)    Are you, or do you have a Family Member who is, employed as an executive officer of another entity where at any time during the past three years any of the executive officers of the Company serve on the compensation committee of such other entity?

**Answer:**    ☐    Yes    ✓    No

(f)    Are you, or do you have a Family Member who is, a current partner of the Company's outside auditor or were you, or do you have a Family Member who was, a partner or employee of the Company's outside auditor who worked on the Company's audit at any time during any of the past three years?

**Answer:**    ☐    Yes    ✓    No

(g)    Are you an Affiliate of the Company or any of its subsidiaries?

Answer: ☐ Yes ✓ No

(h)     Did you (i) acting alone or in conjunction with one or more other persons, directly or indirectly take initiative in founding and organizing the Company, or (ii) in connection with the founding and organizing of the Company, directly or indirectly receive in consideration of services or property, or both, 10% or more of any class of securities of the Company or 10% or more of the proceeds from the sale of any such securities?

Answer: ☐ Yes ✓ No

If YES, state (i) the nature and amount of anything of value (including money, property, contracts, options or rights of any kind) received or to be received by you, directly or indirectly, from the Company; (ii) the nature and amount of any assets, services or other consideration received or to be received by the Company in exchange for any items of value reported in (i) above; and (iii) as to any assets acquired or to be acquired by the Company from you, state (a) the amount at which such assets were or are to be acquired, (b) the principle followed or to be followed in determining such amount, (c) the name (and relationship with the Company or you) of the persons making such a determination and (d) if the assets were acquired by you within two years prior to their transfer to the Company, the cost of such assets to you.

_____

_____

_____

**(5)**   **Audit Committee Membership and Compensation Committee Matters (Based on NASDAQ and/or NYSE criteria):**

(a)     Are you a member of or nominee for election to the Company's Audit Committee?

Answer: ☐ Yes ✓ No

**If NO, please proceed to Question 5(f).**

(b)     Have you accepted, directly or indirectly, any consulting, advisory or other compensatory fee from the Company or any of its subsidiaries (other than in your capacity as a member of the Audit Committee, the Board of Directors or any other Board Committee of the Company), except fixed amounts of compensation under a retirement plan (including deferred compensation) for prior service with the Company (provided that such compensation is not contingent in any way on continued service)?

Answer: ☐ Yes ☐ No

(c)     Do you have an understanding of the functions of the Audit Committee?

Answer: ☐ Yes ☐ No

(d)     Have you participated in the preparation of the financial statements of the Company or any of its current subsidiaries at any time during the past three years?

Answer:      ☐     **Yes**     ☐     **No**

(e)      <u>Financial Literacy</u>

(i)      Are you able to read and understand fundamental financial statements, including a company's balance sheet, income statement, and cash flow statement?

Answer:      ✔     **Yes**     ☐     **No**

(ii)      Have you taken formal courses relating to financial or accounting matters?

Answer:      ☐     **Yes**     ✔     **No**

(iii)      Have you received any degree(s) or professional certification relating to financial or accounting matters?

Answer:      ☐     **Yes**     ✔     **No**

(iv)      Have you taught any courses or published any books or articles relating to financial or accounting matters?

Answer:      ☐     **Yes**     ✔     **No**

(v)      List chronologically and summarize the duties of positions you have held that involved accounting, financial management, or the analysis and interpretation of financial statements or the evaluation of internal accounting controls.

_____none_____

_____

_____

_____

_____

_____

(vi)      Have you invested in enterprises that required you to analyze or interpret financial statements?

Answer:      ☐     **Yes**     ✔     **No**

If YES, summarize the extent of such activity.

_____

_____

_____

_____

(vii)    Do you regularly read publications relating to financial or accounting matters?

**Answer:**    ☐    Yes    ✔    **No**

If YES, indicate the content and length of time that you currently spend -- and over the last five years spent -- on such activity.

_____
_____
_____
_____
_____
_____

(viii)    Do you engage, or have you engaged, in any other activities that relate to financial or accounting matters?

**Answer:**    ☐    Yes    ✔    **No**

If YES, please provide details.

_____
_____
_____
_____
_____
_____

(ix)    Describe any experience that you may have (i) as a public accountant, auditor, principal financial or accounting officer or controller, or in any position including similar functions or otherwise relating to the preparation of financial statements and (ii) with internal accounting controls and in financial reporting procedures.  If so, please provide details below.

**In particular, describe whether you:**

(A)    have any accounting or financial education, including whether you have earned an advanced degree in finance or accounting;

(B)    are a certified public accountant, or the equivalent, in good standing, and the length of time that you actively have practiced as a certified public accountant, or the equivalent;

(C)    are certified or otherwise identified as having accounting or financial experience by a recognized private body that establishes and administers standards in respect of such expertise;

(D)    are in good standing with the recognized private body, and the length of time that you have been actively certified or identified as having this expertise;

(E)    have served as a chief executive officer, principal financial officer, controller, principal accounting officer or a senior officer (with financial oversight responsibilities) of a company that, at the time you held such position, was required to file reports with the SEC;

(F)    have any other relevant qualifications or experience that would assist you in understanding and evaluating a company's financial statements and other financial information and in making knowledgeable and thorough inquiries.

_____none_____
_____
_____
_____
_____
_____
_____
_____
_____

(x)    Do you have education and experience as a principal financial officer, principal accounting officer, controller, public accountant or auditor or experience in one or more positions that involve the performance of similar functions?

**Answer:**    ☐    **Yes**    ✓    **No**

(xi)    Do you have experience actively supervising a principal financial officer, principal accounting officer, controller, public accountant, auditor or person performing similar functions?

**Answer:**    ☐    **Yes**    ✓    **No**

(xii)    Do you have experience overseeing or assessing the performance of companies or public accountants with respect to the preparation, auditing or evaluation of financial statements?

**Answer:**    ☐    **Yes**    ✓    **No**

(xiii)    Do you have other relevant experience relating to audit committee matters?

**Answer:**    ☐    Yes    ✔    No

If YES, please provide details.

_____

_____

_____

_____

_____

_____

(xiv)    Which of the following attributes do you possess?

(A)    An understanding of generally accepted accounting principles and financial statements, including balance sheets, income statements, and cash flow statements:

**Answer:**    ✔    Yes    ☐    No

(B)    The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves:

**Answer:**    ✔    Yes    ☐    No

(C)    Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the Company's financial statements, or experience actively supervising one or more persons engaged in such activities:

**Answer:**    ☐    Yes    ✔    No

(D)    An understanding of internal controls over financial reporting:

**Answer:**    ☐    Yes    ✔    No

(E)    An understanding of audit committee functions:

**Answer:**    ✔    Yes    ☐    No

(xv)    Identify any other public company on which you serve as a member of the board's audit committee, including describing how long you have served in that capacity. Indicate whether you intend to discontinue serving on any of these audit committees in the near future, and whether you intend to join any new audit committee in the near future.

_____none _____

_____

_____

_____

_____

Please provide information with regard to your relationship or interest, if any, direct or indirect, by security holdings or otherwise, with or in the Company's independent registered accounting firm.

If none, check here ___ ✔ ____.

Are you or is any *immediate family member* a current partner or employee of Company's independent registered accounting firm, or were you or any *immediate family member* a partner or employee of Company's independent registered accounting firm who worked on the Company's audit at any time during any of the last three years?

No __ ✔ __.

Yes _____.   If yes, please identify your position with Company's independent registered accounting firm, or the position of your *immediate family member*, if applicable:

If, to your knowledge, Ernst & Young LLP, or any partner or professional employee of such independent registered accounting firm, (i) had or has committed to acquire any direct financial interest in the Company or any of its subsidiaries or affiliates, or (ii) was or is connected with the Company or any of its subsidiaries or affiliates as a promoter, underwriter, voting trustee, director, officer or employee, please describe such interest or connection.

If none, check here __ ✔ __.

(f)      **Compensation Committee Matters**:

(i)      Are you a member of or nominee for election to the Company's Compensation Committee?

**Answer:**      ☐   Yes      ✔   No

(ii)     Are you aware of any arrangements with compensation consultants?  If so, please state below the name, role and compensation paid to such compensation consultant.

**Answer:**      ☐   Yes      ✔   No

_____

_____

_____

_____

_____

(iii)    With respect to any compensation consultant identified, please disclose if you were aware of any conflict of interests between the Company and such compensation consultant.  If so, please disclose the nature of the conflict and how the conflict is being addressed.

**Answer:**    ☐    **Yes**    ✔    **No**

_____
_____
_____
_____
_____

(iv)    Do you currently have, or have you had in the past three years, any business or personal relationship with the individual compensation consultant or the entity employing the compensation consultant?  For purposes of this question, "business and personal relationships" include, among other things, familial relationships, employment, business partnerships and other commercial relationships.  If the answer is "Yes", please describe your relationship.

**Answer:**    ☐    **Yes**    ✔    **No**

_____
_____
_____
_____
_____

**(6)    Ownership of Company Stock**.

(a)    Exhibit B lists all shares, options and warrants that are *beneficially* owned by you or your Affiliates or Associates as of the date of this Questionnaire, including shares (i) registered in your name; (ii) registered in your name as trustee, executor, custodian, pledgee, agent or nominee, either alone or with others; (iii) owned by any Affiliate or Associate of yours or (iv) registered in the name of a nominee or in street name, including any such shares held for the account of any of the above.  If your voting or investment control over any shares is shared, Exhibit B should so indicate and provide a brief description of any arrangement concerning such shared control, including the names of all persons or entities with voting or dispositive power over such shares.

**Please review Exhibit B and indicate below whether it is correct.**

Correct    __ ✔ ___.

Not correct _____.  Please correct on <u>Exhibit B</u>.

(b)    Do you have a right to acquire (<u>other than through exercise of warrants or options</u>) beneficial ownership of common stock of the Company?

No ___ ✓ __.

Yes _____.  Description of type of right (e.g., power to revoke a trust, discretionary account or similar arrangement, etc.) and exercisability, including with respect to each of the rights described below the date or dates on which the right becomes or became exercisable, and the number of shares for which the right is exercisable on each such date:

| Type of Right | Date Exercisable | Number of Shares for which Right is Exercisable |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

If you are a member of any *group* for the purpose of acquiring, holding or disposing of stock of the Company, please provide the following information with regard to the beneficial ownership, direct or indirect, of common or preferred stock of the Company by such group and any of its members: class and series of shares; number of shares held of record and beneficially by the *group* (see definition in index); the nature of voting or investment control over any such shares, including the names of all persons with voting or dispositive power over such shares, and a brief description of any *arrangement* concerning shared control.

If not applicable, check here _ ✓ _, otherwise, give details on <u>Exhibit B</u>.

Are any of the securities listed on <u>Exhibit B</u> known by you to be subject to any pledge, lien, encumbrance, voting trust agreement or option arrangement (e.g., a put or call)?  Include shares pledged as part of a margin account, or any hedging arrangement that includes a pledge.

No __ ✓ __.

Yes _____.  If yes, give details on <u>Exhibit B</u>, including, if a voting trust agreement, the title of the securities, the amount held, the duration of the agreement, the names and addresses of the voting trustees and brief outlines of their voting rights.

(c)    Have you purchased or sold any financial instruments, including prepaid variable forward contracts, equity swaps, collars or exchange funds, that are designed to hedge or offset any decrease in the market value of equity securities (i) granted to you by the Company as part of your compensation as an Executive Officer or a Director of the Company or (ii) otherwise Beneficially Owned by you?

No ___ ✓ __.

Yes _____.  If yes, give details on <u>Exhibit B</u>, including, a description of the transaction(s), the number and type of securities and the date that such transactions occurred.

**(7)**    <u>**Disclaimer of Beneficial Ownership:**</u>

Please state the number of shares (if any) in which you have an ownership interest, with respect to which you disclaim beneficial ownership and why. In addition, please indicate the name of the person or persons who should be shown as the beneficial owner(s) of the shares in question:

_____none_____

_____

_____

_____

**(8)**    <u>**Arrangements Regarding Securities:**</u>

(a)    Are you or any of your Affiliates or Associates parties to any contractual arrangements, including the pledge of securities of the Company, the operation of the terms of which may at a subsequent date result in any other persons becoming the owner of 5% or more of the Company's securities?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please describe such arrangements.

_____

_____

_____

_____

(b)    If you know of any arrangements whereby more than 5% of any class of the Company's voting securities is held or is to be held subject to any voting trust or similar agreements, please provide:

(i)    the title of such securities:_____

(ii)    amount held under the voting trust or agreement:_____

(iii)    duration of the agreement:_____

(iv)    names and addresses of voting trustees:_____

_____

(v)    brief description of voting rights and other powers of voting trustees under the trust or agreement: _____

_____

_____

(c)    Do you consider yourself to be a control person of the Company (other than solely as a director of the Company)?

**Answer:** ☐ **Yes** ☐ **No**

If YES, describe the basis for your conclusion.

_____

_____

_____

_____

(d)     Describe any arrangements known to you, including any pledge by <u>any</u> person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company.

_____

_____

_____

**(9)     <u>Section 16 Reports</u>**

Attached as <u>Exhibit C</u> are copies of all Section 16 filings on Forms 3, 4 and 5 as reported on EDGAR made by you in the last fiscal year.  Based on your review of these filings, please respond to the following questions:

These forms completely and accurately reflect the transactions set forth therein.

Correct _____.

Not correct _____.  **If not correct, please make corrections and submit to the Company.**

Have you engaged in any other transactions in the Company's securities in the last fiscal year that were not reported on the Forms 3, 4 and 5 on <u>Exhibit C</u>?  **If so, you may be required to file a Form 5 to report these transactions.  If you have any questions regarding whether you are required to file a Form 5 for our last full fiscal year, please contact Linda Kalayjian.**

No _____.

Yes _____.  Description: _____

_____

_____

_____

**(10)     <u>Compensation</u>:**

(a)     Did you receive or have accrued compensation (including all items listed below) for services rendered to the Company in all capacities during the last three fiscal years?

**Please see Special Instructions below for Question 10.**

**Answer:**    ☐    **Yes**         ☐    **No**

If YES, please complete the following with respect to the last three fiscal years:

(i)    directors' fees, including committee fees, and please describe arrangement or understanding for such payment:

**Answer:**    ☐    **Yes**    ☐    **No**

2015: _____        Amount: _____
2016: _____        Amount: _____
2017: _____        Amount: _____

Explanation:

_____
_____
_____
_____

(ii)    base salary:

**Answer:**    ☐    **Yes**    ☐    **No**

2015: _____        Amount: _____
2016: _____        Amount: _____
2017: _____        Amount: _____

(iii)    bonuses:

**Answer:**    ☐    **Yes**    ☐    **No**

2015: _____        Amount: _____
2016: _____        Amount: _____
2017: _____        Amount: _____

(iv)    other annual compensation:

**Answer:**    ☐    **Yes**    ☐    **No**

        2015: _____        Amount: _____
2016: _____        Amount: _____
2017: _____        Amount: _____

Please provide details below:

_____
_____
_____
_____
_____

(v)     restricted stock/restricted stock unit awards:

**Answer:**     ☐     **Yes**     ☐     **No**

2015: _____     Amount: _____
2016: _____     Amount: _____
2017: _____     Amount: _____

Please state the number and value of your aggregate restricted stock holdings at the end of the Company's last completed fiscal year:

_____
_____

Please state the total number of shares awarded and the vesting schedule for any restricted stock awards reported for each of the last three fiscal years of the Company that will vest, in whole or in part, in under three years from the date of grant:

_____
_____

Were any dividends paid on any of the restricted stock awards reported above?

**Answer:**     ☐     **Yes**     ☐     **No**

If YES, please provide details below:

_____
_____
_____
_____

(vi)     stock options:

**Answer:**     ☐     **Yes**     ☐     **No**

| **Amount** | **Year of Grant** | **Per-share Exercise Price** | **Market Value of Underlying Securities on Date of Grant** | **Expiration Date** |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

Please give additional information on material terms of the grant (i.e., date of exercisability, number of options granted, performance-based condition to exercisability, reload feature, a tax-reimbursement feature or a provision of grant (other than anti-dilution) which could cause the exercise price to be lowered):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Have you exercised any options to purchase any securities from the Company during the Company's last completed fiscal year?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please furnish the following information with respect to each applicable exercise:

| **Date of Exercise** | **Shares Acquired Upon Exercise** | **Amount Paid Per Share for Shares Acquired** |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Please state the total number of securities underlying unexercised options held by you at the end of the Company's last completed fiscal year, identifying separately the unexercisable and exercisable options:

**Exercisable:_____ Unexercisable:_____**

Please state the aggregate dollar value of in-the-money, unexercised options held by you at the end of the Company's last completed fiscal year, identifying separately the unexercisable and exercisable options:

**Exercisable:_____ Unexercisable:_____**

Was the exercise price of any stock options previously awarded adjusted or amended (whether through amendment, cancellation or replacement grants, or any other means) at any time during the Company's last fiscal year?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please give details as to the number of options so repriced and the terms of such repricing:

_____
_____
_____
_____

(vii)     SARs:

**Answer:**        ☐        Yes        ☐        No

| Amount | Year of Grant | Per-share Base/exercise Price | Market Value of Underlying Securities on Date of Grant | Expiration Date |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

Please give additional information on material term of the grant (i.e, date of exercisability, the number of SARs, performance-based condition to exercisability, reload feature, a tax-reimbursement feature or a provision of grant (other than anti-dilution) which could cause the exercise price to be lowered):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Have you exercised or realized any SARs granted by the Company during the last completed fiscal year?

**Answer:**        ☐        Yes        ☐        No

If YES, please furnish the following information with respect to each applicable exercise:

| Date of Exercise | Shares Acquired Upon Exercise | Value Realized Upon Exercise | Amount Paid Per Share for Shares Acquired |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_____        _____        _____        _____

    (A)    State the total number of securities underlying unexercised SARs held by you at the end of the Company's last completed fiscal year, identifying separately the unexercisable and exercisable SARs:

**Exercisable:**_____ **Unexercisable:**_____

    (B)    State the aggregate dollar value of in-the-money, unexercised SARs held by you at the end of the last completed fiscal year, identifying separately the unexercisable and exercisable SARs:

**Exercisable:**_____ **Unexercisable**:_____

    (C)    Was the exercise price of any SARs previously awarded adjusted or amended (whether through amendment, cancellation or replacement grants, or any other means) at any time during the Company's last fiscal year?

**Answer:** ☐ **Yes** ☐ **No**

If YES, please give details as to the number of SARs so repriced and the terms of such repricing:

_____
_____
_____

(viii)    LTIP:

    (A)    Payouts pursuant to LTIP:

**Answer:** ☐ **Yes** ☐ **No**

2015: _____        Amount: _____

2016: _____        Amount: _____

2017: _____        Amount: _____

Please state whether any specified performance, target, goal or condition to payout was waived with respect to any amount included in LTIP payouts reported:

_____
_____
_____
_____
_____
_____

    (B)    Have you received any award under any LTIP during the last completed fiscal year?

**Answer:** ☐ **Yes** ☐ **No**

If YES, please state:

The number of shares, units or other rights awarded and the number of underlying securities, if applicable:

_____
_____
_____
_____

The performance or other time period until payout or maturation of the award:

_____
_____
_____
_____

The dollar value of the estimated payout, the number of shares to be awarded as the payout or a range of estimated payouts in dollars or number of shares under the award (i.e., the threshold, target and maximum amounts) for plans not based on stock price.

_____
_____
_____
_____
_____
_____

Any other material terms of the award, including the formula or criteria to be applied in determining the amounts payable:

_____
_____
_____
_____

(ix)  <u>Other Compensation</u>.  In addition to the cash and stock-based compensation described above and except as provided under the remaining specific questions of this section, with respect to the Company's last full fiscal year:

(A)  Did you receive any "other compensation" (as defined below)?

**Answer:** ☐ **Yes** ☐ **No**

If "yes," please provide details:

_____
_____
_____
_____

_____

(B)     Did you receive (or do you expect) any perquisites in the form of personal benefits, securities, property or other non-cash compensation? This would include, among others:

- The value of any property transferred without charge by our company to you or the spread between the value of any property you acquired from our company and any lesser amount you paid for the property;
- Home repairs and improvements paid for by us or any of our subsidiaries;
- Housing and other living expenses (including domestic service) provided at principal and/or vacation residences;
- Personal use of our company's property such as automobiles, planes, yachts, apartments, hunting or skiing lodges, or the like;
- Personal travel expenses;
- Personal entertainment outside our or our subsidiaries' business purposes, such as personal or non-business use of tickets to sporting or other public events, club memberships, and related expenses;
- Personal use of our staff; or
- Payment of legal, tax, accounting, medical, and other professional fees for personal or other matters unrelated to our or our subsidiaries' business.

**Answer:**     ☐     **Yes**     ☐     **No**

If "yes," please provide details below:

| Date or Period | Perquisite | Monetary Value |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

(C)     During the Company's last full fiscal year, did you obtain personal benefits from third parties (such as unusually favorable bank loans or unusually favorable terms from suppliers) because we or any of our subsidiaries compensate or promised to compensate, directly or indirectly, the third parties for providing the benefits? For purposes of this question, the term "compensation" should be taken in its broadest sense and would include an express or implied promise by us or any of our subsidiaries to continue doing business or to do increased business with the party that provides the benefit.

**Answer:**     ☐     **Yes**     ☐     **No**

If "yes," please provide details:

_____
_____
_____
_____
_____

(D)     During the Company's last full fiscal year, did you or any member of your family

receive any other types of personal benefits directly or indirectly from us or any of our subsidiaries for purposes unrelated to job performance?

**Answer:**    ☐    **Yes**    ☐    **No**

If "yes," please provide details, including the monetary value of the benefits:

_____
_____
_____
_____
_____

(b)    Please describe any compensatory plan or arrangement (including the amount involved) which will become operative as a result of (i) your resignation, retirement, or any other termination of your employment with the Company and its subsidiaries, or (ii) a change in control of the Company or a change in your responsibilities following such a change in control:

_____
_____
_____
_____
_____

**Special Instructions for Question 10:**

(i)    Amounts deferred at your election, whether pursuant to a plan or otherwise, shall be included for the fiscal year in which earned.

(ii)    In calculating amounts of remuneration, include cash and non-cash compensation. For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(iii)    Include in Question 10(a)(iv) above the dollar value of other annual compensation not properly categorized as salary or bonus. "**Other annual compensation**" include: (A) perquisites and other personal benefits, securities or property, unless the aggregate amount of such compensation is less than $10,000 (for each perquisite or other personal benefit exceeding 25,000 or 10% of the total value of the perquisites and personal benefits, please identify the nature and amount of such perquisite or personal benefit); (B) above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the Company's fiscal year ended December 31, 2017 or payable during that period but deferred at your election; (C) earnings on LTIP compensation paid during the Company's fiscal year ended December 31, 2017 or payable during that period but deferred at your election; (D) amounts reimbursed during the Company's fiscal year ended December 31, 2017 for the payment of taxes; and (E) the dollar value of the difference between the price paid by you for any security of the Company or its subsidiaries purchased from the Company or its subsidiaries (through deferral of salary or bonus or otherwise) and the fair market value of such security at the date of purchase, unless that discount is available generally either to all security holders or to all salaried employees of the Company.

Perquisites and other personal benefits shall be valued on the basis of the aggregate incremental

cost to the Company and its subsidiaries.

Interest on deferred or long-term compensation is "above-market" only if the interest rate exceeds 120% of applicable federal long-term rate, with compounding (as prescribed by Section 1274(d) of the Internal Revenue Code) at the rate that corresponds most closely to the rate under the Company's plan at the time the interest rate or formula is set. In the event of a discretionary reset of the interest rate, the requisite calculation must be made on the basis of the interest rate at the time of such reset. Include only the "above-market" portion of the interest rate. If the applicable interest rates vary depending upon conditions such as a minimum period of continued service, the reported amount should be calculated assuming satisfaction of all conditions to receiving interest at the highest rate.

Dividends (and dividend equivalents) on restricted stock, options, SARs or deferred compensation denominated in stock are preferential only if earned at a rate higher than dividends on the Shares. Include only the "preferential" portion of the dividends or equivalents.

(iv)    Include in Question 10(a)(v) the dollar value (net of any consideration paid by you) of any award of restricted stock, including share units (calculated by multiplying the closing market price of the Company's unrestricted stock on the date of grant by the number of shares awarded).

(v)    Include in Question 10(a)(vi) and Question 10(a)(vii), as applicable, the number of securities underlying stock options granted (including options that subsequently have been transferred), with or without tandem SARs, and the number of free-standing SARs.

(vi)    Include in Question 10(a)(ix) above "other compensation" that could not be properly reported in any other category. Such "**other compensation**" shall include but shall not be limited to: (A) the amount paid, payable or accrued pursuant to a plan or arrangement in connection with your resignation, retirement or any other termination of employment, a change in control of the Company or a change in your responsibilities following a change in control; (B) the dollar value of above-market or preferential amounts earned on restricted stock, options, SARs or compensation deferred at your election during the fiscal year or calculated with respect to that period (other than amounts reported as "other annual compensation"); (C) the dollar value of amounts earned on LTIP compensation during the Company's last fiscal year or calculated with respect to that period (other than amounts reported as "other annual compensation"); (D) annual Company's contributions or other allocations to vested and unvested defined contribution plans; and (E) the dollar value of any insurance premiums paid by, or on behalf of, the Company during the covered fiscal year with respect to term life insurance for your benefit and if there is an arrangement or understanding, whether formal or informal, that you have or will receive or be allocated an interest in any cash surrender value thereof.

Information relating to defined benefit and actuarial plans need not be reported.

(vii)    Options and freestanding SARs are in-the-money if the fair market value of the underlying securities exceeds the exercise or base price of the option or SAR.

(viii)    The value realized or the value of unexercised in-the-money options and SARs are calculated by determining the difference between the fair market value of the securities underlying the options or SARs and the exercise or base price of the options or SARs at exercise or fiscal year-end, respectively.

**(11)    <u>Contracts</u>:**

(a)    Do you have an employment or consulting contract with the Company or any of its

Affiliates?

**Answer:** ☐ **Yes** ☐ **No**

If YES, please state whether the contract is written or oral, its duration and the rate of remuneration provided, provide a summary thereof and attach a copy, if possible.

_____
_____
_____
_____
_____
_____
_____

(b)    Are you, or is any Associate or Affiliate of yours, a party to any other contract with the Company?

**Answer:** ☐ **Yes** ☐ **No**

If YES, please provide a summary thereof and attach written copy of the contract if not previously provided.

_____
_____
_____
_____
_____
_____
_____

**(12)    Compensation Contingent on Resignation, Retirement or Change in Control:**

**If you answer yes to any of the items of this Question 12, please discuss the following:**

1.    Describe and explain the specific circumstances that would trigger payment(s) or the provision of other benefits, including perquisites and health care benefits;

2.    Describe and quantify the estimated payments and benefits that would be provided in each covered circumstance, whether they would or could be lump sum, or annual, disclosing the duration, and by whom they would be provided;

3.    Describe and explain how the appropriate payment and benefit levels are determined under the various circumstances that trigger payments or provision of benefits;

4.    Describe and explain any material conditions or obligations applicable to the receipt of payments or benefits, including but not limited to non-compete, non-solicitation, non-disparagement or confidentiality agreements, including the duration of such agreements and provisions regarding waiver of breach of such agreements; and

5.    Describe any other material factors regarding each such contract, agreement, plan or arrangement.

(a)    Is there any compensation plan or arrangement that provides compensation upon your resignation or retirement or any other termination of your employment with the Company (or its subsidiaries)?

Answer:    ☐    Yes    ☐    No

If YES, please provide details below.

_____

_____

_____

(b)    Is there any compensation plan or arrangement that provides for compensation upon a change in control of the Company or a change in your responsibilities following a change in control?

Answer:    ☐    Yes    ☐    No

If YES, please provide details below.

_____

_____

_____

**(13)    Certain Transactions:**

(a)    Have you or any of your Associates or Affiliates, or has any Family Member, had any direct or indirect interest in any transaction or series of similar transaction **during the last two fiscal years** of the Company, or in any currently proposed transaction or series of similar transactions, involving more than $120,000 (without regard to the amount of the profit or loss involved in the transactions) to which the Company and/or any of its subsidiaries was or is to be a party?  **Please see Special Instructions below for Question 13.**

Answer:    ☐    Yes    ☐    No

If YES, briefly describe the transaction and your interest and the interest of any of your Associates or Affiliates or any Family Members.  If any such transaction involved or is to involve the purchase or sale of property by or to the Company otherwise than in the ordinary course of business, state the cost of the assets to the purchaser and the cost thereof to the seller if acquired by the seller within two years prior to the transaction.

_____

_____

_____

_____

_____

_____

_____

(b)    Has the Company acquired, or will the Company acquire, any assets from you or any of your Associates or Affiliates or any Family Member?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please state below (i) the amount at which the assets were or are to be acquired; and (ii) the costs of such assets to you any of your Associates or Affiliates or any Family Members (see definitions) if such assets were acquired by you or any of your Associates or Affiliates or any Family Members within two (2) years prior to their transfer to the Company.

_____

_____

_____

_____

_____

_____

(c)    Has the Company's auditors or any of its affiliates ever provided any "tax services" to you, your spouse or spousal equivalent, or your dependents?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please indicate below who received the tax services, and when:

_____

_____

_____

_____

**Special Instructions for Question 13:**

(i)    No information need be provided for any transaction where: (A) the rates or charges involved in the transaction are determined by competitive bids, or the transaction involves the rendering of services at rates or charges fixed by or governmental authority; (B) the transaction involves services as a bank depository of funds, transfer agent, registrar, trustee under a trust indenture, or similar services; and (C) your interest arises solely from the ownership of securities of the Company and you receive no extra or special benefit that was not shared on a pro rata basis by all holders of the class of securities.

(ii)    Include information for any material underwriting discounts and commission upon the sale of securities by the Company where you or any of your Associates or Affiliates was or is to be a principal underwriter or the controlling person or member of a firm that was or is to be principal underwriter.

(iii)    You may respond in the negative if your interest in the transaction arises only:

(A)    from your position as a director of another corporation or organization (other than a partnership) which is a party to the transaction;

(B)    from the total ownership by you (together with all directors, executive officers, nominees for directors and executive officers of the Company, all record holders and beneficial holders of more than 5% of the Shares or any other class of voting securities, and all Family Members and the Family Member of each of the foregoing persons) <u>less than 10% of the equity securities</u> of another corporation or other entity (other than a partnership) which is a party to the transaction;

(C)    a combination of A and B above;

(D)    from your position as a limited partner in a partnership in which you (together with all directors, nominees for directors and executive officers of the Company, all record holders and beneficial holders of more than 5% of the Shares or any other class of voting securities, and all Family Members and the Family Members of each of the foregoing persons) hold <u>less than a 10% interest</u>; or

(E)    from your equity interest (other than a general partnership interest) or any person who has an equity interest (excluding a general partnership interest) or your creditor interest in another person that is a party to the transaction and the transaction is not material to such other party.

**(14)** <u>**Change in Control of the Company:**</u>

Do you have any knowledge of any arrangements which may result in a change in control of the Company?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please provide details of such arrangements to the best of your knowledge.

_____

_____

_____

_____

_____

**(15)** <u>**Indemnification:**</u>

Do you know, to the best of your knowledge, whether any controlling person, director or officer of the Company is insured or indemnified in any manner against any liability which he/she may incur in his/her capacity as such, other than pursuant to a statutory provision, charter provision, by-law, or provision of any agreement to which the Company is a party?

**Answer:**    ☐    **Yes**    ☐    **No**

If YES, please provide details below.

_____

_____

_____

**(16)    Foreign Corrupt Practices Act:**

Are you involved or potentially involved in, or do you have any knowledge of, any of the following matters: (a) any political contributions by the Company or from its assets, whether legal or illegal; (b) the disbursement or receipt of Company funds outside the normal system of accountability; (c) payments, whether direct or indirect, to or from foreign or domestic governments, officials, employees or agents for purposes other than the satisfaction of lawful obligations, or any transaction which has as its intended effect the transfer of Company assets for the purposes of effecting such a payment; (d) the improper or inaccurate recording of payments and receipts on the books of the Company or any of its subsidiaries; or (e) any other matters of a similar nature involving disbursements of Company assets.

**Answer:**    ☐    **Yes**    ✓    **No**

If YES, please provide details below.

_____

_____

_____

_____

**(17)    Iran-Related Activities**

Under the Exchange Act, an SEC reporting company must include in its annual or quarterly reports disclosure (if any) regarding certain activities under the Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRSHRA). This Question 17 is based on this requirement.

During the last fiscal year;

(a)    Have you or any of your affiliates knowingly engaged in any activities or transactions relating or contributing to Iran's petroleum or petroleum products industries or Iran's ability to acquire or develop weapons of mass destruction, conventional weapons or other military capabilities?

**Answer:**    ☐    **Yes**    ✓    **No**

(b)    Have you or any of your affiliates knowingly engaged in: any activities or transactions that finance or facilitate the Iranian government's acquisition or development of weapons of mass destruction or that may support or facilitate terrorism; any transactions with an Iranian financial institution to finance or otherwise support Iran's ability to acquire or develop weapons of destruction or international terrorism; or any activities or transactions with or that finance or otherwise benefit Iran's Islamic Revolutionary Guard Corps?

Answer:    ☐   Yes   ✓   No

(c)    Have you or any of your affiliates knowingly engaged in: any transfers of products or technology or provision of services to Iran that are likely to be used by the Iranian government for human rights abuses against the Iranian people; or any transfers of technology that could be used by the Iranian government to restrict the free flow of unbiased information in Iran or disrupt, monitor or otherwise restrict speech of the Iranian people?

Answer:    ☐   Yes   ✓   No

(d)    Have you or any of your affiliates knowingly engaged in or conducted any transactions with the Iranian government or any political subdivision or agency or any entity owned or controlled by the Iranian government without specific authorization from a US federal department or agency or with any persons or entities whose assets are frozen pursuant to executive orders for their involvement with weapons of mass destruction or terrorism?

Answer:    ☐   Yes   ✓   No

If YES to any of the foregoing, please provide details below.

_____

_____

**(18)    Legal Proceedings:**

Please answer the following questions concerning events during the past ten years (or such other time frame as indicated on a question by question basis). For purposes of computing such ten year period, the date of a reportable event shall be deemed the date on which the final order, judgment or decree was entered, or the date on which any rights of appeal from preliminary orders, judgments or decrees lapsed. With respect to bankruptcy petitions, the computation date shall be the date of filing for uncontested petitions or the date upon which approval of a contested petition became final. **If "Yes" is answered for any item, please provide description below or in a separate writing as needed.**

(a)    Has there been any bankruptcy petition (under Federal, State or foreign bankruptcy or insolvency laws) filed by or against you or any business of which you were a general partner or executive officer at the time of bankruptcy or within ten years prior thereto?

Answer:    ☐   Yes   ✓   No

(b)    Has there been any civil litigation in which you have been named as a defendant or counter-claimant in the past ten years?

Answer:    ☐   Yes   ✓   No

(c)    Have you been arrested for, convicted of or plead nolo contendere in a criminal matter or

proceeding or are you the subject of a pending criminal proceeding (excluding traffic violations and other minor traffic offenses)?

**Answer:**    ☐    **Yes**    ✓    **No**

(d)    Have you been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting your involvement in any type of business, securities or banking activities?

**Answer:**    ☐    **Yes**    ✓    **No**

(e)    Have you been found by a court of competent jurisdiction in a civil action, by the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities laws, where such judgment has not been reversed, suspended or vacated?

**Answer:**    ☐    **Yes**    ✓    **No**

(f)    Have you been involved in any judicial or administrative proceedings resulting from involvement in mail or wire fraud or fraud in connection with any business entity?

**Answer:**    ☐    **Yes**    ✓    **No**

(g)    Have you been involved in any judicial or administrative proceedings based on violations of federal or state securities, commodities, banking or insurance laws and regulations, or any settlement to such actions (other than settlements of civil proceedings among private parties)?

**Answer:**    ☐    **Yes**    ✓    **No**

(h)    Have you been involved in any disciplinary sanctions or orders imposed by a stock, commodities or derivatives exchange or other self-regulatory organization?

**Answer:**    ☐    **Yes**    ✓    **No**

The following two questions are based on NASDAQ criteria:

(i)    Have you ever been involved in any inquiries, investigations, lawsuits, litigation, arbitration, hearings, or any other legal or administrative proceedings that are or were initiated or conducted by any regulatory, civil or criminal agency (including but not limited to the SEC, FINRA, PCAOB, state securities, banking and insurance regulators, Commodities Futures Trading Commission, Department of Justice, state bar associations, state boards of accountancy, or any foreign regulatory, civil or criminal authority)?

**Answer:**    ☐    **Yes**    ✓    **No**

(j)     Have you ever been involved in any inquiries, investigations, lawsuits, litigation, arbitration, hearings, or any other legal or administrative proceedings in which claims are or were asserted otherwise alleging fraud, deceit or misrepresentation and seeking damages in excess of $100,000?

**Answer:**     ☐     Yes     ✓     No

If your answer to any of the above questions is "yes", please explain your answer and identify the proceedings, describe such event, the agency taking such action, provide copies of any entered orders, judgments or decrees and explain any mitigating circumstances.

_____

_____

_____

_____

_____

**(19)     <u>Legal Proceedings Adverse to the Company</u>:**

Were you, or are you now, a party adverse to the Company, its parent or any of its subsidiaries, or did you or do you have a material interest adverse to the Company, its parent or any of its subsidiaries, in any legal proceeding.

**Answer:**     ☐     Yes     ✓     No

If YES, please explain, identifying the proceedings.

_____

_____

_____

_____

_____

**(20)     <u>Disqualifying Events</u>**

Under SEC rules promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the Company can be prohibited from conducting certain types of securities offerings if any of its directors and officers (among other persons covered by the rules) were involved in certain types of "disqualifying events." To help the Company avoid the repercussions of losing the ability to undertake certain transactions, please answer the following:

(a)     Have you been convicted within the past ten years of any felony or misdemeanor in connection with (A) the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

Answer:  ☐  Yes  ✔  No

(b)   Are you subject to any order, judgment or decree of any court, entered within the past five years, that restrains or enjoins you from engaging or continuing to engage in any conduct or practice (A) in connection with the purchase or sale of any security; (B) involving the making of any false filing with the SEC; or (C) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

Answer:  ☐  Yes  ✔  No

(c)   Are you subject to any final order of any state securities commission or agency, state authority that supervises or examines banks, savings associations or credit unions, state insurance commission or agency, federal banking agency, the Commodity Futures Trading Commission, or the National Credit Union Administration that bars you from (A) association with an entity regulated by such commission, authority, agency or officer; (B) engaging in the business of securities, insurance or banking; or (C) engaging in savings association or credit union activities?

Answer:  ☐  Yes  ✔  No

(d)   Are you subject to any final order, entered within the past ten years, of any state securities commission or agency, state authority that supervises or examines banks, savings associations or credit unions, state insurance commission or agency, federal banking agency, the Commodity Futures Trading Commission, or the National Credit Union Administration that is based on a violation of any law or regulation prohibiting fraudulent, manipulative or deceptive conduct?

Answer:  ☐  Yes  ✔  No

(e)   Are you subject to any SEC disciplinary order that (A) suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser; (B) limits your activities, functions or operations as a broker, dealer, municipal securities dealer or investment adviser; (C) bars you from being associated with any entity; or (D) bars you from participating in any penny stock offering?

Answer:  ☐  Yes  ✔  No

(f)   Are you subject to any SEC cease-and-desist order, entered within the past five years, that directs you to cease and desist from committing or causing a violation or future violation of (A) any anti-fraud provisions of the federal securities laws; or (B) any provision of Section 5 of the Securities Act of 1933, as amended (the "**Securities Act**"). Anti-fraud provisions of the federal securities laws include Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, Section 15(c)(1) of the Exchange Act and Section 206(a) of the Investment Advisers Act of 1940?

Answer:  ☐  Yes  ✔  No

(g)     Have you been suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

**Answer:**     ☐     **Yes**     ✔     **No**

(h)     Are you subject to any U.S. Postal Service false representation order entered within the past five years?

**Answer:**     ☐     **Yes**     ✔     **No**

(i)     Are you subject to any temporary restraining order or preliminary injunction relating to conduct alleged by the U.S. Postal Service that constitutes a scheme or device for obtaining money or property through the mail by means of false representations?

**Answer:**     ☐     **Yes**     ✔     **No**

**(21)     <u>Board and Committee Meetings (DIRECTORS ONLY)</u>**

<u>Exhibit D</u> sets forth a list of all meetings of the Board of Directors and Board committees held during 2017 and indicates which of those meetings you attended as reflected in the Company's records.  Please review <u>Exhibit D</u> carefully to confirm that it is correct and complete.

<u>Exhibit D</u> is correct _____.

Changes made on <u>Exhibit D</u> _____.

## SIGNATURE

I understand that the information that I am furnishing to the Company and Ellenoff Grossman & Schole LLP herein will be used by the Company in the preparation of the merger transaction documents between the Company and Rocketfuel Blockchain Company as well as any material to be filed with the Securities and Exchange Commission relating to such transaction. I hereby affirm that the answers to the foregoing are true and accurate. I will notify Ellenoff Grossman & Schole LLP immediately if any material change occurs in any of the foregoing information.


Dated: ____Mar 30, 2018___                              _                                              ___
                                                                                    Signature


                                                                    _____Joseph Page_____
                                                                             Print Name

**Exhibit A**

**Biography**

**Exhibit B**

**Ownership of Company Securities**

**Exhibit C**

**Section 16 Filings**

**Exhibit D**

**Board and Committee Meetings**

Exhibit F – RocketFuel V. PAGE

# EXHIBIT F

1  DON SPRINGMEYER, ESQ. (#1021)
   d.springmeyer@kempjones.com
2  NATHANAEL R. RULIS, ESQ. (#11259)
   n.rulis@kempjones.com
3  CHAD R. ARONSON, ESQ. (#14471)
   c.aronson@kempjones.com
4  KEMP JONES, LLP
   3800 Howard Hughes Parkway, 17th Floor
5  Las Vegas, Nevada 89169
   Telephone: (702) 385-6000
6  Facsimile:  (702) 385-6001

7  CLARISSE YOUNG SHUMAKER (pro hac vice)
   youngshumaker@smcounsel.com
8  LISA HIRAIDE (pro hac vice)
   hiraide@smcounsel.com
9  BRETT J. WASSERMAN (pro hac vice)
   wasserman@smcounsel.com
10 SHUMAKER MALLORY LLP
   333 S. Grand Avenue, Suite 3400
11 Los Angeles, California 90071
   **Mailing Address:**
12 1 Ringbit Road West
   Rolling Hills, California 90274
13 Telephone: (213) 793-2020
   Facsimile: (213) 674-4268
14
   *COUNSEL FOR PLAINTIFFS*

15

**UNITED STATES DISTRICT COURT**

16

**DISTRICT OF NEVADA**

17

| | |
|---|---|
| 18  ROCKETFUEL BLOCKCHAIN, INC., a Nevada corporation; and ROCKETFUEL 19  BLOCKCHAIN COMPANY, a Nevada Corporation, | Case No.: 2:21-cv-00103-KJD-EJY |

20        Plaintiffs,

21  vs.

22  JOSEPH PAGE, an individual; AND
    DOES 1 THROUGH 10, INCLUSIVE,
23

24        Defendant.

**PLAINTIFFS' (PROPOSED) FIRST AMENDED COMPLAINT FOR:**

1. **Violation of Section 10(b) of the *Securities Exchange Act Rule* 10b-5**
2. **Violations of Cal. Corp. Code §§ 24501 and 25501 or, alternatively, Nev. Rev. Stat. §§ 90.570 and 90.660**
3. **Fraud**
4. **Breach of Fiduciary Duty**
5. **Negligent Misrepresentation**
6. **Breach of Contract**
7. **Breach of the Implied Covenant of Good Faith and Fair Dealing**
8. **Unjust Enrichment**
9. **Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or, alternatively, Nev.**

25

26

27

28

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

JOSEPH PAGE, an individual,

       Counterclaimant,

vs.

ROCKETFUEL BLOCKCHAIN, INC., a Nevada corporation; and ROCKETFUEL BLOCKCHAIN COMPANY, a Nevada Corporation, *et al.*,

       Counterdefendants.

Rev. Stat. §§ 589.0903, *et seq.*
10. **Injunctive Relief under Cal. Civ. Code § 3439.07, or, alternatively, Nev. Rev. Stat. § 112.210**
11. **Declaratory Judgment and Injunctive Relief under *Federal Rules of Civil Procedure* Rule 57**

**DEMAND FOR JURY TRIAL**

Plaintiffs ROCKETFUEL BLOCKCHAIN, INC. and ROCKETFUEL BLOCKCHAIN COMPANY (collectively, "Plaintiffs") allege as follows:

## PARTIES

1.    Plaintiff ROCKETFUEL BLOCKCHAIN, INC. ("Parent") is a corporation organized and existing under the laws of the state of Nevada. Parent is a publicly traded company formed in 1987 in Nevada, formerly known as B4MC Gold Mines, Inc. ("B4MC"). On June 27, 2018, B4MC acquired Plaintiff RocketFuel Blockchain Company in a reverse acquisition[1], after which B4MC changed its name to RocketFuel Blockchain, Inc.[2]

2.    Plaintiff ROCKETFUEL BLOCKCHAIN COMPANY ("Subsidiary") was formed on January 12, 2018 in Nevada. At all times mentioned herein, Subsidiary was a private operating company. Prior to Parent's acquisition of Subsidiary, Subsidiary's shareholders included Defendant Joseph Page (300 Shares), Gert Funk ("Funk") (300 Shares), Henrik Rouf ("Rouf") by and through his company Pacific Wave Partners Limited ("PWP") (150 Shares), and Richway Finance Ltd. (150 Shares). Prior to Subsidiary being acquired by B4MC (now Parent), an additional 100 Shares were sold to Saxton Capital Ltd. ("Saxton"). After Subsidiary was

---

[1]  A reverse acquisition occurs when a public company acquires an existing private company and the shareholders of the private company receive a controlling block of the parent's stock.

[2]  RBC Parent will be referred to herein as B4MC when referring to pre-closing events.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

acquired by B4MC (now Parent) in the reverse acquisition, Subsidiary became a wholly owned subsidiary of Parent.

3.      Defendant JOSEPH PAGE ("Page" or "Defendant") was a co-founder of Subsidiary.  At all times alleged herein Page served as an officer (Treasurer) of Subsidiary along with Funk and Rouf.  At all times relevant herein Page was a resident of La Jolla, California.  Plaintiffs are informed and believe and thereon allege that Page currently resides in Valbonne, France.

4.      Plaintiffs do not presently know the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive.  Plaintiffs will seek leave of court to amend this complaint to allege said defendants' true names and capacities as soon as plaintiff ascertains them.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those defendants.  Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers also to DOES 1 through 10.

5.      Plaintiffs are informed and believe and thereon allege that each of the Defendants is now, and has been at all times herein mentioned, the agent, servant, employee, partner, associate, joint venture, co-participant, and/or principal of or with each of the remaining Defendants, including the DOE Defendants, and that each Defendant has been, at all times herein mentioned acting within the scope of such relationship and with the full knowledge, consent, authority, ratification, and/or permission of each of the remaining Defendants.

## JURISDICTION AND VENUE

6.      The claims alleged herein arise under the *Securities Exchange Act Rule* 10b-5 (17 C.F.R. § 240.10b-5).  This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and § 27 of the *Securities Exchange Act of 1934*.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and

the agreement alleged herein was executed through electronic means by Parties located in Los Angeles, La Jolla, California and Las Vegas.

## FACTS COMMON TO ALL CAUSES OF ACTION

*Corporate History*

8.    Plaintiff Subsidiary was co-founded by Defendant and Funk for developing and bringing a highly efficient, automated and secure check-out system to e-commerce based on blockchain technology.  Prior to Subsidiary's formation, Defendant developed the prototype for the check-out system and between 2013 and 2017 filed with the U.S. Patent and Trademark Office ("PTO") five patent applications ("Patent Applications") and two trademark applications ("Trademarks") as follows:

| No.[3] | U.S. Patent Application Number and Description | Filing Date |
|---|---|---|
| I | Patent Application 14/078,202 - "Commerce Systems Having Automated Delivery Feature" | 12 Nov 2013 |
| II | Patent Application 14/324,134 - "Commerce Systems Having Integrated Electronic Delivery Features" | 04 Jul 2014 |
| III | Patent Application 14/244,058 - "Commerce Systems Having Integrated Delivery Feature" | 04 Apr 2014 |
| IV | Patent Application – 14/970,404 - "Cryptocurrency Commerce User Interface Systems" | 15 Dec 2015 |
| V | Patent Application – 14/616,683 - "Cryptocurrency Commerce User Interface Systems" | 07 Feb 2015 |

| No. | U.S. Trademark and Number | Registration Date |
|---|---|---|
| I | **Hit It** – 5,034,747 | 06 Sept 2016 |
| II | **Hit It** (wordmark) - 5,030,179 | 30 Aug 2016 |

---

[3]  For ease of reference, the Patent Applications will be referred to herein by the corresponding Roman numeral.

First Amended Complaint

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

Defendant Page filed non-publication requests with the Unites Stated Patent and Trademark Office, which means that the Patent Applications were not published and not made available to the public. Thus, all of the confidential information contained therein would remain confidential and not be available to the public.

9. <u>Assignment of Intellectual Property</u>. In March 2018, Defendant Page executed an assignment of the aforementioned inventions, which included and/or were embodied in the five Patent Applications (hereinafter "IP Portfolio"), to Subsidiary, and did so in exchange for the issuance of 300 shares of Subsidiary common stock.

***The Reverse Acquisition***

10. <u>Subsidiary's Reverse Acquisition with B4MC Gold Mines, Inc. (now Parent)</u>. In June 2018, Subsidiary's management contemplated a reverse acquisition transaction with B4MC, a publicly traded company, by which B4MC acquired 100% of Subsidiary's outstanding and issued shares and Subsidiary's shareholders received newly issued B4MC shares constituting 75% of the total post-acquisition outstanding shares of B4MC.

11. During discussions between Defendant and B4MC leading up to the reverse acquisition, Defendant told Bennett Yankowitz ("Yankowitz"),[4] B4MC's sole director and President at the time, and Rouf that the Patent Applications ***were pending and in the process of being examined*** by the PTO. Defendant also represented that he filed assignments of the Patent Applications and Trademarks in favor of Subsidiary with the PTO.

***The Contribution Agreement***

12. In reliance on these representations, B4MC entered into a "Contribution Agreement" with Subsidiary and its shareholders, including Defendant, Funk, PWP, PWP UK Ltd. (as successor in interest to Richway Financial Ltd.), and Saxton (Subsidiary's shareholders are hereafter collectively referred to as "Sellers") on June 27, 2018. A copy of the Contribution Agreement is attached hereto as Exhibit A and incorporated herein by reference.

---

[4] Bennett Yankowitz is a member of the California Bar (SBN 96802) and an attorney with Shumaker Mallory, LLP, California counsel for Plaintiffs.

13.     Under the Contribution Agreement, the Sellers sold 100% of their Subsidiary shares in exchange for shares of B4MC's common stock representing 75% of B4MC's outstanding shares post-closing.  Thus, at closing on June 27, 2018, Defendant received 5,100,394 shares of B4MC, which constituted 22.5% of B4MC's (now Parent's) total outstanding shares, valued at over $45,000,000.00.[5]

14.     In addition, under the Contribution Agreement, Subsidiary represented and warranted with regard to the sufficiency of its assets that:

> "The assets (including contractual rights) of [Subsidiary] [including the IP Portfolio] constitute all of the assets, rights and properties that are used in the operation of the businesses of [Subsidiary] as it is now conducted and presently proposed to be conducted or that are used or held by [Subsidiary] for use in the operation of the businesses of [Subsidiary], and taken together, ***are adequate and sufficient for the operation of the businesses of [Subsidiary] as currently conducted and as presently proposed to be conducted***." Contribution Agreement § 4.12 (emphasis added).

15.     Page, as a "Seller" under the Contribution Agreement, further represented and warranted that he possessed the authority to execute and deliver "each Ancillary Document"[6] to which he was a party.  Section 5,1 provides:

> "Each of the Sellers has the requisite power and authority to enter into this Agreement and to carry out such Seller's obligations hereunder. ***The execution and delivery of this Agreement and each Ancillary*** **Document** to which it is a party and the consummation of the transactions contemplated hereby and thereby ***(a) have been duly and validly authorized by each Seller, and (b) no other joint venture proceedings,*** other than as set forth elsewhere in the Agreement, on the part of such Seller ***are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby***. This Agreement has been, and each Ancillary Document to which such Seller is a party shall be when delivered, duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties

---

[5]  At the time of the closing, the closing market price of the shares quoted on the OTC Pink sheets was $9.00 per share.

[6]  The Contribution Agreement defines "Ancillary Documents" as "each agreement, instrument or document attached hereto as an Exhibit, and the other agreements, certificates and instruments to be executed or delivered by any of the Parties hereto in connection with or pursuant to this Agreement." *See* Contribution Agreement § 12.1.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

hereto and thereto, constitutes . . . the valid and binding obligation of such Seller . . ." *See* Contribution Agreement § 5.1 (emphasis added).

16. Further, Subsidiary represented it would make "commercially reasonable efforts" to "consummate the transactions contemplated by [the Contribution] Agreement," which necessarily encompass a promises regarding the prosecution, preservation, and/or advancement of all rights pertaining to the IP Portfolio. This provision of the Contribution Agreement states:

> "The Parties hereto shall further cooperate with each other ***and use their respective commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable*** on their part under this Agreement and applicable Laws ***to consummate the transactions contemplated by this Agreement*** as soon as reasonably practicable***, including preparing and filing as soon as practicable all documentation to effect all necessary notices, reports and other filings***. Contribution Agreement § 6.5 (emphasis added).

17. <u>B4MC Name Change</u>. Post-closing, B4MC changed its name to its current name, *RocketFuel Blockchain, Inc.* (herein *Parent*). Parent's Board of Directors was reconstituted to be comprised of Defendant, Funk, and Yankowitz. Defendant was appointed Parent's Chief Technology Officer ("CTO"), Funk was appointed Parent's Chief Executive Officer (CEO) and Yankowitz was reappointed Parent's Chief Financial Officer (CFO) and Secretary.

***Defendant's Demand Leads to Discovery of Defendant's Fraud***

18. <u>Defendant's Demands and Resignation</u>. On or about May 15, 2019, Defendant made a demand to Carsten Jensen ("Jensen"), the president of Saxton (one of Parent's largest shareholders), threatening to resign as a director and CTO of Parent unless three demands were met: 1) Parent paid Defendant €100,000 immediately; 2) Parent raised €4,000,000 within 90 days - out of which Defendant was to be paid €350,000; and 3) in the event that €4,000,000 was not raised within 90 days, Parent would transfer the IP Portfolio to Defendant, and only then would Defendant return the 22.5% of Parent shares back to Parent. Defendant claimed that he was disappointed that Parent had not yet raised capital to develop the technology contained in the IP Portfolio. Jensen forwarded Defendant's email to Funk. Parent rejected Defendant's demands, and Defendant resigned from Parent's Board on May 29, 2019. Despite requests by Parent, Defendant did not resign as Parent's CTO or as the Treasurer of Subsidiary.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

19.     On May 24, 2019, prior to Defendant's resignation from Parent's Board, Yankowitz, on behalf of Parent, wrote to Defendant reminding him that he was still an officer and significant shareholder of Parent and an officer of Subsidiary, and thus he owed fiduciary obligations to Subsidiary, Parent, and Parent's shareholders, including a duty of loyalty. Yankowitz requested that Defendant: (1) transfer back to Parent all company property, including source code and other property and systems Defendant may have developed in his capacity as Parent CTO relating to Parent's intellectual property, including, but not limited to, the IP Portfolio owned through Subsidiary; and (2) provide all communications and correspondence with respect to the Patent Applications between Defendant and any other officer, director, shareholder or employee of Subsidiary or Parent.

20.     <u>Defendant Admits Patent Applications Abandoned</u>.  On or about June 3, 2019, during the course of a conversation with Yankowitz, Defendant admitted ***for the first time*** that the Patent Applications had been abandoned (contradicting his earlier representations) – but conveniently failed to provide the dates the applications were abandoned.  This prompted Yankowitz to immediately dispatch a letter to Defendant on June 3, 2019, requesting that Defendant provide the exact date each Patent Application was abandoned, the files for each Patent Application, the Image File Wrappers (IFW) [7] and all of Defendant's communications with the PTO.  Yankowitz further advised Defendant that because Subsidiary, not Defendant, was the owner of the Patent Applications, Defendant should not attempt to revive the Applications with the PTO or file any new patent application that included, incorporated or referenced the subject matter of the abandoned Patent Applications.

21.     In an apparent attempt to cover up his prior admission by further misrepresenting the truth, Defendant responded to Yankowitz the following day stating that the reason the Patent Applications were abandoned was because Parent had failed to raise capital:

> "I believe [the abandoned patent applications] are now and forever lost
> to intentional abandonment via extended non prosecution as a result of

---

[7]  According to the uspto.gov, the IFW system "uses technology to replace the paper processing of patent applications in the Office. Paper components of these application files (including the specification, oath or declaration, drawings, information disclosure statements, amendments, Office actions, and file jacket notations) have been scanned to create electronic image files."

[Parent] failing to capitalize and meet its legal duty to prosecute the applications. I reject the notion that I should not file any new patent applications referring to the subject matter of the abandon[ed] patent applications."

22. Defendant refused to cooperate by simply providing the requested information and files, and would not agree to refrain from filing any new patent applications that included the subject matter of the abandoned Patent Applications.

23. <u>More Lies of Defendant Uncovered by Outside IP Counsel</u>. Outside IP counsel, Mark Kendrick ("Kendrick"), retained by Parent as patent counsel to replace Defendant (who is a registered patent agent) and review and investigate the abandoned Patent Applications[8], uncovered the following information:

a. Three of the five Patent Applications had been abandoned because of Defendant's failure to respond to a PTO action *years before* Defendant had assigned them to Subsidiary:

i. <u>Patent Application I</u>: Abandoned **8/7/2014** because Defendant failed to pay an extra filing fee for additional claims.

ii. <u>Patent Application III</u>: Abandoned **5/11/2017** because Defendant failed to respond to a restriction requirement.

iii. <u>Patent Application IV</u>: Abandoned **9/8/2016** because Defendant failed to pay the filing fee and describe the drawings properly in the specification.

b. The Assignments for the other two Patent Applications II and V were defective. As a result, Kendrick was unable to obtain power of attorney over Patent Applications II and V in order to review the same. Kendrick eventually learned that Patent Applications II and V had also been abandoned by Defendant before being assigned to Subsidiary.

c. In or around October 2014, Defendant had attempted unsuccessfully to revive Patent Application I by filing a petition with the PTO; however, on June 30, 2015, the PTO

---

[8] Kendrick became patent attorney of record of the Patent Applications in the United States Patent and Trademark Office, replacing Defendant as patent agent.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

1  dismissed the petition. Because the petition had been dismissed, it would be extremely difficult

2  for Parent to ever successfully revive Patent Application I.

3          d.    Because Subsidiary did not own the Patent Applications at the time they

4  were abandoned and because of the extended length of time that had passed since abandonment,

5  it was unlikely that Parent would be able to successfully revive the Patent Applications from the

6  Patent Applications' abandoned status, requiring Parent to file new applications and take the risk

7  that others, including Defendant, may have already filed competing applications; and

8          e.    Because Defendant's practice was to file all of his Patent Applications with

9  a non-publication request, these Patent Applications are not published and are not searchable on

10  the U.S. Patent and Trademark Office website. Thus, there was no way for Parent to know

11  whether there have been intervening filings by Defendant that Defendant assigned to competing

12  claimants.

13      24.    At no time pre-closing did Defendant disclose the above-mentioned material

14  information about the Patent Applications to Parent/Subsidiary, Yankowitz, Funk or Rouf until

15  Defendant was confronted by Yankowitz on June 3, 2019.

16      25.    On July 10, 2019, Kendrick wrote to Defendant to, among other things, confront

17  him with his misrepresentations and omissions concerning the Patent Applications and his attempt

18  to mislead Yankowitz into believing that the Patent Applications were abandoned as a result of

19  Parent's failure to raise money to prosecute them. Kendrick also asked Defendant to: (i) provide

20  a list of any idea, invention and/or technology he developed while an officer of Subsidiary; (ii)

21  verify he had not filed any new patent applications that included any portion

22  of the Patent Applications or referred to and/or incorporated by reference any of the disclosures

23  therein in any document; and (iii) had no plans to file any new patent applications that were

24  directed to the same or similar subject matter as the Patent Applications.

25      26.    Defendant denied that he failed to tell B4MC (now Parent) that the Patent

26  Applications were abandoned and insisted that *both* Yankowitz and Rouf were somehow

27  "confused…with the terminology related to [the] patents" as "the full and true nature of the

28  applications was fully disclosed repeatedly." Defendant had no explanation – beside a blanket

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

10

denial - why he then tried to deceive Yankowitz to believe that the Patent Applications were abandoned because Parent failed to raise capital with which to prosecute them. Defendant also failed to comply with Kendrick's requests concerning the Patent Applications set forth in paragraph 22 above.

27.     Plaintiffs now seek to recover from Defendant all damages that Plaintiffs have incurred as a result of Defendant's fraud and omissions and further seeks recovery of all stock in Parent issued to Defendant.

## FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the *Securities Exchange Act*, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), by Parent against Defendant and Does 1-10)**

28.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 27 above as if fully set forth herein.

29.     Between 2013 and 2017, Defendant Page developed the IP Portfolio, including the prototype for the check-out system and the Patent Applications.

30.     Defendant Page made certain representations as to the validity and viability of the IP Portfolio before contributing the Patent Applications, among other intellectual property assets, to Subsidiary in consideration for the issuance of Subsidiary stock to Page in March of 2018.

31.     Defendant Page knew and intentionally failed to disclose to Subsidiary the following material facts:

        a.    The Patent Applications were abandoned and no longer pending *before* Page assigned them to Subsidiary;

        b.    That because the Patent Applications were already abandoned when Defendant assigned them to Subsidiary, Subsidiary would be unable to successfully revive the Patent Applications;

        c.    In or about 2015, Page unsuccessfully attempted to revive the application for Patent I, but that petition was dismissed by the PTO on June 30, 2015. As a result, it will be nearly impossible for Parent to revive the application for Patent I.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

32.   Defendant Page made the misrepresentations and omissions directly in connection with the issuance of Subsidiary stock in consideration for Page's contribution of the IP Portfolio to Subsidiary.

33.   In addition, Defendant Page, as an Officer of Subsidiary, further intentionally failed to disclose to B4MC (now Parent) the following known material facts before the reverse Acquisition transaction occurred, including:

    a.   A number of the Patent Applications had been abandoned years prior;

    b.   The Patent Applications were abandoned and no longer pending *before* Page assigned them to Subsidiary;

    c.   That because the Patent Applications were already abandoned when Defendant assigned them Subsidiary, Subsidiary would be unable to successfully revive the Patent Applications;

    d.   In or about 2015, Page unsuccessfully attempted to revive the application for Patent I, but that petition was dismissed by the PTO on June 30, 2015. As a result, it will be nearly impossible for Parent to revive the application for Patent I.

    e.   That Subsidiary's stock was in fact worth substantially less than the agreed upon valuation because the underlying assets, including the Patent Applications, which were the basis for Subsidiary's valuation were materially different than Page represented, a fact which was also concealed from Subsidiary's other shareholders and directors by Page.

34.   Moreover, during pre-closing discussions leading up to the reverse acquisition between B4MC (now Parent) and Subsidiary, Defendant Page, as an Officer of Subsidiary and in his individual capacity as a shareholder, made certain oral and written misrepresentations, specifically including the written misrepresentations concerning the IP Portfolio in the Contribution Agreement and the oral misrepresentations to Yankowitz and Rouf that the Patent Applications *were pending and in the process of being examined*.  Defendant Page solely knew said misrepresentations were patently false when he made them because he never disclosed to

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

Subsidiary that he was aware that the Patent Applications had been *__abandoned__* by his failure to act considerably *before* he had assigned the Patent Applications to Subsidiary.

35.     Defendant Page made the material misrepresentations and omissions directly in connection with the sale/exchange of Subsidiary stock for B4MC (now Parent) stock in June of 2018.

36.     Defendant knew that the above-referenced statements and omissions were false and/or misleading or acted with reckless disregard as to constitute willful deceit and fraud upon Subsidiary and/or B4MC (now Parent).  Defendant had actual knowledge of the true facts and knowingly and/or deliberately misrepresented, mislead, withheld and/or concealed such material information from Subsidiary and/or B4MC (now Parent), including but not limited to the fact that: (i) Defendant was the inventor, filer, and agent of record of the Patent Applications; (ii) Defendant would have received all communications and deficiency and other notices about the Patent Applications from the PTO, and thus would have received actual notice that the Patent Applications had, in fact, been abandoned, as much as one year before he had assigned them to Subsidiary; and (iii) Defendant's failed petition to revive Patent Application I.

37.     At the time of Defendant's misrepresentations, Subsidiary and/or B4MC (now Parent) were ignorant of their falsity, and believed them to be true.  Subsidiary and/or B4MC (now Parent) were also ignorant of the omitted facts.  The misrepresentations and omissions were material in that: (i) had Subsidiary known that the misrepresentations were false and/or known of the omissions, Subsidiary would have not issued shares of Subsidiary to Page in consideration for the IP Portfolio; and (ii) had B4MC (now Parent) known that the misrepresentations were false and/or known of the omissions, B4MC (now Parent) would not have undertaken the Acquisition by which it purchased Defendant's and the other Subsidiary shareholders' stock and sold its securities to Defendant and the other Subsidiary shareholders as the Patent Applications comprised the majority of Subsidiary's assets.

38.     Defendant Page made use of the means or instrumentalities of interstate commerce, or of the mails, in making the untrue statements of material fact to B4MC (now Parent) and/or Subsidiary, or in omitting to state material facts necessary in order to make statements

made to B4MC (now Parent) and/or Subsidiary, in light of the circumstances under which they were made, not misleading.

39.     By reason of the foregoing, Defendant violated Section 10(b) of the *Securities and Exchange Act*, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.

40.     As a direct and proximate result of Defendant's violations, Parent, directly and by and through Subsidiary, has suffered money damages at least in excess of $5.1 million, the exact amount of which it will prove at trial.

41.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same back to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

## SECOND CLAIM FOR RELIEF

**(Violations of Cal. Corp. Code §§ 24501 and 25501 or, alternatively, Nev. Rev. Stat. §§ 90.570 and 90.660 by Defendant and Does 1-10)**

42.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 41 above as if fully set forth herein.

43.     In connection with the offer to issue shares of Subsidiary in consideration for contribution of the IP Portfolio to Subsidiary, Defendant intentionally made oral and/or written communications to Subsidiary, which included untrue statements of material fact or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to, statements concerning the viability and validity of the Patent Applications.

44.     In addition, in connection with the offer to sell and the actual sale of all Defendant's issued and outstanding shares of Subsidiary to B4MC (now Parent), Defendant, as an Officer of Subsidiary, and in his individual capacity as a shareholder of Subsidiary, intentionally made oral and/or written communications to B4MC (now Parent) as previously

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

described above, which included untrue statements of material fact or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Such misrepresentations include, but are not limited to, written misrepresentations in the Contribution Agreement, and oral misrepresentations to Yankowitz and Rouf, concerning the pending status of the Patent Applications.

45. Subsidiary did not know the truth regarding the misrepresentations and/or omissions of Defendant, and relied upon the same in agreeing to issue stock to Defendant Page in consideration for the IP Portfolio. Had Subsidiary known that the misrepresentations were false and of the omissions, Subsidiary would not have issued stock to Defendant Page in consideration for the IP Portfolio.

46. B4MC (now Parent) did not know the truth regarding the misrepresentations and/or omissions of Defendant, and relied upon the same in agreeing to the Acquisition by which it purchased Defendant's and the other Subsidiary shareholders' stock and sold its stock to Defendant and the other Subsidiary shareholders. Had B4MC (now Parent) known that the misrepresentations were false and/or of the omissions, B4MC (now Parent) would not have undertaken the Acquisition.

47. Defendant knew that the above-mentioned misrepresentations and omissions to Subsidiary and/or B4MC (now Parent) were false, misleading or Defendant acted with such reckless disregard as to constitute willful deceit and fraud upon B4MC (now Parent). Defendant had actual knowledge of the true facts and knowingly and/or deliberately misrepresented, mislead, withheld and/or concealed material information from Subsidiary and/or B4MC (now Parent), including but not limited to the fact that: (i) Defendant was the inventor, filer, and agent of record of the Patent Applications; (ii) Defendant would have received all communications and deficiency and other notices about the Patent Applications from the PTO, and thus would have received actual notice or communications that the Patent Applications had, in fact, been abandoned as much as one year before he had assigned them to Subsidiary; and (iii) Defendant's failed petition to revive Patent Application I.

48.     By reason of the foregoing, Defendant violated Defendant violated Cal. Corp. Code § 25401 or, alternatively, NRS § 90.570.

49.     The material misrepresentations and omissions proximately injured Parent, directly and by and through Subsidiary, in excess of $5.1 million, the exact amount of which will be proven at trial.

50.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

## THIRD CLAIM FOR RELIEF

### (Fraud by Defendant and Does 1-10)

51.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 50 above as if fully set forth herein.

52.     As alleged above, Defendant made the aforementioned misrepresentations and misleading omissions of material facts to Subsidiary, knowing the misrepresentations were false and the omissions were made with the intent to deceive Subsidiary, or acting with reckless indifference to the truth or falsity of the representations, with the intention and knowledge that they would be relied on by Subsidiary in its decision to issue shares of Subsidiary to Defendant Page in consideration for the Page's contribution of the IP Portfolio to Subsidiary.

53.     As alleged above, prior to the Acquisition, Defendant, as an Officer of Subsidiary and in his individual capacity as a shareholder of Subsidiary, made the aforementioned misrepresentations and misleading omissions of material facts to B4MC (now Parent), knowing the misrepresentations and omissions were false and with the intent to deceive B4MC (now Parent), or acting with reckless indifference to the truth or falsity of the representations, with the intention and knowledge that they would be relied on by B4MC (now Parent) in its decision to

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

participate in the Acquisition by purchasing Subsidiary's outstanding and issued stock and selling a majority of B4MC's (now Parent's) outstanding and issued stock to Subsidiary.

54.     Subsidiary did not know the truth regarding the misrepresentations and/or omissions of Defendant, and relied upon the same in agreeing to issue stock to Defendant Page in consideration for the IP Portfolio.  Had Subsidiary known that the misrepresentations were false and of the material facts that were not disclosed, Subsidiary would not have issued stock to Defendant Page in consideration for the IP Portfolio.

55.     B4MC (now Parent) did not know the truth regarding the misrepresentations and/or omissions of Defendant, and relied upon the same in agreeing to the Acquisition by which it purchased Defendant's and the other Subsidiary shareholders' stock and sold its stock to Defendant and the other Subsidiary shareholders.  Had B4MC (now Parent) known that the misrepresentations were false and/or of the omissions, B4MC (now Parent) would not have undertaken the Acquisition.

56.     Defendant knew that the above-mentioned misrepresentations and omissions to Subsidiary and/or B4MC (now Parent) were false, misleading or Defendant acted with such reckless disregard as to constitute willful deceit and fraud upon Subsidiary and/or B4MC (now Parent).  Defendant had actual knowledge of the true facts, both as an individual and as an Officer of Subsidiary, and knowingly and/or deliberately misrepresented, mislead, withheld and/or concealed material information from Subsidiary and/or B4MC (now Parent), including but not limited to the fact that: (i) Defendant was the inventor, filer, and agent of record of the Patent Applications; (ii) Defendant would have received all communications and deficiencies and other notices about the Patent Applications from the PTO, and thus would have received actual notices of communications that the Patent Applications had, in fact, been abandoned as much as one year before he had assigned them to Subsidiary; and (iii) Defendant's failed petition to revive Patent Application I.

57.     Defendant made the misrepresentations and materially misleading omissions, and conducted such concealment of the truth concerning the omissions, to Subsidiary with the

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

1  intention of inducing Subsidiary to rely thereon by issuing shares of Subsidiary to Page in

2  consideration for the contribution of the IP Portfolio to Subsidiary.

3       58.    Subsidiary, not knowing of the truth concerning the aforesaid misrepresentations

4  and materially misleading omissions, relied thereon by issuing Subsidiary stock to Defendant

5  Page in consideration for the contribution of the IP Portfolio to Subsidiary.

6       59.    Defendant made the misrepresentations and materially misleading omissions, and

7  conducted such concealment of the truth concerning the omissions, to B4MC (now Parent), as an

8  Officer of Subsidiary and in his individual capacity as a shareholder, with the intention of

9  inducing B4MC (now Parent) into participating in the Acquisition with Subsidiary.  Defendant

10  intended all along to bait B4MC (now Parent) into the transaction by dangling the promise of

11  potentially profitable patents which covered state-of-the art e-commerce check-out IP, which in

12  reality were abandoned, in order to acquire 5,100,394 shares constituting 22.5% of Parent's

13  outstanding shares to the detriment of Parent.

14       60.    B4MC (now Parent), not knowing of the truth concerning the aforesaid

15  misrepresentations and materially misleading omissions, relied thereon by participating in the

16  Acquisition and exchanging Subsidiary's outstanding and issued stock for a majority of B4MC's

17  (now Parent's) outstanding and issued stock.

18       61.    Such reliance by Subsidiary and/or B4MC (now Parent) on such

19  misrepresentations and materially misleading omissions was reasonable especially in view of

20  Defendant's: (i) legal duties under the federal and California and/or Nevada securities laws; (ii)

21  position as an Officer of Subsidiary; and (iii) position as IP agent of record on the Patent

22  Applications.

23       62.    As a direct and proximate result of Subsidiary's and B4MC's (now Parent's)

24  respective reliance on such misrepresentations and materially misleading omissions of Defendant

25  Page, B4MC (now Parent) directly and by and through Subsidiary, has been damaged in an

26  amount subject to proof at trial.

27       63.    The aforementioned conduct of Defendant consists of intentional

28  misrepresentations, deceit, and concealment of material facts known solely to him, with the

intention on the part of said Defendant to deprive Subsidiary and/or B4MC (now Parent) of property or legal rights or otherwise cause injury to it.  Such actions were done to induce Subsidiary to issue shares to Page and to induce B4MC (now Parent) to exchange a majority of its outstanding shares of common stock in exchange for Defendant's and the other Subsidiary shareholders' shares in Subsidiary.

64.    Accordingly, the actions of Defendant, individually and collectively against Subsidiary and B4MC (now Parent), were oppressive, fraudulent and malicious and justifies awarding exemplary and punitive damages to Parent, sufficient to make an example of and punish Defendant, in an amount to be proven at trial.

65.    As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

### FOURTH CLAIM FOR RELIEF

**(Breach of Fiduciary Duty by Defendant and DOES 1-10)**

66.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 65 above as if fully set forth herein.

67.    At all times relevant herein, Defendant served as an Officer (Treasurer) of Subsidiary.  At all times relevant herein, Defendant also served as an Officer (Chief Technology Officer) and Director of Parent post-closing of the Acquisition.  Thus, while serving in his capacity as an Officer and Director of Subsidiary and Parent, Defendant owed Subsidiary and/or Parent, statutory and common law fiduciary duties, including the duty of loyalty, which required Defendant to act in good faith and in the best interest of Subsidiary and/or Parent and their respective shareholders, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

68.     Defendant breached his respective fiduciary duties to Subsidiary and/or Parent by failing to disclose that the Patent Applications had been abandoned by Defendant before Defendant purportedly assigned those Patent Applications to Subsidiary.  Such failure to disclose prevented Subsidiary from taking steps to revive the Patent Applications pre-closing, caused Subsidiary and B4MC (now Parent) to enter into the Acquisition under false pretenses thereby exposing Subsidiary to claims of fraud, and prevented Parent from reviving and/or refiling the Patent Applications much earlier.

69.     Defendant further breached his fiduciary duties to Parent, including the duty of loyalty, by refusing to simply cooperate with Yankowitz's and Kendrick's requests on behalf of Parent to turn over basic information and files concerning the Patent Applications, including all communications with the PTO and/or shareholders, officers, directors or employees of Subsidiary or Parent.

70.     By engaging in the previously mentioned conduct, Defendant failed to act in good faith and in the best interests of both Subsidiary and/or Parent, failed to act in the face of a known duty to act, and instead, placed his own personal and pecuniary interests above those of Subsidiary and/or Parent.  As such, Defendant breached his respective fiduciary duties, including the duty of loyalty and duty to act in good faith, to Subsidiary and/or Parent.

71.     As a direct and proximate result of Defendant's breach of his respective fiduciary duties to Subsidiary and/or Parent as set forth herein, Parent, directly and by and through Subsidiary, has suffered and will continue to suffer damages in the amount according to proof at the time of trial.

72.     In engaging in the above acts, in violation of his respective fiduciary duties to Subsidiary and/or Parent, Defendant acted in conscious disregard of the rights of Subsidiary and/or Parent therefore justifying an award of exemplary and punitive damages in an amount to be proven at the time of trial.

73.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but

1   instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for

2   Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or,

3   alternatively, Nevada common law.

## FIFTH CLAIM FOR RELIEF

### (Negligent Misrepresentation by Defendant and Does 1-10)

6   74.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 73

7   above as if fully set forth herein.

8   75.     Defendant, in his dealings with Subsidiary and B4MC (now Parent), had a duty of

9   good faith and fair dealing.  Defendant further had a duty to Subsidiary as an Officer of

10  Subsidiary.

11  76.     Defendant breached his respective duties to Subsidiary and B4MC (now Parent)

12  by making certain material misrepresentations and omitting certain material facts, as previously

13  described hereinabove, with the intention of: (i) Subsidiary relying on the same in issuing shares

14  of Subsidiary in consideration for the contribution of the IP Portfolio; and (ii) B4MC (now Parent)

15  relying on the same in agreeing to the Acquisition and exchanging shares representing a

16  controlling interest of B4MC (now Parent) for all of the shares of Subsidiary.

17  77.     In truth and in fact, each of the material misrepresentations and material omissions

18  previously described hereinabove were false.

19  78.     Defendant failed to exercise due diligence or conduct reasonable inquiry about the

20  truth and accuracy of his representations concerning the Patent Applications or in disclosing all

21  material information concerning the same.

22  79.     As a direct and proximate result of Defendant's respective misrepresentations and

23  omissions to Subsidiary and B4MC (now Parent), and in actual and reasonable reliance thereon,

24  Subsidiary issued shares to Defendant Page in consideration for the contribution of the IP

25  Portfolio to Subsidiary and B4MC (now Parent) entered into the Contribution Agreement.

26  80.      As a direct and proximate result of Defendant's respective misrepresentations and

27  omissions to Subsidiary and B4MC (now Parent), Parent directly and by and through Subsidiary,

28

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

has suffered and will continue to suffer damages in the amount according to proof at the time of trial.

**SIXTH CLAIM FOR RELIEF**

**(Breach of Contract against Defendant and Does 1-10)**

81.     Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 80 as if fully set forth herein.

82.     As alleged above, Page initially assigned rights to the IP Portfolio to Subsidiary in exchange for common stock in the same, and then subsequently entered the Contribution Agreement, under which Page (and other shareholders) transferred the IP Portfolio in exchange for common stock in Parent.

83.     In March of 2018, Page, and other shareholders of Subsidiary, executed a valid agreement, the Contribution Agreement, with B4MC (predecessor of Parent), providing for Page and the other shareholders' receipt of B4MC's common stock in exchange for 100% of their shares in Subsidiary.

84.     Parent performed under the Contribution Agreement in all material respects, particularly by transferring to Page shares of B4MC's common stock.

85.     Page, on the other hand, failed to perform under §§ 4.12, 5.1 and 6.5, under which Page promised to provide the IP Portfolio as identified in the Contribution Agreement,  prosecute the rights within the IP Portfolio, including  and to timely provide and/or return documentation and/or information to Parent upon demand for the same in the event of termination of the Contribution Agreement.

86.     Under § 4.12 of the Contribution Agreement, Page represented Subsidiary's assets, including the IP Portfolio " constitute all of the assets, rights and properties that are used in the operation of the businesses of [Subsidiary] as it is now conducted and presently proposed to be conducted or that are used or held by [Subsidiary] for use in the operation of the businesses of [Subsidiary]." *See* Contribution Agreement § 4.12 (emphasis added).

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

87.     Section 4.12 continues that Subsidiary's assets "taken together, are adequate and sufficient for the operation of the businesses of [Subsidiary] as currently conducted and as presently proposed to be conducted." *See id.*

88.      Additionally, Page represented and warranted he had authority to execute and deliver "each Ancillary Document to which [he] is a party" and promised to undertake "commercially reasonable efforts" to "consummate the transactions contemplated by [the Contribution] Agreement," which necessarily encompasses a promise the prosecution, preservation, and/or advancement of all rights pertaining to the IP Portfolio. *See* Contribution Agreement §§ 5.1, 6.5.

89.     Page, by failing to transfer the IP Portfolio as identified under § 4.12, failed to tender performance and, consequently, breached the Contribution Agreement.

92.     Under §§ 5.1 and 6.5, Page's abandonment of the IP Portfolio and admitted failure to make any effort to revive rights under the same at all relevant times constitutes a failure of performance under the Contribution Agreement.

90.     As a direct and proximate result of Page's breach of contract, Parent directly and by and through Subsidiary, has suffered and will continue to suffer damages in the amount according to proof at trial.

91.     Further, and pursuant to § 11.6 of the Contribution Agreement, Plaintiffs are entitled to specific performance, including through an injunction or restraining order, "to prevent breaches of [the Contribution Agreement] and to seek to enforce specifically the terms and provisions hereof [.]" As such, Plaintiffs are entitled to a court order compelling Page to perform under the Contribution Agreement by executing a valid assignment of the IP Portfolio, as promised.

## SEVENTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Defendant and Does 1-10)

92.     Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 91 as if fully set forth herein.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

93.     As alleged above, Page entered into a contract with Subsidiary to exchange Page's IP Portfolio for shares in Subsidiary, and later executed the Contribution Agreement, under which Page and other shareholders of Subsidiary gained common stock in Parent in exchange for Subsidiary's assets, including the IP Portfolio.

94.     Page breached his duty of good faith required under the Contribution Agreement, under which Page and the other shareholders sold 100% of their shares in Subsidiary in exchange for shares of B4MC's common stock.

95.     As alleged above, the Contribution Agreement contains several provisions that evince the parties' understanding that the IP Portfolio was being advanced before the PTO, Page would continue to prosecute, monitor, and execute all writings with respect to the PTO process, and the parties would cooperate in returning all Confidential Information in the event of the Contribution Agreement's termination.

96.     Page performed its contractual obligations in a manner unfaithful to the purpose of the agreement by failing to provide to Parent valid, viable rights to the IP Portfolio, refusing to disclose the abandoned (and perhaps un-revivable) status of the IP Portfolio, declining to make efforts to advance, prosecute, or monitor the status of the IP Portfolio before the PTO, and by rejecting demands from Parent to immediately turn over all Confidential Information, namely all documentation concerning the IP Portfolio.

97.     Subsidiary was denied its justified expectations that the IP Portfolio:

a.     Possessed the value and validity as contemplated under the Contribution Agreement;

b.     Contained Patent Applications that were presently before the PTO;

c.     Was being actively prosecuted and monitored by Page during the pendency of the PTO process, including by completing any required writings or documentation.

d.     Would be promptly returned to Parent upon termination of the Contribution Agreement, along with all related documentation constituted "Confidential Information."

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

98.    As a direct and proximate result of Page's breach of contract, Parent directly and by and through Subsidiary, has suffered and will continue to suffer damages in the amount according to proof at trial.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment against Defendant and Does 1-10)

99.    Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 98 as if fully set forth herein.

100.    As a result of the conduct alleged herein, Subsidiary was fraudulently induced to issue shares to Defendant Page in consideration for the contribution of the IP Portfolio to Subsidiary.

101.    As a result of the conduct alleged herein, B4MC (now Parent) was fraudulently induced to enter into the Contribution Agreement and consummate the reverse Acquisition for valuable consideration.

102.    Defendant has been unjustly enriched at the expense of Parent, directly and by and through Subsidiary.

103.    Parent seeks restitution from Defendant and seeks an order of this Court disgorging all profits, benefits, and other consideration obtained by Defendant as a result of Defendant's receipt of Subsidiary stock and the acquisition of Subsidiary by B4MC (now Parent), including, but not limited to, Defendant's Parent stock.

104.    As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

/ / /

/ / /

/ / /

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

## NINTH CLAIM FOR RELIEF

### (Violation Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or, alternatively, Nev. Rev. Stat. §§ 589.0903, *et seq.* against Defendant and Does 1-10)

105. Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 104 as if fully set forth herein.

106. Cal. Bus. & Prof Code §§ 17200 *et seq.*, also known as California's Unfair Competition Law ("UCL"), prohibits any "unlawful, unfair or fraudulent business act or practice."

107. NRS §§ 589.0903, *et seq.* prohibits persons from engaging in a "deceptive trade practice" during the "course of his or her business or occupation."

108. Defendant Page at all times herein mentioned was an individual doing business in the County of San Diego, City of La Jolla.

109. Defendant Page has violated, and continues to violate Cal Bus. & Prof. Code §§ 17200, *et seq.*'s prohibition on "unfair" acts or practices, or, alternatively, NRS §598.0903, *et seq.*'s prohibition on "deceptive trade practices," by:

    a.    Making material misrepresentations and/or omitting material facts concerning the validity and viability of the Patent Applications to Subsidiary prior to contributing the same to Subsidiary in consideration for the issuance of Subsidiary shares;

    b.    Failing to apprise the shareholders, officers, and directors of Subsidiary, as an Officer of Subsidiary, as to the abandonment of the Patent Applications;

    c.    Misrepresenting and/or omitting material facts concerning the status of the Patent Applications to B4MC (now Parent), in his capacity as an Officer of Subsidiary and in his capacity as an individual shareholder, during B4MC's (now Parent's) due diligence prior to the Acquisition;

    d.    Refusing to apprise the shareholders, officers, and directors of Parent, as an Officer and Director of Parent, as to the abandonment of the Patent Applications; and

e.     Failing to simply cooperate and turn over to Parent basic information and files concerning the Patent Applications, including all communications with the PTO and/or shareholders, officers, directors or employees of Subsidiary or Parent, as repeatedly requested by Yankowitz and Kendrick.

110.    Defendant Page has violated, and continues to violate Cal. Bus. & Prof. Code §§ 17200, *et seq.*'s prohibition on "unfair" acts or practices or, alternatively, NRS §§ 598.0903, *et seq.*'s prohibition on "deceptive trade practices," by his failure to relinquish the shares of Parent that Defendant Page obtained through his misrepresentations, omissions, and deceit of Subsidiary and/or B4MC (now Parent).

111.    Parent, directly and by and through Subsidiary, was harmed by "unfair" acts or "deceptive trade practices" in an amount to be proven at trial.

112.    Injunctive Relief preventing Defendant Page from disposing of his Parent stock is appropriate to further prevent said acts and omissions under Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and NRS §§ 598.0903, *et seq.*  Parent lacks an adequate remedy at law, as any compensation by Page would be insufficient relative to the value of the Parent stock, and there is a serious risk of irreparable harm absent injunctive relief.  Parent is likely to prevail on the merits of the underlying controversy, and a comparison of the harm to defendant in issuing an injunction versus the harm to Plaintiffs in withholding it, favors Parent.

## TENTH CLAIM FOR RELIEF

### (Injunctive Relief under Cal. Civ. Code § 3439.07, or, alternatively, Nev. Rev. Stat. § 112.210 against Defendant and Does 1-10)

113.    Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 112 as if fully set forth herein.

114.    Injunctive Relief preventing Defendant Page from disposing of his Parent stock is appropriate to prevent the fraudulent transfer of the same under Cal Civ Code § 3439.07 or, alternatively, NRS § 112.210.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

115.    Parent lacks an adequate remedy at law, as any compensation by Page would be insufficient relative to the value of the Parent stock, and there is a serious risk of irreparable harm absent injunctive relief.

116.    Parent is likely to prevail on the merits of the underlying controversy, and a comparison of the harm to defendant in issuing an injunction versus the harm to Plaintiffs in withholding it, favors Parent.

## ELEVENTH CLAIM FOR RELIEF

**(Declaratory Judgment and Injunctive Relief under *Federal Declaratory Judgments Act*, 28 U.S.C. §§ 2201–2202, and Rule 57 of the *Federal Rules of Civil Procedure* against Defendant and Does 1-10)**

117.    Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 116 as if fully set forth herein.

118.    This action for declaratory judgment is made pursuant to the *Federal Declaratory Judgments Act*, 28 U.S.C. §§ 2201–2202, and Rule 57 of the *Federal Rules of Civil Procedure*.

119.    An actual controversy regarding the ownership of the subject matter of the Patent Applications exists between the Parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

120.    This action concerns the issue of whether the Plaintiffs are the owners of the subject matter of the Patent Applications and jurisdiction is therefore proper under 28 U.S.C. § 1331.

121.    Defendant Page filed the Patent Applications, which contained confidential information.  The Patent Applications remained confidential and unavailable to the public due to the non-publication requests filed by Page with the United States Patent and Trademark Office and the subsequent abandonment of the Patent Applications (the subject matter of the Patent Applications has not been published).

122.    In or around March of 2018, Defendant Page transferred his ownership interests in the Patent Applications, and all of the underlying subject matter, to Subsidiary in exchange for shares of Subsidiary stock.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

123.    On June 27, 2018, Defendant Page and Subsidiary, along with the other parties involved, executed the Contribution Agreement, which transferred 100% ownership of the stock of Subsidiary to Parent, and as such, all of the ownership interests in the Patent Applications, and the underlying subject matter, held by Subsidiary at the time became the property of Parent.

124.    On or about June 4, 2019, Defendant Page represented to Yankowitz that he owned the underlying subject matter of the Patent Applications and his intent to file new patent applications utilizing the same subject matter when he rejected "the notion that [he] should not file any new patent applications referring to the subject matter of the abandon[ed] patent applications."

125.    As a result of the facts described above in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the Parties regarding Plaintiffs' ownership of the underlying subject matter of the Patent Applications.

126.    Injunctive Relief preventing Defendant Page from filing new patent applications utilizing the same subject matter as the unpublished Patent Applications (and the subject matter contained therein) is appropriate to prevent further perpetuating the fraudulent acts committed by Page against Subsidiary and Parent.

127.    Parent lacks an adequate remedy at law, as any compensation by Page would be insufficient relative to the value of the underlying subject matter of the Patent Applications, and there is a serious risk of irreparable harm absent injunctive relief.

128.    Parent is likely to prevail on the merits of the underlying controversy, and a comparison of the harm to defendant in issuing an injunction versus the harm to Plaintiffs in withholding it, favors Parent.

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for judgment against Defendant as follows:

**On the FIRST (Violations of § 10(b) of the Securities and Exchange Act, etc.) AND SECOND (Violations of Cal. Corp. Code §§ 24501 and 25501 or, alternatively, Nev. Rev. Stat. §§ 90.570 and 90.660) CLAIMS FOR RELIEF:**

1. For an order declaring that Defendant hold in constructive trust for Parent all shares of Parent stock and any and all proceeds, in whatever form, Defendant has received therefrom;

2. For compensatory and consequential damages in an amount to be proven at trial;

3. For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

4. For prejudgment interest at the maximum legal rate;

5. For reasonable attorneys' fees and costs of the suit incurred herein;

6. For such other and further relief as the Court deems just and proper.

**On the THIRD  (Fraud) AND FOURTH (Breach of Fiduciary Duty) CLAIMS FOR RELIEF:**

7. For an order declaring that Defendant hold in constructive trust for Parent all shares of Parent stock and any and all proceeds, in whatever form, Defendant has received therefrom;

8. For general and special damages in an amount to be proven at trial;

9. For exemplary and punitive damages in an amount to be proven at trial;

10. For an award of prejudgment interest, costs of the suit, and reasonable attorneys' fees to the extent permitted by law; and

11. For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

12. For such other relief as this Court deems just and proper under the circumstances.

First Amended Complaint

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

On the **FIFTH CLAIM FOR RELIEF (Negligent Misrepresentation):**

13. For an order declaring that Defendant hold in constructive trust for Parent all Company shares of stock and any and all proceeds, in whatever form, Defendant has received therefrom;

14. For general and special damages in an amount to be proven at trial;

15. For prejudgment interest at the maximum legal rate;

16. For reasonable attorneys' fees and costs of the suit incurred herein;

17. For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

18. For such other and further relief as the Court deems just and proper.

On the **SIXTH CLAIM FOR RELIEF (Breach of Contract):**

19. For an order requiring specific performance of the Contribution Agreement, namely Page's assignment of rights to the IP Portfolio to Parent.

20. For compensatory and consequential damages in an amount to be proven at trial;

21. For prejudgment interest at the maximum legal rate;

22. For reasonable attorneys' fees and costs of the suit incurred herein;

23. For such other and further relief as the Court deems just and proper.

On the **SEVENTH CLAIM FOR RELIEF (Breach of the Implied Covenant of Good Faith and Fair Dealing):**

24. For compensatory and consequential damages in an amount to be proven at trial;

25. For prejudgment interest at the maximum legal rate;

26. For reasonable attorneys' fees and costs of the suit incurred herein;

27. For such other and further relief as the Court deems just and proper.

On the **EIGHTH CLAIM FOR RELIEF (Unjust Enrichment):**

28. For an order declaring that Defendant hold in constructive trust for Parent all Company shares of stock and any and all proceeds, in whatever form, Defendant has received therefrom.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

29.     For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

30.     For prejudgment interest at the maximum legal rate;

31.     For reasonable attorneys' fees and costs of the suit incurred herein;

32.     For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

33.     For such other and further relief as the Court deems just and proper.

**On the <u>NINTH CLAIM FOR RELIEF (Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or, alternatively, Nev. Rev. Stat. §§ 589.0903, *et seq.*)</u>:**

34.     For a preliminary and permanent injunction, enjoining and restraining Defendant, his agents, and all other persons in active concert or privity or in participation with them, from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, granting a lien or security or other interest in, or otherwise disposing of shares of Parent stock, or any interest therein, wherever located, including outside the territorial United States, that Defendant wrongfully acquired from B4MC (now Parent) and requiring Defendant to hold such shares of stock in trust for the benefit of Parent until final judgment in this action;

35.     For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

36.     For general and special damages in an amount to be proven at trial;

37.     For prejudgment interest at the maximum legal rate;

38.     For reasonable attorneys' fees and costs of the suit incurred herein;

39.     For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

40.     For such other and further relief as the Court deems just and proper.

First Amended Complaint

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

**On the <u>TENTH CLAIM FOR RELIEF (Injunctive Relief under Cal Civ. Code §</u> <u>3439.07 or, alternatively, Nev. Rev. Stat. § 112.210)</u>:**

41.    For a preliminary and permanent injunction, enjoining and restraining Defendant, his agents, and all other persons in active concert or privity or in participation with them, from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, granting a lien or security or other interest in, or otherwise disposing of shares of Parent stock, or any interest therein, wherever located, including outside the territorial United States, that Defendant wrongfully acquired from B4MC (now Parent) and requiring Defendant to hold such shares of stock in trust for the benefit of Parent until final judgment in this action;

42.    For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

43.    For general and special damages in an amount to be proven at trial;

44.    For prejudgment interest at the maximum legal rate;

45.    For reasonable attorneys' fees and costs of the suit incurred herein;

46.    For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

47.    For such other and further relief as the Court deems just and proper.

**On the <u>ELEVENTH CLAIM FOR RELIEF (Declaratory Judgment and Injunctive</u> <u>Relief under *Federal Declaratory Judgments Act*, 28 U.S.C. §§ 2201–2202, and Rule 57 of the</u> <u>*Federal Rules of Civil Procedure*</u>):**

48.    For a declaration that Parent is the undivided owner of the Patent Applications and the underlying subject matter, including the non-published confidential information.

49.    For a preliminary and permanent injunction, enjoining and restraining Defendant, his agents, and all other persons in active concert or privity or in participation with them, from filing any patent applications with the United States Patent and Trademark Office utilizing the underlying subject matter of the Patent Applications until final judgment in this action;

50.    For reasonable attorneys' fees and costs of the suit incurred herein;

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

51.     For such other and further relief as the Court deems just and proper.

**<u>DEMAND OF JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury on all issues so triable.

DATED this _____ day of February 2021.

Respectfully Submitted,

KEMP JONES, LLP

_____
Don Springmeyer, Esq. (#1021)
Nathanael R. Rulis, Esq. (#11259)
Chad R. Aronson, Esq. (#14471)
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, NV 89169

SHUMAKER MALLORY LLP
Clarisse Young Shumaker (pro hac vice)
Lisa Hiraide (pro hac vice)
Brett J. Wasserman (pro hac vice)
333 S. Grand Avenue, Suite 3400
Los Angeles, California 90071
Mailing Address:
1 Ringbit Road West
Rolling Hills, California 90274

*Counsel for Plaintiffs*

First Amended Complaint

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

# EXHIBIT A

**CONTRIBUTION AGREEMENT**

by and among

**B4MC Gold Mines, Inc.**
as the Purchaser,

**Rocketfuel Blockchain Company**
as the Company,

and

**Gert Funk, Joseph Page, PacificWave Partners Limited, PacificWave Partners UK Ltd. and Saxton Capital Ltd.**

as the Sellers

**Dated as of June 27, 2018**

## CONTRIBUTION AGREEMENT

This Contribution Agreement (this "***Agreement***") is made and entered into as of June 27, 2018 by and among (i) B4MC Gold Mines, Inc., a Nevada corporation (the "***Purchaser***"), (ii) Rocketfuel Blockchain Company, a Nevada corporation (the "***Company***"), and Gert Funk ("***Funk***"), Joseph Page ("***Page***"), PacificWave Partners Limited ("***PWP***"), PacificWave Partners UK Ltd. ("***PWPUK***") and Saxton Capital Ltd ("***Saxton***"). Funk, Page, PWP, PWPUK and Saxton are collectively referred to herein as the "***Sellers***", individually each a "***Seller***"). The Purchaser, Company and the Sellers are sometimes referred to herein individually as a "***Party***" and, collectively, as the "***Parties***".

### RECITALS:

A. The Sellers are the owners of all of the issued and outstanding shares of common stock of the Company (the "***Company Interests***") and desire to transfer one hundred percent (100%) of such shares of common stock of the Company ("***Contributed Securities***") for shares of Purchaser Common Stock as described herein.

B. The Purchaser is authorized to issue seven hundred fifty million (750,000,000) shares of its Common Stock, and as of the date hereof, 5,667,104 shares of that Purchaser Common Stock are issued and outstanding. The Purchaser desires to exchange at the Closing, seventeen million one thousand three hundred twelve (17,001,312) Purchaser Common Stock (the "***Contribution Consideration***") representing seventy-five percent (75%) of the total outstanding Purchaser Common Stock, on a fully diluted basis, after the issuance of the Contribution Consideration, for the Contributed Securities.

C. The Parties intend that the Contribution will qualify as a tax-free "reorganization" within the meaning of Section 351 of the Code (as defined herein).

D. Certain capitalized terms used herein are defined in Article XII hereof.

**NOW, THEREFORE**, in consideration of the premises set forth above, which are incorporated in this Agreement as if fully set forth below, and the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, the Parties hereto agree as follows:

### ARTICLE I
### CONTRIBUTION

1.1     Contribution. Effective as of the Closing Date, (i) the Sellers each hereby contribute, transfer, assign and convey to the Purchaser all right, title and interest in and to all of the Contributed Securities, together with any and all rights, privileges, benefits, obligations and liabilities appertaining thereto, reserving unto such Seller no rights or interests therein whatsoever, and (ii) the Purchaser hereby accepts the contribution of the Contributed Securities, and in consideration for such contribution the Sellers collectively shall be entitled to receive from the Purchaser the Contribution Consideration with each Seller receiving for their respective percentage of Contributed Securities that same percentage of the Contribution Consideration (the "***Contribution***").

1.2     Tax Treatment. For federal income tax purposes, the Contribution is intended to constitute a tax-free reorganization within the meaning of Section 351, as mutually agreed to by the Parties.

### ARTICLE II
### CLOSING

2.1    Closing. Subject to and conditional upon the satisfaction or waiver of the Closing Conditions the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Ellenoff Grossman & Schole, LLP ("**EGS**"), 1345 Avenue of the Americas, New York, NY 10105, on the second (2nd) Business Day after all the Closing conditions to this Agreement have been satisfied or waived at 10:00 a.m. local time, or at such other date, time or place as the Purchaser and the Company may agree (the date and time at which the Closing is actually held being the "**Closing Date**"). The parties need not be physically present at the Closing and may participate telephonically.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Except as set forth in the disclosure schedules delivered by the Purchaser to the Company on the date hereof (the "**Purchaser Disclosure Schedules**"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer the Purchaser represents and warrants to the Company, as of the date hereof and as of the Closing, as follows:

3.1    Organization and Standing. The Purchaser is a corporation duly incorporated, validly existing and in good standing under the state of Nevada. The Purchaser has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Purchaser is duly qualified or licensed and in good standing to do business in each jurisdiction in which the character of the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary. The Purchaser has heretofore made available to the Company accurate and complete copies of the Organizational Documents of the Purchaser, as currently in effect. The Purchaser is not in violation of any provision of its Organizational Documents.

3.2    Authorization; Binding Agreement. The Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Document to which it is a party, to perform the Purchaser's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each Ancillary Document to which it is a party and the consummation of the transactions contemplated hereby and thereby (a) have been duly and validly authorized by the board of directors of the Purchaser, and (b) no other corporate proceedings, other than as set forth elsewhere in the Agreement, on the part of the Purchaser are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which the Purchaser is a party shall be when delivered, duly and validly executed and delivered by the Purchaser and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting the enforcement of creditors' rights generally or by any applicable statute of limitation or by any valid defense of set-off or counterclaim, and the fact that equitable remedies or relief (including the remedy of specific performance) are subject to the discretion of the court from which such relief may be sought (collectively, the "**Enforceability Exceptions**").

3.3    Governmental Approvals. No Consent of or with any Governmental Authority, on the part of the Purchaser is required to be obtained or made in connection with the execution, delivery or performance by the Purchaser of this Agreement and each Ancillary Document to which it is a party or the consummation by the Purchaser of the transactions contemplated hereby and thereby, other than (a) such filings as contemplated by this Agreement, (b) any filings required with FINRA or the SEC with respect to the transactions contemplated by this Agreement, (c) applicable requirements, if any, of the Securities Act,

3

the Exchange Act, and/ or any state "blue sky" securities Laws, and the rules and regulations thereunder, and (d) where the failure to obtain or make such Consents or to make such filings or notifications, would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

      3.4    Non-Contravention. The execution and delivery by the Purchaser of this Agreement and each Ancillary Document to which it is a party, the consummation by the Purchaser of the transactions contemplated hereby and thereby, and compliance by the Purchaser with any of the provisions hereof and thereof, will not (a) conflict with or violate any provision of the Purchaser's Organizational Documents, (b) subject to obtaining the Consents from Governmental Authorities referred to in Section 3.3 hereof, and the waiting periods referred to therein having expired, and any condition precedent to such Consent or waiver having been satisfied, conflict with or violate any Law, Order or Consent applicable to the Purchaser or any of its properties or assets, or (c) (i) violate, conflict with or result in a breach of, (ii) constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, (iii) result in the termination, withdrawal, suspension, cancellation or modification of, (iv) accelerate the performance required by the Purchaser under, (v) result in a right of termination or acceleration under, (vi) give rise to any obligation to make payments or provide compensation under, (vii) result in the creation of any Lien upon any of the properties or assets of the Purchaser under, (viii) give rise to any obligation to obtain any third party Consent or provide any notice to any Person or (ix) give any Person the right to declare a default, exercise any remedy, claim a rebate, chargeback, penalty or change in delivery schedule, accelerate the maturity or performance, cancel, terminate or modify any right, benefit, obligation or other term under, any of the terms, conditions or provisions of, any Purchaser Material Contract, except for any deviations from any of the foregoing clauses (a), (b) or (c) that would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

      3.5    Capitalization

      (a)    The Purchaser is authorized to issue 750,000,000 shares of Purchaser Common Stock. The issued and outstanding shares of Purchaser Common Stock as of the date of this Agreement are set forth on Schedule 3.5(a). All outstanding Purchaser Common Stock are duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, right of first refusal, preemptive right, subscription right or any similar right under any provision under Chapter 78 of the Nevada Revised Statutes, as then applicable, the Purchaser Charter or any Contract to which the Purchaser is a party. None of the outstanding Purchaser Common Stock has been issued in violation of any applicable securities Laws.

      (b)    There are no (i) outstanding options, warrants, puts, calls, convertible securities, preemptive or similar rights, (ii) bonds, debentures, notes or other Indebtedness having general voting rights or that are convertible or exchangeable into securities having such rights or (iii) subscriptions or other rights, agreements, arrangements, Contracts or commitments of any character (other than this Agreement and the Ancillary Documents), (A) relating to the issued or unissued shares of the Purchaser or (B) obligating the Purchaser to issue, transfer, deliver or sell or cause to be issued, transferred, delivered, sold or repurchased any options or shares or securities convertible into or exchangeable for such shares, or (C) obligating the Purchaser to grant, extend or enter into any such option, warrant, call, subscription or other right, agreement, arrangement or commitment for such capital shares. There are no outstanding obligations of the Purchaser to repurchase, redeem or otherwise acquire any shares of the Purchaser or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any Person. There are no shareholders agreements, voting trusts or other agreements or understandings to which the Purchaser is a party with respect to the voting of any shares of the Purchaser.

      3.6    Indebtedness. Except as otherwise set forth in the balance sheet of the Purchaser, dated March 31, 2018 (the "**Closing Date Balance Sheet**"), immediately prior to the Closing, the Purchaser will

not have any Indebtedness except for certain accounts payable and accrued expenses not to exceed $10,000 in the aggregate.

3.7    <u>SEC Filings and Purchaser Financials</u>

(a)    The Purchaser, since May 12, 2015, has filed all forms, reports, schedules, statements, registration statements, prospectuses and other documents required to be filed or furnished by the Purchaser with the SEC under the Securities Act and/or the Exchange Act, together with any amendments, restatements or supplements thereto, and will file all such forms, reports, schedules, statements and other documents required to be filed subsequent to the date of this Agreement (the "**SEC Reports**").  The SEC Reports (x) were prepared in all material respects in accordance with the requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations thereunder and (y) did not, as of their respective effective dates (in the case of SEC Reports that are registration statements filed pursuant to the requirements of the Securities Act) and at the time they were filed with the SEC (in the case of all other SEC Reports) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)    The financial statements and notes contained or incorporated by reference in the SEC Reports (the "**Purchaser Financials**"), fairly present in all material respects the financial position and the results of operations, changes in shareholders' equity, and cash flows of the Purchaser at the respective dates of and for the periods referred to in such financial statements, all in accordance with (i) GAAP methodologies applied on a consistent basis throughout the periods involved and (ii) Regulation S-X or Regulation S-K, as applicable (except as may be indicated in the notes thereto and for the omission of notes and audit adjustments in the case of unaudited quarterly financial statements to the extent permitted by Regulation S-X or Regulation S-K, as applicable).

(c)    Except as and to the extent reflected or reserved against in the Purchaser Financials, the Purchaser has not incurred any Liabilities or obligations of the type required to be reflected on a balance sheet in accordance with GAAP that is not adequately reflected or reserved on or provided for in the Purchaser Financials, other than Liabilities of the type required to be reflected on a balance sheet in accordance with GAAP that have been incurred since the Purchaser's formation in the ordinary course of business.

3.8    <u>Shell Company</u>.  The Purchaser is a shell company and except as otherwise shown on the Closing Date Balance Sheet, has (a) no assets or liabilities as of the Closing Date, (b) other than as described on Schedule 3.8, since May 12, 2015, conducted no business other than the public offering of its securities (and the related private offerings), public reporting and related activities.

3.9    <u>Compliance with Laws</u>.  The Purchaser is, and has since May 12, 2015, been, in compliance with all Laws applicable to it and the conduct of its business except for such noncompliance which would not reasonably be expected to have a Material Adverse Effect on the Purchaser, and the Purchaser has not received since May 12, 2015, written notice alleging any violation of applicable Law in any material respect by the Purchaser.

3.10    <u>Actions; Orders; Permits</u>**.**  There is no pending or, to the Knowledge of the Purchaser, threatened material Action to which the Purchaser is subject which would reasonably be expected to have a Material Adverse Effect on the Purchaser.  There is no material Action that the Purchaser has pending against any other Person.  The Purchaser is not subject to any material Orders of any Governmental Authority, nor are any such Orders pending.  The Purchaser holds all material Permits necessary to lawfully conduct its business as presently conducted, and to own, lease and operate its assets and properties, all of

which are in full force and effect, except where the failure to hold such Consent or for such Consent to be in full force and effect would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.11    <u>Taxes and Returns</u>.

(a)    The Purchaser has or will have timely filed, or caused to be timely filed, all material Tax Returns required to be filed by it for the tax years 2015 and later, which Tax Returns are true, accurate, correct and complete in all material respects, and has paid, collected or withheld, or caused to be paid, collected or withheld, all material Taxes required to be paid, collected or withheld, other than such Taxes for which adequate reserves in the Purchaser Financials have been established in accordance with GAAP.    There are no audits, examinations, investigations or other proceedings pending against the Purchaser in respect of any Tax, and the Purchaser has not been notified in writing of any proposed Tax claims or assessments against the Purchaser (other than, in each case, claims or assessments for which adequate reserves in the Purchaser Financials have been established in accordance with GAAP or are immaterial in amount).    There are no Liens with respect to any Taxes upon any of the Purchaser's assets, other than Permitted Liens.    The Purchaser has no outstanding waivers or extensions of any applicable statute of limitations to assess any material amount of Taxes.    There are no outstanding requests by the Purchaser for any extension of time within which to file any Tax Return or within which to pay any Taxes shown to be due on any Tax Return.

(b)    Since May 12, 2015, the Purchaser has not (i) changed any Tax accounting methods, policies or procedures except as required by a change in Law, (ii) made, revoked, or amended any material Tax election, (iii) filed any amended Tax Returns or claim for refund or (iv) entered into any closing agreement affecting or otherwise settled or compromised any material Tax Liability or refund.

3.12    <u>Employees and Employee Benefit Plans</u>.    The Purchaser does not (a) have any paid employees or (b) maintain, sponsor, contribute to or otherwise have any Liability under, any Benefit Plans.

3.13    <u>Properties</u>.    The Purchaser does not own, license or otherwise have any right, title or interest in any material Intellectual Property.    The Purchaser does not own or lease any material real property or Personal Property.

3.14    <u>Material Contracts</u>.    Except as set forth on <u>Schedule 3.14</u>, other than this Agreement and the Ancillary Documents, there are no Contracts to which the Purchaser is a party or by which any of its properties or assets may be bound, subject or affected, which (i) creates or imposes a Liability greater than $1,000, (ii) may not be cancelled by the Purchaser on less than sixty (60) days' prior notice without payment of a material penalty or termination fee or (iii) prohibits, prevents, restricts or impairs in any material respect any business practice of the Purchaser as its business is currently conducted, any acquisition of material property by the Purchaser, or restricts in any material respect the ability of the Purchaser from engaging in business as currently conducted by it or from competing with any other Person (each, a "***Purchaser Material Contract***").    All Purchaser Material Contracts have been filed as exhibits to the SEC Reports.

3.15    <u>Transactions with Affiliates</u>.    Except as set forth on Schedule 3.15, there are no contracts or arrangements that are in existence as of the date of this Agreement under which there are any existing or future Liabilities or obligations between the Purchaser and any (a) present or former director, officer or employee or Affiliate of the Purchaser, or any immediate family member of any of the foregoing, or (b) record or beneficial owner of more than five percent (5%) of the Purchaser's outstanding capital stock as of the date hereof.

3.16    Finders and Brokers. Except as set forth on Schedule 3.16, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Purchaser, the Company or any of their respective Affiliates in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Purchaser.

3.17    Ownership of Contribution Consideration.  All shares of Purchaser Common Stock to be issued and delivered to the Sellers as Contribution Consideration in accordance with Article I shall be, upon issuance and delivery of such Purchaser Common Stock, fully paid and non-assessable, free and clear of all Liens, other than restrictions arising from applicable securities Laws and any Liens incurred by the Company or any Seller, and the issuance and sale of such Purchaser Common Stock pursuant hereto will not be subject to or give rise to any preemptive rights or rights of first refusal.

3.18    Independent Investigation.  The Purchaser has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Company for such purpose.  The Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied solely upon its own investigation and the express representations and warranties of the Company set forth in Article IV (including the related portions of the Company Disclosure Schedules); and (b) none of the Company nor its respective Representatives have made any representation or warranty as to the Company, or this Agreement, except as expressly set forth in Article IV (including the related portions of the Company Disclosure Schedules).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure schedules delivered by the Company to the Purchaser on the date hereof (the "***Company Disclosure Schedules***"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer, the Company hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing, as follows:

4.1    Organization and Standing. The Company is a Nevada corporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  The Company has heretofore made available to the Purchaser accurate and complete copies of the Organizational Documents of the Company, as currently in effect.  The Company is not in violation of any provision of its Organizational Documents.

4.2    Authorization; Binding Agreement. The Company has all requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Document to which it is or is required to be a party, to perform the Company's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which the Company is a party shall be when delivered, duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of the Company, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by the Enforceability Exceptions.

4.3    Subsidiaries. The Company does not own, of record or beneficially, or control any direct or indirect equity or other interest, or any right (contingent or otherwise) to acquire the same, in any corporation, partnership, limited liability company, joint venture, association or other entity.

4.4     Governmental Approvals. No Consent of or with any Governmental Authority on the part of the Company is required to be obtained or made in connection with the execution, delivery or performance by the Company of this Agreement or any Ancillary Documents or the consummation by the Company of the transactions contemplated hereby or thereby other than such filings as are expressly contemplated by this Agreement and (b) pursuant to Antitrust Laws.

4.5     Non-Contravention. The execution and delivery by the Company of this Agreement and each Ancillary Document to which the Company is a party or otherwise bound, and the consummation by the Company of the transactions contemplated hereby and thereby and compliance by the Company with any of the provisions hereof and thereof, will not (a) conflict with or violate any provision of the Company's Organizational Documents, (b) subject to obtaining the Consents from Governmental Authorities referred to in Section 4.4 hereof, the waiting periods referred to therein having expired, and any condition precedent to such Consent or waiver having been satisfied, conflict with or violate any Law, Order or Consent applicable to the Company or any of its properties or assets, or (c) (i) violate, conflict with or result in a breach of, (ii) constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, (iii) result in the termination, withdrawal, suspension, cancellation or modification of, (iv) accelerate the performance required by the Company under, (v) result in a right of termination or acceleration under, (vi) give rise to any obligation to make payments or provide compensation under, (vii) result in the creation of any Lien upon any of the properties or assets of the Company under, (viii) give rise to any obligation to obtain any third party Consent or provide any notice to any Person or (ix) give any Person the right to declare a default, exercise any remedy, claim a rebate, chargeback, penalty or change in delivery schedule, accelerate the maturity or performance, cancel, terminate or modify any right, benefit, obligation or other term under, any of the terms, conditions or provisions of any material contract of the Company.

4.6     Financial Statements. As used herein, the term "**Company Financials**" means the (i) audited financial statements of the Company (including, in each case, any related notes thereto), consisting of the audited balance sheets of the Company as of March 31, 2018, and the related audited income statements, changes in stockholder equity and statements of cash flows for the period from inception to March 31, 2018, each audited in accordance with GAAP standards by a PCAOB qualified auditor (the "**Audited Company Financials**"), (ii) pro forma financial information for the Company after the Contribution, (iii) if the Closing occurs prior to August 14, 2018 but the Super 8-K (as defined in Section 6.6(b) herein) is filed after August 14, 2018, the unaudited financial statements, consisting of the balance sheet of the Company as of June 30, 2018, and (iv) if the Closing occurs after August 14, 2018, the unaudited financial statements, consisting of the balance sheet of the Company for the applicable fiscal quarters as may be required for the SEC filing. True and correct copies of the Company Financials have been provided to the Purchaser.  The Company Financials (i) accurately reflect the books and records of the Company as of the times and for the periods referred to therein, (ii) were prepared in accordance with GAAP, consistently applied throughout and among the periods involved (except that the unaudited statements exclude the footnote disclosures and other presentation items required for GAAP and exclude year-end adjustments which will not be material in amount), and (iii) fairly present in all material respects the financial position of the Company as of the respective dates thereof and the results of the operations and cash flows of the Company for the periods indicated.  The Company has never been subject to the reporting requirements of Sections 13(a) and 15(d) of the Exchange Act.

4.7     Absence of Certain Changes. Since January 12, 2018 (date of inception), the Company has (a) conducted its business only in the ordinary course of business consistent with past practice, (b) not been subject to a Material Adverse Effect and (c) has not taken any action or committed or agreed to take any action that would be prohibited by Section 6.2(b) if such action were taken on or after the date hereof without the consent of the Purchaser.

4.8     Compliance with Laws. The Company has not nor has been in material conflict or material non-compliance with, or in material default or violation of, nor has the Company received, since January 12, 2018 (date of inception), any written or, to the Knowledge of the Company, oral notice of any material conflict or non-compliance with, or material default or violation of, any applicable Laws by which it or any of its properties, assets, employees, business or operations are or were bound or affected.

4.9     Litigation. There is no (a) Action of any nature pending or, to the Company's Knowledge, threatened, nor is there any reasonable basis for any Action to be made (and no such Action has been brought or, to the Company's Knowledge, threatened); or (b) Order pending now or rendered by a Governmental Authority, in either case of (a) or (b) by or against the Company, its members, its business, equity securities or assets.

4.10     Material Contracts. The Company has not received notice of breach on any material contract.

4.11     Taxes and Returns. The Company has or will have timely filed, or caused to be timely filed, all federal, state and local Tax Returns required to be filed by it (taking into account all available extensions), which Tax Returns are true, accurate, correct and complete in all material respects. The Company has complied with all applicable Laws relating to Tax.

4.12     Title to and Sufficiency of Assets. The Company has good and marketable title to, or a valid leasehold interest in or right to use, all of its assets, free and clear of all Liens other than (a) Permitted Liens, (b) the rights of lessors under leasehold interests, and (c) Liens specifically identified on the Interim Balance Sheet.  The assets (including contractual rights) of the Company constitute all of the assets, rights and properties that are used in the operation of the businesses of the Company as it is now conducted and presently proposed to be conducted or that are used or held by the Company for use in the operation of the businesses of the Company, and taken together, are adequate and sufficient for the operation of the businesses of the Company as currently conducted and as presently proposed to be conducted.

4.13     No Brokers.  The Company has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or charges or any similar charges in connection with this Agreement or any transactions contemplated hereby.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth in the disclosure schedules delivered by the Sellers to the Purchaser on the date hereof (the "Seller Disclosure Schedules"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer, each of the Sellers, severally, hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing, as follows:

5.1     Authority, Etc. Each of the Sellers has the requisite power and authority to enter into this Agreement and to carry out such Seller's obligations hereunder. The execution and delivery of this Agreement and each Ancillary Document to which it is a party and the consummation of the transactions contemplated hereby and thereby (a) have been duly and validly authorized by each Seller, and (b) no other joint venture proceedings, other than as set forth elsewhere in the Agreement, on the part of such Seller are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby.  This Agreement has been, and each Ancillary Document to which such Seller is a party shall be when delivered, duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when

delivered shall constitute, the valid and binding obligation of such Seller, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by the Enforceability Exceptions.

      5.2     Title to Properties, Liens and Encumbrances. Each of the Sellers have good title to each of their Contributed Securities of the Company, free and clear free of all claims, liens, security interests and other rights and encumbrances, and as a group the Sellers are owners of all the Company Interests.

      5.3     Reliance. This Agreement is made with the Sellers in reliance upon each Seller's representation to the Purchaser, which by such Seller's execution of this Agreement, such Seller hereby confirms, that the shares of the Purchaser's Common stock constituting the Contribution Consideration to be acquired by such Seller (the "*Securities*") will be acquired for investment for such Seller's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Seller has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each Seller further represents that such Seller does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Securities. The Purchaser has not been formed for the specific purpose of acquiring the Securities.

      5.4     Investment Representations. Each Seller understands that the shares of Purchaser Common Stock have not been registered under the Securities Act, or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under applicable securities laws of certain states or unless an exemption from such registration is available. Each Seller understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Each Seller acknowledges that the Purchaser has no obligation to register or qualify the Securities for resale. Each Seller further acknowledges that (a) there is no assurance that any exemption from registration or qualification will be available, and (b) if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Purchaser which are outside of such Seller's control (including without limitation any current public information requirements of Rule 144 promulgated under the Securities Act or any similar or successor rule or regulation), and which the Purchaser is under no obligation and may not be able to satisfy, and therefore that there is no assurance that any such exemption will allow such Seller to dispose of, or otherwise transfer, all or any portion of the Securities.

      5.5     Legends. Each Seller understands that the Securities and any securities issued in respect of or exchange for the Securities, may bear one or all of the following legends:

            (a)    "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SALE, TRANSFER, ASSIGNMENT, PLEDGE OR HYPOTHOCATION OF SUCH SECURITIES MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT, PLEDGE OR HYPOTHOCATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

    (b)     Any legend required by the securities laws of any state to the extent such laws are applicable to the Securities represented by the certificate so legended.

5.6    <u>Accredited Investor</u>.  Each Seller is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

5.7    <u>Risks</u>.  Each Seller is aware that the Securities are highly speculative and that there can be no assurance as to what return, if any, there may be.  Each Seller is aware that the Purchaser may issue additional securities in the future which could result in the dilution of such Seller's ownership interest in the Purchaser.

## ARTICLE VI
## COVENANTS

6.1    <u>Access and Information</u>  The Purchaser shall give, and shall direct its Representatives to give, the Company and its Representatives, at reasonable times during normal business hours and upon reasonable intervals and notice, access to all offices and other facilities and to all employees, properties, Contracts, agreements, commitments, books and records, financial and operating data and other information (including Tax Returns, internal working papers, client files, client Contracts and director service agreements), of or pertaining to the Purchaser or its Subsidiaries, as the Company or its Representatives may reasonably request regarding the Purchaser, its Subsidiaries and their respective businesses, assets, Liabilities, financial condition, prospects, operations, management, employees and other aspects (including unaudited quarterly financial statements, including a consolidated quarterly balance sheet and income statement, a copy of each material report, schedule and other document filed with or received by a Governmental Authority pursuant to the requirements of applicable securities Laws, and independent public accountants' work papers (subject to the consent or any other conditions required by such accountants, if any)) and to reasonably cooperate with the Company and its Representatives in their investigation; provided, however, that the Company and its Representatives shall conduct any such activities in such a manner as not to unreasonably interfere with the business or operations of the Purchaser or any of its Subsidiaries.

6.2    <u>No Solicitation</u>.

    (a)     For purposes of this Agreement, (i) an "***Acquisition Proposal***" means any inquiry, proposal or offer, or any indication of interest in making an offer or proposal, from any Person or group at any time relating to an Alternative Transaction, and (ii) an "***Alternative Transaction***" means (A) with respect to the Company and its Affiliates, a transaction (other than the transactions contemplated by this Agreement) concerning the sale of (x) all or any material part of the business or assets of the Company (other than in the ordinary course of business consistent with past practice) or (y) any of the shares or other equity interests or profits of the Company, in any case, whether such transaction takes the form of a sale of shares or other equity, assets, merger, consolidation, issuance of debt securities, management Contract, joint venture or partnership, or otherwise and (B) with respect to the Purchaser and its Affiliates, a transaction (other than the transactions contemplated by this Agreement) concerning a Business Combination.

    (b)     In order to induce the other Parties to continue to commit to expend management time and financial resources in furtherance of the transactions contemplated hereby, each Party shall not, and shall cause its Representatives to not, without the prior written consent of the Company and the Purchaser, directly or indirectly, (i) solicit, assist, initiate or facilitate the making, submission or announcement of, or intentionally encourage, any Acquisition Proposal, (ii) furnish any non-public information regarding such Party or its Affiliates or their respective businesses, operations, assets,

Liabilities, financial condition, prospects or employees to any Person or group (other than a Party to this Agreement or their respective Representatives) in connection with or in response to an Acquisition Proposal, (iii) engage or participate in discussions or negotiations with any Person or group with respect to, or that could be expected to lead to, an Acquisition Proposal, (iv) approve, endorse or recommend, or publicly propose to approve, endorse or recommend, any Acquisition Proposal, (v) negotiate or enter into any letter of intent, agreement in principle, acquisition agreement or other similar agreement related to any Acquisition Proposal, or (vi) release any third Person from, or waive any provision of, any confidentiality agreement to which such Party is a party.

(c)     Each Party shall notify the others as promptly as practicable (and in any event within 48 hours) orally and in writing of the receipt by such Party or any of its Representatives of (i) any bona fide inquiries, proposals or offers, requests for information or requests for discussions or negotiations regarding or constituting any Acquisition Proposal or any bona fide inquiries, proposals or offers, requests for information or requests for discussions or negotiations that could be expected to result in an Acquisition Proposal, and (ii) any request for non-public information relating to such Party or its Affiliates, specifying in each case, the material terms and conditions thereof (including a copy thereof if in writing or a written summary thereof if oral) and the identity of the party making such inquiry, proposal, offer or request for information.  Each Party shall keep the others promptly informed of the status of any such inquiries, proposals, offers or requests for information.  Each Party shall, and shall cause its Representatives to, immediately cease and cause to be terminated any solicitations, discussions or negotiations with any Person with respect to any Acquisition Proposal and shall, and shall direct its Representatives to, cease and terminate any such solicitations, discussions or negotiations.

6.3     Notification of Certain Matters. Each of the Parties shall give prompt notice to the other Parties if such Party or its Affiliates:  (a) fails to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it or its Affiliates hereunder in any material respect; (b) receives any notice or other communication in writing from any third party (including any Governmental Authority) alleging (i) that the Consent of such third party is or may be required in connection with the transactions contemplated by this Agreement or (ii) any non-compliance with any Law by such Party or its Affiliates; (c) receives any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; (d) discovers any fact or circumstance that, or becomes aware of the occurrence or non-occurrence of any event the occurrence or non-occurrence of which, would reasonably be expected to cause or result in any of the conditions to set forth in Article VIII not being satisfied or the satisfaction of those conditions being materially delayed; or (e) becomes aware of the commencement or threat, in writing, of any Action against such Party or any of its Affiliates, or any of their respective properties or assets, or, to the Knowledge of such Party, any officer, director, partner, member or manager, in his, her or its capacity as such, of such Party or of its Affiliates with respect to the consummation of the transactions contemplated by this Agreement.  No such notice shall constitute an acknowledgement or admission by the Party providing the notice regarding whether or not any of the conditions to the Closing have been satisfied or in determining whether or not any of the representations, warranties or covenants contained in this Agreement have been breached.

6.4     Tax Matters. For federal income tax purposes, the Contribution is intended to constitute a "reorganization" within the meaning of Section 351 of the Code, as mutually agreed to by the Parties. None of the Parties shall (and each of the Parties shall cause their respective Subsidiaries not to) take any action, or fail to take any action, that could reasonably be expected to cause the Contribution to fail to qualify as a "reorganization" within the meaning of Section 351 of the Code. The Parties intend to report and, except to the extent otherwise required by Law, shall report, for federal income tax purposes, the Contribution as a "reorganization" within the meaning of Section 351 of the Code.

6.5     Further Assurances.  The Parties hereto shall further cooperate with each other and use their respective commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on their part under this Agreement and applicable Laws to consummate the transactions contemplated by this Agreement as soon as reasonably practicable, including preparing and filing as soon as practicable all documentation to effect all necessary notices, reports and other filings.

6.6     Public Announcements and Filings.

(a)     The Parties shall mutually agree upon and, as promptly as practicable after the execution of this Agreement (but in any event within four (4) Business Days thereafter), issue a press release announcing the execution of this Agreement (the "**Signing Press Release**").

(b)     Promptly after the issuance of the Signing Press Release, the Purchaser shall file a current report on Form 8-K (the "**Super 8-K**") with the Signing Press Release and a description of this Agreement as required by Federal Securities Laws, which the Company shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing (with the Company reviewing, commenting upon and approving such Super 8-K in any event no later than the third (3rd) Business Day after the execution of this Agreement).

(c)     The Parties shall mutually agree upon and, as promptly as practicable after the Closing (but in any event within four (4) Business Days thereafter), issue a press release announcing the consummation of the transactions contemplated by this Agreement (the "**Closing Press Release**"). Promptly after the issuance of the Closing Press Release, the Purchaser shall file a current report on Form 8-K (the "**Closing Filing**") with the Closing Press Release and a description of the Closing as required by Federal Securities Laws which the Company shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing.

(d)     The Parties shall mutually agree upon and, as promptly as practicable after the execution of this Agreement (but in any event within ten (10) days thereafter), file a current report on Form 8-K reporting a change in control of the Company and a Rule 14f-1 Information Statement (the "**14f Filing**"). In addition, those directors and officers or other insiders or Affiliates who will no longer have such status as a result of this Agreement and the contemplated transactions, shall file final Form 4's with the SEC within two (2) days following the effective date of the 14f Filing as to all current directors.

(e)     The Parties shall mutually agree upon and, as promptly as practicable after the Closing Date, file an information statement on a Schedule 14C with the SEC reporting a name change and mail such Schedule 14C to the shareholders of the Purchaser (the "**Schedule 14C**").

(f)     In connection with the preparation of the Signing Press Release, the Super 8-K, the Closing Filing, the Closing Press Release, the 14f Filing, the Schedule 14C or any other report, statement, filing notice or application made by or on behalf of a Party to any Governmental Authority or other third party in connection with the transactions contemplated hereby, each Party shall, upon request by any other Party, furnish the Parties with all information concerning themselves, their respective managers, members, directors, officers and equity holders, and such other matters as may be reasonably necessary or advisable in connection with the transactions contemplated hereby, or any other report, statement, filing, notice or application made by or on behalf of a Party to any third party and/ or any Governmental Authority in connection with the transactions contemplated hereby.

(g)     Purchaser shall be solely responsible for the costs and expenses relating to the Signing Press Release, the Super 8-K, the Closing Press Release, the Closing Filing, the 14f Filing, the

Schedule 14C and related documents, instruments or filings. Purchaser shall be responsible for any Form 10-K filing, and any related documents, instruments or filings due to be filed with the SEC on or before the Closing Date.

      6.7   <u>Confidential Information</u>. The Parties hereby agree that in the event this Agreement is terminated in accordance with Section 9.1, for a period of two (2) years after such termination, they shall, and shall cause their Representatives to: (i) treat and hold in strict confidence any Confidential Information, and will not use for any purpose (except in connection with the consummation of the transactions contemplated by this Agreement or the Ancillary Documents, performing their obligations hereunder or thereunder, enforcing their rights hereunder or thereunder), nor directly or indirectly disclose, distribute, publish, disseminate or otherwise make available to any third party any of the Confidential Information without the other Party's prior written consent; and (ii) in the event that either Party or its Affiliates or Representatives, in the event this Agreement is terminated in accordance with Section 9.1, for a period of two (2) years after such termination, becomes legally compelled to disclose any Confidential Information, (A) provide the other Party with prompt written notice of such requirement so that that Party or an Affiliate thereof may seek a protective Order or other remedy or waive compliance with this <u>Section 6.7</u>, and (B) in the event that such protective Order or other remedy is not obtained, or the relevant Party waives compliance with this <u>Section 6.7</u>, furnish only that portion of such Confidential Information which is legally required to be provided as advised in writing by outside counsel and to exercise its commercially reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information. In the event that this Agreement is terminated and the transactions contemplated hereby are not consummated, the Parties shall, and shall cause their Affiliates and Representatives to, promptly deliver to the other Party any and all copies (in whatever form or medium) of Confidential Information and destroy all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon.

**ARTICLE VII**
**<u>SURVIVAL AND INDEMNIFICATION</u>**

      7.1   <u>Survival</u>.

      (a)   All representations and warranties of the Purchaser contained in this Agreement (including all schedules and exhibits hereto and all certificates, documents, instruments and undertakings furnished pursuant to this Agreement) shall survive the Closing through and until and including June 27, 2020. All covenants, obligations and agreements of the Purchaser contained in this Agreement (including all schedules and exhibits hereto and all certificates, documents, instruments and undertakings furnished by the Purchaser pursuant to this Agreement), including any indemnification obligations, shall survive the Closing and continue until fully performed in accordance with their terms.

      (b)   The representations and warranties of the Company contained in this Agreement or in any certificate or instrument delivered by or on behalf of Company pursuant to this Agreement shall not survive the Closing, and from and after the Closing, the Company shall not have any further obligations, nor shall any claim be asserted or action be brought against the Purchaser. The covenants and agreements made by the Company in this Agreement or in any certificate or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such covenants or agreements, shall not survive the Closing, except for those covenants and agreements contained herein and therein that by their terms apply or are to be performed in whole or in part after the Closing (which such covenants shall survive the Closing and continue until fully performed in accordance with their terms).

**ARTICLE VIII**
**<u>CLOSING CONDITIONS</u>**

14

8.1     Conditions to Obligations of the Company.    The obligations of the Company to consummate the Contribution and the other transactions contemplated by this Agreement are subject to the satisfaction or written waiver (by the Company) of the following conditions:

(a)     *Representations and Warranties*.  All of the representations and warranties of the Purchaser set forth in this Agreement and in any certificate delivered by the Purchaser pursuant hereto shall be true and correct on and as of the date of this Agreement and on and as of the Closing Date as if made on the Closing Date, except for (i) those representations and warranties that address matters only as of a particular date (which representations and warranties shall have been accurate as of such date), and (ii) any failures to be true and correct that (without giving effect to any qualifications or limitations as to materiality or Material Adverse Effect), individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on, or with respect to, the Purchaser.

(b)     *Agreements and Covenants*.  The Purchaser shall have performed in all material respects all of the Purchaser's obligations and complied in all material respects with all of the Purchaser's agreements and covenants under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)     *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred with respect to the Purchaser since the date of this Agreement which is continuing and uncured.

(d)     *Closing Deliveries.*

(i)     OFFICER CERTIFICATE.  The Purchaser shall have delivered to the Company a certificate, dated the Closing Date, signed by an executive officer of the Purchaser in such capacity, certifying as to the satisfaction of the conditions specified in Sections 8.1(a), 8.1(b) and 8.1(c).

(ii)     SECRETARY CERTIFICATE.  The Purchaser shall have delivered to the Company a certificate from its secretary or other executive officer certifying as to, and attaching, (A) copies of the Purchaser's Organizational Documents as in effect as of the Closing Date (immediately prior to giving effect to the Conversion), (B) the resolutions of the Purchaser's board of directors authorizing the execution, delivery and performance of this Agreement and each of the Ancillary Documents to which it is a party or by which it is bound, and the consummation of the transactions contemplated hereby and thereby, and (C) the incumbency of officers authorized to execute this Agreement or any Ancillary Document to which the Purchaser is or is required to be a party or otherwise bound.

(iii)     GOOD STANDING.  The Purchaser shall have delivered to the Company a good standing certificate (or similar documents applicable for such jurisdictions) for the Purchaser certified as of a date no later than thirty (30) days prior to the Closing Date from the proper Governmental Authority of the Purchaser's jurisdiction of organization and from each other jurisdiction in which the Purchaser is qualified to do business as a foreign entity as of the Closing, in each case to the extent that good standing certificates or similar documents are generally available in such jurisdictions.

(iv)     RESIGNATIONS AND ELECTIONS. The Purchaser shall have obtained and deliver to the Company at or prior to the Closing the resignation of each officer of the Purchaser and the board resolutions of the Purchaser appointing, effective at Closing, Joe Page as Chief Technical Officer and Chairman, Gert Funk as Chief Executive Officer and Bennett Yankowitz as Chief Financial Officer, and the elections (subject to requirements of Rule 14f-1 of the Exchange Act) of Joe Page and Gert Funk as additional directors of the Purchaser .

8.2     Conditions to Obligations of the Purchaser.     The obligations of the Purchaser to consummate the Contribution and the other transactions contemplated by this Agreement are subject to the satisfaction or written waiver (by the Purchaser) of the following conditions:

(a)     *Representations and Warranties*.  All of the representations and warranties of the Company set forth in this Agreement and in any certificate delivered by the Company, shall be true and correct on and as of the date of this Agreement and on and as of the Closing Date as if made on the Closing Date, except for (i) those representations and warranties that address matters only as of a particular date (which representations and warranties shall have been accurate as of such date), and (ii) any failures to be true and correct that (without giving effect to any qualifications or limitations as to materiality or Material Adverse Effect), individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on, or with respect to, the Company.

(b)     *Agreements and Covenants*.  The Company shall have performed in all material respects all of its obligations and complied in all material respects with all of its agreements and covenants under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)     *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred with respect to the Company since the date of this Agreement which is continuing and uncured.

(d)     Closing Deliveries.

(i)     OFFICER CERTIFICATE.  The Purchaser shall have received a certificate from the Company, dated as the Closing Date, signed by an executive officer of the Company in such capacity, certifying as to the satisfaction of the conditions specified in Sections 8.2(a), 1.1(b) and 1.1(c).

(ii)     SECRETARY CERTIFICATE.  The Company shall have delivered to the Purchaser a certificate executed by the Company's secretary certifying as to the validity and effectiveness of, and attaching, (A) copies of the Company's Organizational Documents as in effect as of the Closing Date (immediately prior to the Closing), and (B) the incumbency of officers of the Company authorized to execute this Agreement or any Ancillary Document to which the Company is or is required to be a party or otherwise bound.

8.3     Frustration of Conditions.  Notwithstanding anything contained herein to the contrary, no Party may rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure was caused by the failure of such Party or its Affiliates (or with respect to the Company, the Company or Seller) failure to comply with or perform any of its covenants or obligations set forth in this Agreement.

## ARTICLE IX
## TERMINATION AND EXPENSES

9.1     Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as follows:

(a)     by mutual written consent of the Purchaser and the Company;

(b)     by written notice by the Purchaser or the Company if any of the conditions to the Closing set forth in Article VIII have not been satisfied or waived by August 1, 2018 (the "***Outside Date***"); provided, however, the right to terminate this Agreement under this Section 9.1(b) shall not be available to a Party if the breach or violation by such Party or its Affiliates of any representation, warranty,

covenant or obligation under this Agreement was the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

(c)     by written notice by either the Purchaser or the Company if a Governmental Authority of competent jurisdiction shall have issued an Order or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such Order or other action has become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(c) shall not be available to a Party if the failure by such Party or its Affiliates to comply with any provision of this Agreement has been a substantial cause of, or substantially resulted in, such action by such Governmental Authority;

(d)     by written notice by the Company, if (i) there has been a material breach by the Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, or if any representation or warranty of the Purchaser shall have become materially untrue or materially inaccurate, in any case, which would result in a failure of a condition set forth in Section 8.1(a) or Section 8.1(b) to be satisfied (treating the Closing Date for such purposes as the date of this Agreement or, if later, the date of such breach), and (ii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of (A) twenty (20) days after written notice of such breach or inaccuracy is provided by the Company or (B) the Outside Date;

(e)     by written notice by the Purchaser, if (i) there has been a breach by the Company of any of its representations, warranties, covenants or agreements contained in this Agreement, or if any representation or warranty of such Parties shall have become untrue or inaccurate, in any case, which would result in a failure of a condition set forth in Section 8.2(a) to be satisfied (treating the Closing Date for such purposes as the date of this Agreement or, if later, the date of such breach), and (ii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of (A) twenty (20) days after written notice of such breach or inaccuracy is provided by the Purchaser or (B) the Outside Date;

(f)     by written notice by the Purchaser, if there shall have been a Material Adverse Effect on the Company or its Subsidiaries following the date of this Agreement which is uncured and continuing; or

(g)     by written notice by the Purchaser to the Company if (i) the Company shall not have delivered to the Purchaser on or prior to August 14, 2018 the PCAOB Audited Financials, or (ii) if the PCAOB Audited Financials are substantially different from the Audited Company Financials in an adverse manner, including any of the consolidated revenues, net income or assets being at least five percent (5%) less than the amounts set forth in the Audited Company Financials or the consolidated liabilities being at least five percent (5%) greater than the amounts set forth in the Audited Company Financials.

9.2     Effect of Termination. This Agreement may only be terminated in the circumstances described in Section 9.1 and pursuant to a written notice delivered by the applicable Party to the other applicable Parties, which sets forth the basis for such termination, including the provision of Section 9.1 under which such termination is made.  In the event of the valid termination of this Agreement pursuant to Section 9.1, (i) this Agreement shall forthwith become void, , and (ii) there shall be no Liability on the part of any Party or any of their respective Representatives, and all rights and obligations of each Party shall cease, except: (x) Section 9.3, Article X, Article XI and this Section 9.2 shall survive the termination of this Agreement, and (y) nothing herein shall relieve any Party from Liability for any willful breach of any representation, warranty, covenant or obligation under this Agreement or any Fraud Claim against such Party, in either case, prior to termination of this Agreement.

9.3     Fees and Expenses.  Except as provided otherwise in this Agreement, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.  As used in this Agreement, "*Expenses*" shall include all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, financial advisors, financing sources, experts and consultants to a Party hereto or any of its Affiliates) incurred by a Party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution or performance of this Agreement or any Ancillary Document related hereto and all other matters related to the consummation of this Agreement.

**ARTICLE X**
**OTHER AGREEMENT OF THE PARTIES**

10.1 Piggy-Back Registration Rights.

(a)     If the Company proposes to register any of the Purchaser Common Stock after the first anniversary of the Closing Date, but prior to the third anniversary of the Closing Date, it will give prompt written notice to PacificWave Partners and Bennett Yankowitz of its intention to effect such registration (the "*Incidental Registration*"). Within five (5) Business Days of receiving such written notice of an Incidental Registration, Sellers, PacificWave Partners or its Affiliates, or Bennett Yankowitz (the "*Piggy-Back Parties*") may each make a written request (the "*Piggy-Back Request*") that the Company include in the proposed Incidental Registration all, or a portion, of the Registrable Shares owned by such Piggy-Back Party (which Piggy-Back Request shall set forth the number of Registrable Shares intended to be disposed of by the Piggy-Back Party and the intended method of disposition thereof). For the purposes of Section 10.1 "*Registrable Shares*" shall mean the Purchaser Common Stock held by any of the Piggy-Back Parties at Closing; provided that any particular securities of such Registrable Shares shall cease to be Registrable Shares when (i) any registration statement of the Company that covers the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such registration statement, (ii) such securities shall have become eligible to be sold to the public by the Purchaser pursuant to Rule 144 under the Securities Act, or (iii) subsequent disposition of such securities shall not require registration or qualification of them under the Securities Act or of any similar state law then in force.

(b)     The Company will use its commercially reasonable efforts to include in any Incidental Registration all Registrable Shares which the Company has been requested to register pursuant to any timely Piggy-Back Request, to the extent required to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Shares so to be registered. If the Registrable Shares are not included in an Incidental Registration by the 90th calendar day after the Closing Date, then the Company shall immediately prepare and file a registration statement on such form as may be required covering the Registrable Shares.

(c)     Notwithstanding the preceding Sections 10.1(a) and 10.1(b): (i) the Company shall not be obligated pursuant to this Section 10.1 to effect a registration of Registrable Shares requested pursuant to a timely Piggy-Back Request if the Company discontinues the related Incidental Registration at any time prior to the effective date of any registration statement filed in connection therewith; (ii) if a registration pursuant to this Section 10.1 involves an underwritten offering, and the managing underwriter (or, in the case of an offering that is not underwritten, an investment banker) shall advise the Company that, in its opinion, the number of securities requested and otherwise proposed to be included in such registration exceeds the number which can be sold in such offering without adversely affecting the marketability of the offering, the Company will include in such registration the number which the Company is so advised can be sold in such offering in the following order: first, the securities the Company proposes to sell for its own account in such registration, second, the Registrable Shares of the Piggy-Back Party requesting to be

18

included in such Registration, through a timely Piggy-Back Request, and, third, all other securities requested to be included in such registration on a pro rata basis; and (iii) if the Company is engaged in, or has definitive plans to engage in, any activity or negotiations that, in the good faith determination of the managers of the Company, would be adversely affected by disclosure that would be required in connection with a registration to the material detriment of the Company, then the Company may delay such registration for a period of 20 days from the date of termination or disclosure of such activity or negotiations.

## ARTICLE XI
## MISCELLANEOUS

11.1 <u>Notices</u>.  All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered (i) in person, (ii) by facsimile or other electronic means, with affirmative confirmation of receipt, (iii) one Business Day after being sent, if sent by reputable, nationally recognized overnight courier service or (iv) three (3) Business Days after being mailed, if sent by registered or certified mail, pre-paid and return receipt requested, in each case to the applicable Party at the following addresses (or at such other address for a Party as shall be specified by like notice):

| | |
|---|---|
| *If to the Purchaser, to* | B4MC Gold Mines, Inc.<br>c/o Bennett J. Yankowitz<br>3651 Lindell Road, Suite D565<br>Las Vegas, NV 89103<br>bjy@yankowitzlaw.com |
| *If to the Company, to:* | Henrik Rouf<br>c/o PacificWave Partners<br>468 N. Camden Dr., Suite 350<br>Beverly Hills, CA 90210<br>hrouf@pacificwavepartners.com |

11.2 <u>Binding Effect; Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. This Agreement shall not be assigned by operation of Law or otherwise without the prior written consent of the Purchaser and the Company and any assignment without such consent shall be null and void; <u>provided</u> that no such assignment shall relieve the assigning Party of its obligations hereunder.

11.3 <u>Third Parties</u>. Nothing contained in this Agreement or in any instrument or document executed by any party in connection with the transactions contemplated hereby shall create any rights in, or be deemed to have been executed for the benefit of, any Person that is not a Party hereto or thereto or a successor or permitted assign of such a Party.

11.4 <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by, construed and enforced in accordance with the Laws of the State of Nevada without regard to the conflict of laws principles thereof.  All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any state or federal court located in Las Vegas, Nevada (or in any appellate court thereof) (the "**Specified Courts**").  Each Party hereto hereby (a) submits to the exclusive jurisdiction of any Specified Court for the purpose of any Action arising out of or relating to this Agreement brought by any Party hereto and (b) irrevocably waives, and agrees not to assert by way of motion, defense or

otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any Specified Court. Each Party agrees that a final judgment in any Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably consents to the service of the summons and complaint and any other process in any other Action relating to the transactions contemplated by this Agreement, on behalf of itself, or its property, by personal delivery of copies of such process to such Party at the applicable address set forth in <u>Section 11.1</u>. Nothing in this <u>Section 11.4</u> shall affect the right of any Party to serve legal process in any other manner permitted by Law.

11.5 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.5</u>.

11.6 <u>Specific Performance</u>. Each Party acknowledges that the rights of each Party to consummate the transactions contemplated hereby are unique, recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Parties may have not adequate remedy at law, and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by an applicable Party in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such Party may be entitled under this Agreement, at law or in equity.

11.7 <u>Severability</u>. In case any provision in this Agreement shall be held invalid, illegal or unenforceable in a jurisdiction, such provision shall be modified or deleted, as to the jurisdiction involved, only to the extent necessary to render the same valid, legal and enforceable, and the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby nor shall the validity, legality or enforceability of such provision be affected thereby in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will substitute for any invalid, illegal or unenforceable provision a suitable and equitable provision that carries out, so far as may be valid, legal and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

11.8 <u>Amendment</u>. This Agreement may be amended, supplemented or modified only by execution of a written instrument signed by the Purchaser and the Company.

11.9 <u>Waiver</u>. The Purchaser on behalf of itself and its Affiliates, the Company on behalf of itself and its Affiliates, may in its sole discretion (i) extend the time for the performance of any obligation or other act of any other non-Affiliated Party hereto, (ii) waive any inaccuracy in the representations and

warranties by such other non-Affiliated Party contained herein or in any document delivered pursuant hereto and (iii) waive compliance by such other non-Affiliated Party with any covenant or condition contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party or Parties to be bound thereby.  Notwithstanding the foregoing, no failure or delay by a Party in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

11.10   <u>Entire Agreement</u>. This Agreement and the documents or instruments referred to herein, including any exhibits and schedules attached hereto, which exhibits and schedules are incorporated herein by reference, together with the Ancillary Documents, embody the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or the documents or instruments referred to herein, which collectively supersede all prior agreements and the understandings among the Parties with respect to the subject matter contained herein.

11.11   <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

11.12   <u>Power of Attorney</u>. The Sellers, each and individually, irrevocably and severally appoint Henrik Rouf to be their attorney in fact and to take any action which the Sellers are obliged to take under this Agreement. The Sellers hereby ratify and confirm whatever their attorney in fact does or purports to do pursuant to its appointment under this <u>Section 11.12</u>.

**ARTICLE XII**
**DEFINITIONS**

12.1 <u>Certain Definitions</u>. For purpose of this Agreement, the following capitalized terms have the following meanings:

"***Accounting Principles***" means in accordance with GAAP as in effect at the date of the financial statement to which it refers or if there is no such financial statement, then as of the Closing Date, using and applying the same accounting principles, practices, procedures, policies and methods (with consistent classifications, judgments, elections, inclusions, exclusions and valuation and estimation methodologies) used and applied by the Company in the preparation of the latest audited Financial Statements.  In any event, the Accounting Principles (i) shall not include any purchase accounting or other adjustment arising out of the consummation of the transactions contemplated by this Agreement, (ii) shall be based on facts and circumstances as they exist at or prior to the Closing and shall exclude the effect of any act, decision or event occurring after the Closing and (iii) shall follow the defined terms contained in this Agreement.

"***Action***" means any notice of noncompliance or violation, or any claim, demand, charge, action, suit, litigation, audit, settlement, complaint, stipulation, assessment or arbitration, or any request (including any request for information), inquiry, hearing, proceeding or investigation, by or before any Governmental Authority.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"*Ancillary Documents*" means each agreement, instrument or document attached hereto as an Exhibit, and the other agreements, certificates and instruments to be executed or delivered by any of the Parties hereto in connection with or pursuant to this Agreement.

"*Assignment and Assumption Agreement*" means the (i) Assignment and Assumption Agreement relating to the Company between Purchaser and the Sellers substantially in the form of <u>Exhibit A</u>".

"*Benefit Plans*" of any Person means any and all deferred compensation, executive compensation, incentive compensation, equity purchase or other equity-based compensation plan, employment or consulting, severance or termination pay, holiday, vacation or other bonus plan or practice, hospitalization or other medical, life or other insurance, supplemental unemployment benefits, profit sharing, pension, or retirement plan, program, agreement, commitment or arrangement, and each other employee benefit plan, program, agreement or arrangement, including each "employee benefit plan" as such term is defined under Section 3(3) of ERISA, maintained or contributed to or required to be contributed to by a Person for the benefit of any employee or terminated employee of such Person, or with respect to which such Person has any Liability, whether direct or indirect, actual or contingent, whether formal or informal, and whether legally binding or not.

"*Business Day*" means any day other than a Saturday, Sunday or a legal holiday on which commercial banking institutions in New York, New York are authorized to close for business.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto, as amended. Reference to a specific section of the Code shall include such section and any valid treasury regulation promulgated thereunder.

"*Company Charter*" means the Operating Agreement of the Company, as amended.

"*Confidential Information*" means all confidential or proprietary documents and information concerning the either Party or any of its Representatives; <u>provided</u>, <u>however</u>, that the Confidential Information shall not include any information which, (i) at the time of disclosure by the Company or its respective Representatives, is generally available publicly and was not disclosed in breach of this Agreement or (ii) at the time of the disclosure by the Purchaser or its Representatives to the Company or its Representatives, was previously known by such receiving party without violation of Law or any confidentiality obligation by the Person receiving such Purchaser Confidential Information. For the avoidance of doubt, from and after the Closing, Purchaser Confidential Information will include the confidential or

"*Consent*" means any consent, approval, waiver, authorization or Permit of, or notice to or declaration or filing with any Governmental Authority or any other Person.

"*Contracts*" means all contracts, agreements, binding arrangements, bonds, notes, indentures, mortgages, debt instruments, purchase order, licenses (and all other contracts, agreements or binding arrangements concerning Intellectual Property), franchises, leases and other instruments or obligations of any kind, written or oral (including any amendments and other modifications thereto).

"*Control*" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise. "Controlled", "Controlling" and "under common Control with" have correlative meanings. Without limiting the foregoing a Person (the "*Controlled Person*") shall be deemed Controlled by (a) any other Person (the "*10% Owner*") (i) owning beneficially, as meant in Rule

13d-3 under the Exchange Act, securities entitling such Person to cast ten percent (10%) or more of the votes for election of directors or equivalent governing authority of the Controlled Person or (ii) entitled to be allocated or receive ten percent (10%) or more of the profits, losses, or distributions of the Controlled Person; (b) an officer, director, general partner, partner (other than a limited partner), manager, or member (other than a member having no management authority that is not a 10% Owner) of the Controlled Person; or (c) a spouse, parent, lineal descendant, sibling, aunt, uncle, niece, nephew, mother-in-law, father-in-law, sister-in-law, or brother-in-law of an Affiliate of the Controlled Person or a trust for the benefit of an Affiliate of the Controlled Person or of which an Affiliate of the Controlled Person is a trustee.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***FINRA***" means the Financial Industry Regulatory Authority, Inc.

"***Fraud Claim***" means any claim based in whole or in part upon fraud, willful misconduct or intentional misrepresentation.

"***GAAP***" means generally accepted accounting principles as in effect in the United States of America.

"***Governmental Authority***" means any federal, state, local, foreign or other governmental, quasi-governmental or administrative body, instrumentality, department or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"***Indebtedness***" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money (including the outstanding principal and accrued but unpaid interest), (b) obligations for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business), (c) any other indebtedness of such Person that is evidenced by a note, bond, debenture, credit agreement or similar instrument, (d) all obligations of such Person under leases that should be classified as capital leases in accordance with GAAP, (e) all obligations of such Person for the reimbursement of any obligor on any line or letter of credit, banker's acceptance, guarantee or similar credit transaction, in each case, that has been drawn or claimed against, (f) all obligations of such Person in respect of acceptances issued or created, (g) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (h) all obligations secured by an Lien on any property of such Person, (i) any premiums, prepayment fees or other penalties, fees, costs or expenses associated with payment of any Indebtedness of such Person and (j) all obligation described in clauses (a) through (i) above of any other Person which is directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss.

"***Intellectual Property***" means all of the following as they exist in any jurisdiction throughout the world:  patents, trademarks, copyrights, trade secrets, internet assets, software and other intellectual property, and all licenses, sublicenses and other agreements or permissions related to the preceding property.

"***IRS***" means the U.S. Internal Revenue Service (or any successor Governmental Authority).

"**_Knowledge_**" means, with respect to (i) the Company, the actual knowledge of the executive officers or directors of the Company, after due inquiry or (ii) any other Party, the actual knowledge of its directors and executive officers, after due inquiry.

"**_Law_**" means any federal, state, local, municipal, foreign or other law, statute, legislation, principle of common law, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, directive, requirement, writ, injunction, settlement, Order or Consent that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"**_Liabilities_**" means any and all liabilities, Indebtedness, Actions or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, whether direct or indirect, whether matured or unmatured and whether due or to become due), including Tax liabilities due or to become due.

"**_Lien_**" means any mortgage, pledge, security interest, attachment, right of first refusal, option, proxy, voting trust, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), restriction (whether on voting, sale, transfer, disposition or otherwise), any subordination arrangement in favor of another Person, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar Law.

"**_Material Adverse Effect_**" means, with respect to any specified Person, any fact, event, occurrence, change or effect that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect upon (a) the business, assets, Liabilities, results of operations, prospects or condition (financial or otherwise) of such Person and its Subsidiaries, taken as a whole, or (b) the ability of such Person or any of its Subsidiaries on a timely basis to consummate the transactions contemplated by this Agreement or the Ancillary Documents to which it is a party or bound or to perform its obligations hereunder or thereunder; provided, however, that for purposes of clause (a) above, any changes or effects directly or indirectly attributable to, resulting from, relating to or arising out of the following (by themselves or when aggregated with any other, changes or effects) shall not be deemed to be, constitute, or be taken into account when determining whether there has or may, would or could have occurred a Material Adverse Effect: (i) general changes in the financial or securities markets or general economic or political conditions in the country or region in which such Person or any of its Subsidiaries do business; (ii) changes, conditions or effects that generally affect the industries in which such Person or any of its Subsidiaries principally operate; (iii) changes in GAAP or other applicable accounting principles or mandatory changes in the regulatory accounting requirements applicable to any industry in which such Person and its Subsidiaries principally operate; (iv) conditions caused by acts of God, terrorism, war (whether or not declared) or natural disaster; (v) any failure in and of itself by such Person and its Subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (provided that the underlying cause of any such failure may be considered in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent not excluded by another exception herein) and (vi), with respect to the Purchaser, the consummation and effects of the Redemption; provided further, however, that any event, occurrence, fact, condition, or change referred to in clauses (i) - (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition, or change has a disproportionate effect on such Person or any of its Subsidiaries compared to other participants in the industries in which such Person or any of its Subsidiaries primarily conducts its businesses.

"**Order**" means any order, decree, ruling, judgment, injunction, writ, determination, binding decision, verdict, judicial award or other action that is or has been made, entered, rendered, or otherwise put into effect by or under the authority of any Governmental Authority.

"**Organizational Documents**" means, with respect to any Person that is an entity, its certificate of incorporation or formation, bylaws, operating agreement or similar organizational documents, in each case, as amended.

"**PCAOB**" means the U.S. Public Company Accounting Oversight Board (or any successor thereto).

"**Permits**" means all federal, state, local or foreign or other third-party permits, grants, easements, consents, approvals, authorizations, exemptions, licenses, franchises, concessions, ratifications, permissions, clearances, confirmations, endorsements, waivers, certifications, designations, ratings, registrations, qualifications or orders of any Governmental Authority or any other Person.

"**Permitted Liens**" means (a) Liens for Taxes or assessments and similar governmental charges or levies, which either are (i) not delinquent or (ii) being contested in good faith and by appropriate proceedings, and adequate reserves have been established with respect thereto, (b) other Liens imposed by operation of Law arising in the ordinary course of business for amounts which are not due and payable and as would not in the aggregate materially adversely affect the value of, or materially adversely interfere with the use of, the property subject thereto, (c) Liens incurred or deposits made in the ordinary course of business in connection with social security, (d) Liens on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the ordinary course of business, or (v) Liens arising under this Agreement or any Ancillary Document.

"**Person**" means an individual, corporation, partnership (including a general partnership, limited partnership or limited liability partnership), limited liability company, association, trust or other entity or organization, including a government, domestic or foreign, or political subdivision thereof, or an agency or instrumentality thereof.

"**Personal Property**" means any machinery, equipment, tools, vehicles, furniture, leasehold improvements, office equipment, plant, parts and other tangible personal property.

"**Purchaser Charter**" means the certificate of incorporation of the Purchaser, as amended and effective under Chapter 78 of the Nevada Revised Statutes

"**Purchaser Common Stock**" means the shares of common stock, par value $0.001 per share, of the Purchaser.

"**Representatives**" means, as to any Person, such Person's Affiliates and the respective managers, directors, officers, employees, independent contractors, consultants, advisors (including financial advisors, counsel and accountants), agents and other legal representatives of such Person or its Affiliates.

"**SEC**" means the Securities and Exchange Commission (or any successor Governmental Authority).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons will be allocated a majority of partnership, association or other business entity gains or losses or will be or control the managing director, managing member, general partner or other managing Person of such partnership, association or other business entity.  A Subsidiary of a Person will also include any variable interest entity which is consolidated with such Person under applicable accounting rules.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Taxes or the administration of any Laws or administrative requirements relating to any Taxes.

"**Taxes**" means (a) all direct or indirect federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value-added, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, social security and related contributions due in relation to the payment of compensation to employees, excise, severance, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (b) any Liability for payment of amounts described in clause (a) whether as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law and (c) any Liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax group, tax indemnity or tax allocation agreement with, or any other express or implied agreement to indemnify, any other Person.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

Bennett J. Yankowitz, President and Sole Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____

Name: Gert Funk
Title: President

*The Sellers*:

Gert Funk

Joseph Page

**PacificWave Partners Limited**

By: _____

Name: Henrik Rouf
Title: Managing Director

**Execution Version**

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

Bennett J. Yankowitz, President and Sole Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____

Name: Gert Funk
Title: President

*The Sellers*:

_____

Gert Funk

_____

Joseph Page

**PacificWave Partners Limited**

By: _____

Name: Henrik Rouf
Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____

Name: Henrik Oerbekker
Title:  Managing Director

**Saxton Capital Ltd.**

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____
    Bennett J. Yankowitz, President and Sole
    Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____
    Name: Gert Funk
    Title: President

*The Sellers*:


_____
Gert Funk


_____
Joseph Page

**PacificWave Partners Limited**

By: _____
    Name: Henrik Rouf
    Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____
    Name: Henrik Oerbekker
    Title:  Managing Director

**Saxton Capital Ltd.**

By: _____
    Name: John Moerk
    Title: Director

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

Bennett J. Yankowitz, President and Sole Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____

Name: Gert Funk
Title: President

*The Sellers*:

_____
Gert Funk

_____
Joseph Page

**PacificWave Partners Limited**

By: _____
Name: Henrik Rouf
Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____
Name: Henrik Oerbekker
Title: Managing Director

**Saxton Capital Ltd.**

By: _____
Name: John Moerk
Title: Director